# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| KYLE CANNON, EUGENE DONOVAN, GENARO RAMIREZ, CAROL SASSER, and HARVEY WALTON each Individually and on behalf of those similarly situated<br><br>Plaintiffs,<br><br>Vs.<br><br>BP PRODUCTS NORTH AMERICA, INC.<br><br>Defendant. | § § § § § § § § § § § § § § § | Case No. 3:10-CV-00622<br><br><br><br><br><br><br>CLASS ACTION PURSUANT TO FED. R. CIV. P. 23 |

### EXPERT REPORT OF ROBERT A. SIMONS, Ph.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, Robert A. Simons, declare as follows to a reasonable degree of scientific certainty:

1.    My name is Robert A. Simons, and I have personal knowledge about matters in this expert report because of my academic qualifications and my knowledge and experience described below.  I make this expert report in support of the Plaintiffs' motion for class certification concerning economic damages on real property in this case.

2.    I have a Ph.D. in City and Regional Planning, a Master's degree in Economics, and a second Master's degree in City and Regional Planning, all from the University of North Carolina at Chapel Hill.  I also have a Bachelor of Arts degree in Anthropology from Colorado State University.  I have published over 40 articles in peer-reviewed journals. Of these, over half pertain to environmental damages or contaminated land redevelopment.  I have also published a book on redevelopment of contaminated lands (brownfields) and another on quantifying the effect of environmental contamination on property values.  A copy of my curriculum vitae summarizing my qualifications is appended to this affidavit as Exhibit 1 and incorporated herein.  This also contains the articles I have authored in the past several years, as well as my expert witness assignments.

3.    I am a Professor of Urban Planning and Real Estate Development in the Maxine Goodman Levin College of Urban Affairs at Cleveland State University ("CSU") in Cleveland, Ohio.  At CSU, I teach graduate classes in real estate market analysis and finance, public finance and budgeting, urban planning, Ph.D. research methods, and environmental finance.  For several years I was also the director of the Master's degree

1

program in Urban Planning, Design and Development, and director of the Master of Arts in Environmental Studies program. I am also the Coordinator of the graduate certificate program in Urban Real Estate Development and Finance. I have been a Fulbright Scholar, and have taught and conducted research on contaminated land issues in other countries on several occasions.

## OVERVIEW

4.    I have been retained by Plaintiffs' counsel in this case. My hourly rate is $425, plus expenses. I have reviewed various publicly available materials concerning this case, and items related to the real estate market in Texas City and La Marque, Galveston County, Texas. Attached as Exhibit 2 is a list of materials I reviewed in connection with this engagement prior to preparing and signing this report.

5.    I have been asked by Plaintiffs' counsel to opine upon various issues including class certification and diminution in value, if any, to real property in portions of Texas City and La Marque, Texas (ZIP Codes 77568, 77590 and 77591), due to emissions and related long-term stigma, resulting from multiple releases of harmful chemicals and particulates during the period beginning December 22, 2008, from the Texas City refinery ("BP Refinery") owned and operated by Defendant BP Products North America, Inc.

6.    The homes in the Texas City and La Marque neighborhoods affected by the airborne chemical releases from the BP Refinery are primarily ranch style houses, with some newer, two-story colonial designs. While some homes date from earlier periods and others have been built more recently, most appear to have been constructed from 40 to 60 years ago. It is my understanding that all of the homes are on municipal water for indoor (drinking, bathing, cooking, etc.) and outdoor (irrigation) use.

7.    My opinion at this point addresses class certification and the property value aspect of this case. I am aware that in some cases in other U.S. states damages have been awarded for restoration costs, as opposed to solely for diminution of property value. If this situation pertains to this case, I would be prepared to compare other experts' remediation cost estimates with property valuation damages to determine the impact of these factors.

## SUMMARY OF MY OPINION

8.    Theory and empirical evidence from peer-reviewed published literature indicate that real property would be negatively affected by airborne chemical releases from nearby industrial facilities. There are at least two case studies involving circumstances similar to those of this case. In addition, any deposition of contaminants on Plaintiffs' property that would have to be disclosed to potential buyers would also negatively affect property values.

9.    Identification and quantification of these types of negative impact can readily be determined through a combination of well-established, scientifically accepted, real estate

2

analytical techniques including evaluation of similar peer-reviewed literature, hedonic regression analysis, real estate trends analysis, sale-resale analysis, and contingent valuation analysis. These methodologies are generally accepted in the peer-reviewed literature, cover the population or have a known error rate, and can be applied in a formulaic manner for all residential properties in the proposed class for this case, which face common circumstances relating to airborne chemical releases from the BP Refinery. These are primary techniques that I will use to provide the percentage reduction in real property value attributable to the airborne chemical releases from the BP Refinery. I also plan to use several corroborative techniques, including transaction rates analysis, list/sale price analysis, days-on-market analysis, and a survey of potential class member plaintiffs in this case. None of these methodologies depend on how the owners use their property. The techniques I describe below are well accepted in the peer-reviewed literature. I have personally conducted research of this type and have had several articles on environmental damages published in the peer-reviewed literature.

10. My opinion, based on my academic and professional background, research in this case, and knowledge of other similar cases, is that the proposed class members in this case are commonly affected by airborne chemical releases from the BP Refinery. All have suffered property damages resulting from those airborne chemical releases. It seems reasonable that all homeowners in the class would be obliged to disclose to potential buyers the history, and the anticipation of future recurrence, of airborne chemical releases from the BP Refinery, in response to item 6 of the Texas Seller's Disclosure of Property Condition, as creating a "condition on the Property which materially affects the physical health or safety of an individual" (see Exhibit 5; Texas Real Estate Commission 2011). This disclosure requirement would create the probability of a diminution in property value, due to the uncertainty and risk associated with those airborne chemical releases upon the Texas City/La Marque neighborhood.

11. My opinion at this time is that according to a more narrow definition and scientifically-based of the class based on air modeling provided by independent environmental consultants Soil /Water /Air Protection Enterprise ("SWAPE") of Santa Monica, California, there are approximately 14,300 residential parcels in an area delineated as the "10th Highest 1-Hour Concentration of $SO_2$ Based on 2009 and 2010 Emissions from BP Texas City Refinery" ("SWAPE Boundary") within the proposed class for this case.[1] These SWAPE-Boundary parcels represent 77.1% of all residential parcels within the combined proposed class (ZIP Codes 77568, 77590 and 77591) and 92% of those homes in ZIP code 77590. According to data downloaded from the Galveston Central Appraisal District website, these residential class properties had an aggregate market value of approximately $1.0 billion as of January 1, 2011. Based on information available at this time, it is my opinion that the permanent economic losses to all residential class properties, resulting from airborne chemical releases at the BP Refinery, likely range between 5% and 20% (or more) of property value. Aggregate value losses have also accrued to owners of residential property in the 77590, 77591 and 77568 ZIP Codes. I reserve the right to update my opinion when new information becomes available.

---

[1] The great majority of these parcels contain single family detached homes.

3

12.   My opinion at this time is that the proposed class for this case also includes commercial property (including retail, office, institutional, not for profit, and other property) that have been affected by the air pollution from the BP Refinery. Using techniques similar to those demonstrated below in the residential analysis, we have preliminarily identified 6,778 parcels with an aggregate value of $586.2 million as of January 2011. We plan to determine the unimpaired market value as per the appropriate date on or after December 22, 2008, as a supplemental report to this class certification report or at the merits stage of this case. These properties have also sustained economic damages in the form of permanently reduced property values. Because of the many commonalities, the damages to property in this case can be handled as a class, in a formulaic approach, and generally accepted methodologies and data are available to perform this analysis. I reserve the right to update my opinion when new information becomes available.

13.   This analysis assumes that the residential units are considered to be safe for human habitation by Galveston County Health District officials or other scientific experts. Because of the many commonalities, the damages to property in this case can be analyzed as a class, using a formulaic approach, and generally accepted methodologies and data are available to perform this analysis. I reserve the right to update my opinion when new or additional information becomes available.

## FIELD TRIP AND REVIEW OF THE FACTS OF THIS CASE

14.   Based in part on my review of the original Plaintiffs' Original Class Action Complaint and other documents in this case, I believe that intermittent airborne chemical releases from the BP Refinery continue to degrade the quality and value of homes in the Texas City and La Marque communities, both within the SWAPE Boundary (an area with distances varying from approximately 1.5 to 3.5 miles from the borders of the BP Refinery property) and in the aggregate throughout the proposed class area (ZIP Codes 77568, 77590 and 77591). Exhibit 3 contains a depiction of both the SWAPE Boundary area and the larger proposed class area (ZIP Codes 77568, 77590 and 77591) for this case.

15.   I have reviewed summaries of laboratory analyses of dust samples collected by SWAPE in October 2010 at 20 locations in Texas City and La Marque, as well as maps depicting the extent of airborne chemical releases from the BP Refinery, which were generated by SWAPE's computer modeling program. I have also reviewed data and charts depicting the frequency and scope of airborne chemical releases resulting from flaring practices at the BP Refinery from 2002 through 2010, based on data reported to the National Emissions Inventory and Toxics Release Inventory (Cheremisinoff 2011). The SWAPE Boundary is based on air modeling of the 10th-highest one-hour concentration of sulfur dioxide, attributable to airborne releases from the BP Refinery, based on available data after the December 22, 2008 statutory cutoff for this case. The SWAPE Boundary refines the ZIP Code definition provided at filing of this case. We rely on the SWAPE Boundary definition for our regression analysis, and it is shown in Exhibit 3-1.

4

16. The BP Refinery is the third-largest petroleum refinery in the United States. It is my understanding that the BP Refinery has been found to be one of the largest single sources of pollution in the nation, with a history of inadequate maintenance practices in recent years. A series of fires and explosions in March 2005 killed 15 employees and injured at least 170 people, leading to investigations that resulted in a $21 million fine from the Occupational Safety and Health Administration ("OSHA") and a $50 million fine for violating the Clean Air Act. Defendant's continuing failure to prevent leaks, spills and releases led to an $87 million fine by OSHA in late 2009. Also during 2009, the State of Texas and the Texas Commission on Environmental Quality ("TCEQ") filed suit against Defendant, claiming civil penalties for 68 emissions events and four instances of failing to report flaring events, along with permanent injunctive relief; the suit resulted in a $50 million settlement judgment in 2011.

17. It is my understanding that during the two-year period from December 22, 2008 to December 22, 2010, Defendant reported to TCEQ 77 occasions on which chemical emissions were released from the BP Refinery. This amounts to an average of three releases every month during that period. I understand that at least 12 of those emissions involved the release of more chemicals than its operating permits allowed.

18. On April 6, 2010, a subunit on the BP Refinery's ultracracker went offline. As a result, Defendant sent tons of material to a flare for a 40-day period until the subunit was repaired and brought back online on May 16, 2010. Defendant continued to operate the ultracracker during this period. Defendant has acknowledged releasing 538,000 pounds of chemicals and compounds into the air during this 40-day flaring event. Among other compounds, the release included 17,000 pounds of benzene (a known human carcinogen); 37,500 pounds of nitrogen oxides; 189,000 pounds of carbon monoxide; 61,000 pounds of propane; and 34,600 pounds of isobutene. The benzene release amounts to an average of 425 pounds per day, which I understand to be 40 times the reportable level in Texas.

19. Between May 8, 2009 and August 10, 2010, there were five emission events on the BP Refinery's ultracracker, including the breakdown which led to the 40-day release in April and May of 2010. A Texas state investigator characterized these emission events as indicative of "… a pattern of poor operation and maintenance practices" (Aulds 2010).

20. In 2008, using a computer model developed by the United States Environmental Protection Administration ("USEPA"), *USA Today* investigated the effect of industrial air pollution at schools across the United States. Results of their investigation showed that the air quality at two Texas City schools (Texas City High School and Fry Intermediate School) ranked among the worst 1% in the nation (*USA Today* 2008). Four other Texas City schools experienced air quality among the worst 2%, while the air quality at five more Texas City schools and one La Marque school was among the worst 3% in the nation. The USA Today online database identifies the BP Refinery as the polluter most responsible for air toxicity outside the Texas City and La Marque schools, and identifies the most responsible chemicals as sulfuric acid, polycyclic aromatic compounds, formaldehyde, chlorine, and naphthalene.

5

21. Between the months of July and September 2011, USEPA added the BP Refinery to its "watch list" (Center for Public Integrity and National Public Radio, 2011), which identifies "recidivist and chronically noncomplying facilities …" (Morris et al. 2011). This action is indicative of continuing unsatisfactory process management at the BP Refinery.

22. Based on databases at the National Emissions Inventory and the Toxics Release Inventory, the BP Refinery has in recent years released far more emissions than any of the other 24 refineries in the state of Texas (Cheremisinoff 2011).

23. Accompanied by my senior associate Pitt Curtiss, I conducted a field trip to the Texas City/La Marque area on September 26, 2011. During this visit I drove along the northern perimeter of the BP Refinery; interviewed at their homes the five named plaintiffs who serve as class representatives in this case; and met with plaintiffs' counsel Peter Taaffe of The Buzbee Law Firm, legal assistant Isaac Fanuiel of The Buzbee Law Firm, Paul Rosenfeld, Ph.D. of SWAPE, and local registered real estate appraiser R.C. (Chris) Chuoke. Over the course of several hours I drove through a number of neighborhoods in Texas City and La Marque which lie within the proposed class area as determined by SWAPE from their chemical emissions dispersion models. We took photographs, several of which are included in Exhibit 4 of this expert report.

24. After accompanying me at interviews with two named plaintiffs, Mr. Curtiss spent several hours with Mr. Chuoke, touring neighborhoods in Pasadena, Deer Park and Baytown, Texas and evaluating those neighborhoods for suitability as "control areas" for our analysis of real estate sales. He also took photographs, some of which are included in Exhibit 4. Mr. Curtiss and I discussed his observations. Based on apparent comparability of housing stock to that which we had observed in Texas City and La Marque, and similar proximity to petroleum refineries, I selected several portions of those three communities for use as controls for our real estate sales analyses for this case (see paragraph 67 below).

25. Based upon my observations while driving through Texas City and La Marque, these communities appear to be solidly middle-class to lower-middle class in character. The typical house is a slab-on-grade ranch built during the 1950s or 1960s; most show evidence of care and attention from their owners. I did observe some lower-end homes in close proximity to the BP Refinery. I am also aware, from my review of real estate sales data provided by Mr. Chuoke subsequent to my field visit, that some larger, colonial-style homes have been built in certain areas of Texas City and La Marque during the past 10 to 15 years; some of these homes may be located within the boundaries of the proposed class in this case.

26. During my visit to Texas City, I met with Plaintiff Genaro (Eddie) Ramirez at his home located at 2126 8th Avenue North, about a mile north of the BP Refinery. Mr. Ramirez told me that he and his wife had bought the 1,000-square-foot ranch, which was built in 2002, about five or six years ago for approximately $80,000. He characterized living in a

town with a lot of industry as "OK until about 1-1/2 or 2 years ago." From that point he described problems that developed coincident with flaring practices at the BP Refinery, including feeling "sticky stuff" on his face while outside the home (in April 2010 and again in the early autumn of that year), and the deposition of an oily material on his automobile and the exterior walls of his house. Mr. Ramirez indicated that he filed a claim in response to Defendant's offer to power-wash his house, and received a voucher or payment of $500 for that purpose. I observed some unfinished playground equipment lying outside the home's kitchen patio. Mr. Ramirez explained that he had purchased the equipment to construct a playset for his children (two sons and a daughter, all under 10 years old), but that he had suspended the project in April because he no longer wanted the children to play outdoors. He and his wife pay additional attention to cleaning their children's toys since the effects of the flaring activity have increased. In addition, Mr. Ramirez indicated that the family will stay indoors if they hear the community's flare alarm, if they observe a flare that "lights up the sky," or if their power goes out (which he has correlated to flaring activity at the BP Refinery). Mr. Ramirez also told me that he had recently transferred his homeowners' insurance coverage to a new insurer, after their prior carrier had more than doubled their annual premium. At the close of our conversation, Mr. Ramirez affirmed that in the event he were to put his house up for sale, he would proactively inform any potential buyer of the history of flaring events at the BP Refinery, and of the effects those events had on his family's use and enjoyment of their property. Based upon an exterior-only inspection retrospective residential appraisal performed by Texas state-certified general real estate appraiser Michael Haithcoat, the value of this Plaintiff's home as of December 21, 2008 was $77,000.

27. I next met with Plaintiffs Harvey and Patricia Walton at their home at 903 Ruth Circle in Texas City, about 2-1/2 to 3 miles northwest of the BP Refinery. The Waltons have lived in the 1,960-square-foot home, which they had built for approximately $102,000, for the past 12 years. Mr. and Mrs. Walton and their 16-year-old son, Brandon, have histories of asthma-related problems, and they indicated that their asthmatic episodes have correlated with release events at the BP Refinery over the past couple of years. The Waltons stated that their family's health issues were particularly severe in May and June of 2010. Mr. Walton had to buy an asthma pump after waking up in the middle of the night; they developed allergy-like symptoms which mystified them at the time; and Brandon, who had undergone heart surgery at age 2 but whose condition had been stable from that point, became very ill (puzzling his cardiologists) and ultimately required a heart transplant in December 2010. The Waltons informed me that their home had tested positive during environmental testing in October of 2010. Both Mr. and Mrs. Walton affirmed that they would "definitely" inform any potential buyers of the impact of the chemical release activity from the BP Refinery, in the event they were to offer their house for sale. Based upon an exterior-only inspection retrospective residential appraisal performed by Mr. Haithcoat, the value of this Plaintiff's home as of December 21, 2008 was $125,000.

28. I met with Plaintiff Eugene P. Donovan III and his wife Jan in their home, located at 1219 19th Avenue North, about 1-1/2 to 2 miles from the BP Refinery. The Donovans paid $63,000 in 1993 for their home, which had been built about 20 years previously.

7

Mr. Donovan, who is a retired BP Refinery employee, indicated that "stufff" periodically blows onto his property from events at the BP Refinery and that there was "black stuff" in his yard at the time of our conversation. Their house and car had been pressure-washed in the past to remove airborne deposition of chemical residue from releases at the BP Refinery, but Mr. Donovan was unsure whether that service was still being provided. He added that their house had been tested in October of 2010 and that contamination had been found in the attic insulation. Mrs. Donovan said that she had not gone into the attic since the environmental testing was conducted, as she does not wish to incur the risk of exposure to the chemical contamination; if it were necessary to enter the attic, she would wear a breathing mask. Mr. Donovan stated that, as a former employee at the BP Refinery, he knows that more than half of the employees have sold their Texas City homes and left town, and that the last six employees in his unit had done so. He mentioned that he spends several months each year at Garner State Park near San Antonio, and that while there he does not need allergy medication; however, once he returns to his home in Texas City, he must resume the medication. Mr. Donovan confirmed that he would disclose the contamination to any future potential buyer of their home, as he would not wish for someone to withhold such information from him if the roles were reversed. Based upon an exterior-only inspection retrospective residential appraisal performed by Mr. Haithcoat, the value of this Plaintiff's home as of December 21, 2008 was $105,000.

29. I then met with Plaintiff Carol Sasser at her home, located at 2822 19th Avenue North, approximately 1-1/2 to 2 miles directly north of the BP Refinery. After living in Texas City for 32 years with very few problems or concerns, Ms. Sasser has become very concerned over the recent series of incidents at the BP Refinery. She was greatly upset over the benzene release during the 40-day wait for the ultracracker's replacement part in May and June of 2010, and expressed concern about the long-term effect of the benzene exposure on young children. She added that "the other day" she had opened her front door and was met with a strong odor of gasoline, and that she had noticed a large black cloud over the refinery the previous weekend. Ms. Sasser's perception is that BP is concerned primarily with keeping refinery production at the at maximum level and so pays far less attention to maintenance issues than Amoco had in prior years. She has heard that BP made a number of repairs at the refinery, but questions the Defendant's regard for the concerns of community residents. She commented that whenever she hears the alarm sirens from the BP Refinery, her response is to take cover or drive quickly away from Texas City. She said that "everyone is scared" about the possibility of a serious explosion. Ms. Sasser's home had been tested for contamination in the autumn of 2010, but she did not know the results. Ms. Sasser mentioned that a friend of hers had gotten a job at the BP Refinery and shortly after moved their family to League City; this heightened her concerns about safety, as it indicated to her that the people most aware of circumstances at the BP Refinery do not wish to live anywhere near the facility. Based upon an exterior-only inspection retrospective residential appraisal performed by Mr. Haithcoat, the value of this Plaintiff's home as of December 21, 2008 was $115,000.

30. Finally I met Plaintiff Kyle Cannon and his 8-year-old son Caden at their home, located at 1219 Main Street in La Marque, approximately 2 miles west of the BP Refinery.

I noted a sweet odor in the air as I got out of the car and walked to the Cannons' home. Mr. Cannon has lived in this house for about five years. He works at the Marathon refinery, where he takes health precautions such as wearing respirators and SCUBA gear. At home he does not use such protective measures. Since learning that his house tested positive for chemical contamination, Mr. Cannon prefers not to stay there, choosing instead to stay with his girlfriend, brothers or parents in League City. He has tried to sell his house, or perhaps rent it out, but had no contract as of the date of our conversation. He would disclose the chemical contamination and the pattern of emission events at the BP Refinery to potential buyers or renters, and he indicated that he may have to have the HVAC ducts cleaned. Caden's mother lives near the refineries, and he spends a lot of time there. Mr. Cannon informed me that Caden had visited his doctor's office twice in the prior 45 days, and that both he himself and Caden's mother had made several trips to their physicians since the flaring events at the BP Refinery had become more frequent and severe. Based upon an exterior-only inspection retrospective residential appraisal performed by Mr. Haithcoat, the value of this Plaintiff's home as of December 21, 2008 was $85,000.

## CLASS CERTIFICATION ISSUES

31.    Both economic theory and empirical evidence from peer-reviewed, published literature indicate that the value of real property would be negatively affected by proximity to disamenities of a variety of types. Exposure to heightened air pollution from improperly maintained or operated industrial facilities would generally be acknowledged as such a disamenity, and its presence in a neighborhood can be considered to generate similar types (though not necessarily levels) of market responses as would more geographically concentrated forms of environmental contamination. In light of the historic frequency of airborne chemical releases at the BP Refinery, and particularly so over the past couple of years, it appears that homeowners in the proposed class area for this case would be duty-bound to inform prospective buyers of the emissions patterns at the BP Refinery and of the potential for possible detrimental health effects associated with those airborne releases. This would be the case whether or not the owner's property itself had sustained specific physical damage from the air pollution associated with those chemical emissions, although of course disclosure of such specific physical damage would also be required for properties on which it had occurred. Thus all members of the proposed plaintiff class for this case would likely be required, by conscience if not by state law, to disclose their concerns about the history, and potential for future recurrence, of airborne chemical emissions from the BP Refinery as part of any future sales transaction. Economic theory would predict that such disclosure would lead to a reduction in the number of potential buyers willing to make an offer on the property, a reduction in the purchase price offered by those potential buyers who would make such an offer, or both.

32.    Identification and quantification of these types of negative impact can readily be determined through one or a combination of well-established, scientifically accepted real estate analytical techniques including mass appraisal and/or hedonic regression, real estate trends analysis, sale-resale analysis, and contingent valuation analysis. Because of the many common features concerning the effects of the airborne chemical emissions

from the BP Refinery upon the surrounding neighborhoods in Texas City and La Marque, I believe that the properties can readily be treated as a cohesive group, and thus be analyzed using the same methodology. I believe that sufficient data are available to conduct the analyses to demonstrate the negative effects on residential property values in the proposed class area due to proximity to the BP Refinery and the pattern of airborne chemical releases emanating from it. As of the date of this expert report, we have collected much of that data and await receipt of other data. We have performed sufficient analyses to confirm that the available data will support the analytical techniques which we will employ, but we have not yet completed those analyses. The techniques I describe below are well accepted in the peer-reviewed literature. I have personally conducted research of this type and have had several articles on environmental damages published in the peer-reviewed literature, as well as a recent book on the topic.

33.    In summary, well-accepted formulaic methodologies exist for quantifying the impact of environmental disamenities on classes of property owners within a defined geographic area, such as those portions of Texas City and La Marque within the air pollution zone related to airborne chemical emissions from the BP Refinery, as determined by SWAPE. The appropriate data is available to enable me to apply those methodologies to this case. Furthermore, it is my opinion that the proposed class of Plaintiffs in this case experience similar exposure to and impact from the air pollution emanating from periodic airborne chemical releases at the BP Refinery, similar uncertainties about the future frequency and severity of such airborne chemical releases, similar perception in the eyes of the larger Galveston County and metropolitan Houston community, and similar disclosure obligations when they choose to offer their homes for sale in the future.

## THEORY AND LITERATURE REVIEW

34.    As stated recently in my book (Simons 2006, chapter 3), the separate components that comprise the real estate bundle of rights are the essential building blocks of real property. When you own a piece of real estate (land and building and associated rights), you own not just the property but a bundle of rights related to the property. Randall Bell, in Bell's Guide real estate book (Bell, Bell and Anderson 1999), refers to the bundle of rights as fee simple estate, which includes all the bundle of rights (sell, do nothing, lease, enjoy, bequeath, encumber, use, occupy) subject only to property taxes, zoning and police powers. Hence, if you own all the rights, you have fee simple ownership. The bundle includes the rights to use the property, enjoy the property, control the property, and dispose of the property, all subject to legal parameters. Property includes the surface rights, air rights, and subsurface rights. If any of these rights are abrogated or altered by contamination or other events (such as periodic airborne releases of noxious chemicals) in the surrounding environment, then there is a loss in the property's value because the owner's property rights have been involuntarily reduced.

35.    To use property, the owner can conduct certain activities on the property, subject to legal restrictions such as building codes, zoning and covenants. The owner can decide what purpose to use the property for, such as to occupy it or lease it out; when to change uses, make improvements or modifications; and what not to use it for. Sometimes quiet use is

also required of the occupants, who can then expect their neighbors to also be quiet and not annoy them.

36. "Enjoyment" of property means different things for owner-occupied or investment properties. For an owner-occupant, enjoyment means to take advantage of the housing services generated by the property they live in. This means to have the opportunity to make full use of the land and gardens, warmth and comfort of the building and all its rooms, vegetation, rooftop, clean air, clean groundwater and other property components, in a legal manner. For rental or commercial property, enjoyment means to derive profit from owning real estate, in the form of monthly or annual cash flows. The right to enjoy also includes having the asset appreciate in line with the market.

37. Control of the property is related to being able to use the property how you want to, when you want to, subject to legal restrictions. The right to control property also means being able to exclude others from using it or coming onto it (Kilpatrick 2001). If people enter upon your property without permission, they are trespassing. This is most commonly associated with the surface of the property, but in environmental contamination cases it more typically involves placement of toxic substances in the groundwater under the surface of the property or in the air (from which the toxins may then fall to the grounds of the property in the form of soil contamination, or be breathed by the property's occupants), without the owner's permission. This is commonly called toxic trespass. Another form of loss of control is being unable to refinance a property you own, in order to access capital you have tied up in it. A version of this is where the owner may incur additional costs in order to obtain financing. Cancellation of a homeowner's insurance policy can lead directly to an inability to finance one's property, or lead to increased costs to obtain replacement insurance coverage.

38. Finally, disposal of the property is the right to sell or bequeath the property when you want, at a fair market price. If you cannot sell at a time of your choosing, then this right has been taken away. This means you may not be able to access the equity in your property, and move on to other investments. Alternatively, you may be required to act as a lender and extend financing to a future buyer, rather than cashing out of the property. Real estate appraisers typically focus on sale price (property disposal) as the only indicator of market value, but that assumption is not always true. Focusing on sale price alone often ignores loss of use or loss of control, and in cases where there is limited (or unequal) information about property defects or neighborhood disamenities, sales price may not be a good indicator of what the property's market value would be once complete information was known.

39. The bundle of rights also has a vertical spatial component. Surface rights are the most widely understood, and include the right to use the surface of the property subject to zoning, building codes, covenants, and easements. The real estate bundle of rights is usually thought to apply most directly to the surface of the land. If someone deposits contamination on your soil without your permission, you have lost control of this part of your real estate rights. There are also air rights above your land or building, extending up

11

to the legal building limit or height, and beyond that. Subsurface rights include the water, groundwater, and mineral rights under the property.

40. In the context of the real estate bundle of rights, air pollution or a similar environmental disamenity is a uniformly negative factor. It limits an owner's bundle of rights by independently impairing the ability of the owner to sell, use, enjoy, and control the property. Hence, it is possible to have a loss in value without a sale. Once a property is known to be contaminated, or subject to periodic toxic trespass from airborne chemical emissions, I assume that a residential seller is expected to disclose that contamination to a potential buyer.[2] This disclosure would be expected to cause a reduction in demand for the property, because the rational buyer would prefer an unimpaired property to an identical impaired property every time. However, some buyers may still be interested in obtaining the property, provided they are compensated for the nuisance, potential danger and business risk by getting a discounted price. Unequal information about the particulars of disamenities affecting a property generally favors the sellers, because they are more familiar with the property. Therefore, in cases of environmental contamination or similar airborne toxic trespass, actual sales prices (the basic information used by real estate appraisers) can be expected to overstate the market value of the property, compared to a situation where both buyer and seller are fully informed. In such a situation, market *price* may not reflect unimpaired market *value* (sometimes referred to as fair market value) of the property. Thus, sales data are an important, but not always a definitive, indicator of property value losses.

41. In cases such as this with periodic intermittent airborne releases of potentially noxious chemicals, property owners may also suffer temporary damages. Such temporary losses may include rental losses from inability to rent the home out, one-time or ongoing costs for repair of physical damage to the property (such as power-washing or duct cleaning), other devices intended to allow the homeowner to continue to reside in the unit safely, or hotel expense if the unit must be vacated for a period of time. These temporary losses may be added on top of permanent losses for some property.

42. The peer-reviewed literature indicates several ways that property owners experience a loss in value without a sale (Simons, Bowen and Sementelli 1999). These include loss of commonly held property rights such as the right to use, enjoy, control and the ability to dispose of a property. It is my opinion that this last item implies an unrealized capital loss because homeowners are unable to access capital tied up in their real estate asset. Because of the present value of funds received, delay of sale is itself a loss. Enduring the uncertainty and burden of remediation for a residential property (or for remediation of nearby properties) would also be a concern to potential buyers. Finally, properties that are believed to be contaminated may experience substantial diminution in property value, especially before they are remediated and worthy of no further action. This discount can be substantial. Even after a property has been cleaned, damages are still expected to persist because of the potential for a future reoccurrence of the problem (Simons 1999b).

---

[2] The Texas Seller's Disclosure of Property Condition, appended to this report as Exhibit 5, requires a seller's disclosure of his or her awareness of "[a]ny condition on the Property which materially affects the physical health or safety of an individual," along with an associated explanation of such conditions.

The potential for future airborne chemical releases from the BP Refinery (and thus property owners' associated concern over that potential) remains in this case. These matters are also summarized in my recent book, When Bad Things Happen to Good Property (2006).

43.    The extent of the discount due to airborne chemical releases from the BP Refinery and the ongoing potential for future such releases is the core opinion I provide in this case. In some states, this is referred to as stigma, of which there are two distinct types. Post-remediation stigma is the reduction in property value from contamination on the property that remains after the problem has been cured. A lingering discount may persist due to a potential for future reoccurrence, nuisance, or potentially other reasons. A second type of stigma is proximity stigma, where a property may not itself be contaminated or have evidence of direct physical damage, but is proximate to a value-reducing disamenity (such as a gasoline station with a known history of petroleum leakage or, as in this case, a refinery with a "track record" of periodic, and occasionally very large, releases of noxious chemicals into the air) or to other properties with actual physical damage attributed to the underlying conditions common to both properties. For a more detailed accounting of the peer-reviewed literature on this topic, see Simons 2002; Simons, Bowen and Sementelli 1999; Simons 2006, chapter 4; Mundy 1992; and Patchin 1991.

44.    The peer-reviewed literature contains numerous studies that address the effects of environmental contamination and other disamenities on property values. Most of these studies demonstrate that environmental contamination reduces property values, and none of the studies I am aware of assert that it increases property values. As summarized below, some of the literature indicates that losses for properties with such disamenities are based on proximity only; specific properties with actual contamination or physical damage may have higher losses.

**Residential Property**

45.    Flower and Ragas (1994) studied the effects on residential property values of two petroleum refineries located 1-1/2 miles apart in St. Bernard Parish, Louisiana (just east of New Orleans). They used hedonic regression models to analyze sales of 1,999 homes from 1979 to 1991 near the refineries, based on proximity and air pollution. Their analysis found losses of 5% in the area near one refinery and 1.5% for homes within half a mile of the other refinery. Proximity, neighborhood prestige, and the quality of a buffer were found to contribute to differences in the losses experienced by homes near the refineries.

46.    Anstine (2003) reported an 8% loss in assessed property value for homes located two miles away from a Jonesborough, Tennessee rubber compounding facility which emitted foul odors and air pollution. His study, which employed hedonic regression analysis on data from 171 residential sales in 1996, also found no significant effect on values for homes near a heavy metals processing plant which did not appear to be polluting the local environment. Homes located between the two plants showed a loss in value of nearly 14%. This study provides evidence that public perception about an industrial facility's

13

environmental performance and potential for risk is a factor in determining house value, beyond the measurable scientific risk that may exist.

47. There have been several studies of the effects of air pollution on residential property values. Figueroa et al. (1996) surveyed a random sample of households in Santiago, Chile and used hedonic regression to determine the owners' marginal willingness to pay for a 50% improvement in air quality (measured in terms of the concentration of 10-micron particulate matter [$PM_{10}$]). They found that owners would pay 3.3% of their property's value to live in a neighborhood with 50% cleaner air. In their hedonic meta-analysis of 37 studies of marginal willingness to pay for improved air quality across several U.S. cities, using ordinary least squares regression and an econometric model, Smith and Huang (1995) found that every reduction of $1 \mu g/m^3$ in $PM_{10}$ resulted in an increase of 0.1% of property value in average willingness to pay. Berkman et al. (2012, forthcoming) studied the impact of particular matter on residential property values in Ponca City, Oklahoma. Using hedonic property value econometric models and property-specific particulate matter concentrations, they found that an increase of 10% in particulate matter concentration reduced property value by 1.1%. Pollution sources included a carbon black plant and a nearby oil refinery.

48. Simons (2002) used real estate trends analysis, contingent valuation analysis, and list/sales price ratio analysis to study the effect of long-term PCB releases through the air and water (via a PCB-laden landfill) on a lower-income minority residential neighborhood in Anniston, Alabama. The plant had discontinued producing PCBs, but the plant owners had bought out about 80 homes in a neighborhood, and there was substantial blight as a result. A contingent valuation survey with about 150 telephone respondents showed that almost all the market demand (over 90%) for this type of home was gone. Results showed the neighborhood housing values had dropped by about 60% as a result of proximity to the plant. A single house with PCB contamination over allowable residential levels onsite experienced a 95% drop in property value (cited from Simons 2006, p 92). This evidence was presented in one case of the Monsanto litigation in Anniston, Alabama in 2002. This study is relevant in part because of the methodology summary and use of multiple techniques.

49. Finally, undeveloped land with environmental contamination presents a special case, for which the impact on property value is determined by means of the land residual approach. Because developable land is a factor of production in the housing process, its factor price must fall to meet the end user price (sales price of the house, once built) in order to remain marketable. In other words, lots affected by environmental contamination must absorb the full price drop of the contamination, or the houses will not sell.[3] This is an application of the land residual valuation approach (National Council of Real Estate Investment Fiduciaries; California State Board of Equalization, 1998).

---

[3] A simplified illustration may provide clarification of this concept. Consider a developable lot with a land value of $20,000 in a neighborhood where finished homes would sell for approximately $120,000 if uncontaminated. If we assume (for illustration purposes only) that the contamination reduces property values by 10%, then the contaminated lot and house, once improved, could sell for only $108,000. But because construction costs are fixed, the lot can only be improved at a cost (including developer's profit) of $100,000. Thus, the land value must fall

14

## Commercial Property

50.    We are unaware of any peer-reviewed studies concerning the direct effects of air pollution on commercial property, but there are several peer-reviewed studies which consider the effect of groundwater contamination on commercial or industrial property. Using sale/resale analysis, Simons, Bowen and Sementelli (1999) found losses ranging from 28% to 42% for six commercial properties on petroleum LUST contamination plumes in Cuyahoga County (Cleveland and its suburbs). The same study found that sales transactions for commercial properties on LUST contamination plumes occurred at a one-third lower rate, and were more likely to include seller financing, than sales of uncontaminated commercial properties. These losses are likely more severe than for the BP case at hand, but analytical techniques used may instruct the current case.

51.    Patchin (1994) studied three large, Midwestern industrial facilities which were the source of groundwater (and for two of the facilities, soil) contamination. He found that the properties sold at discounts ranging from 26% to 94%, despite legal and/or contractual provisions protecting the buyers from future cleanup costs. These losses are also likely more severe than for the BP case at hand.

52.    Page and Rabinowitz (1993) studied the effects of groundwater contamination underlying six commercial and industrial properties in Pennsylvania, Wisconsin and California. They found reductions in property value ranging from 15% to 50%, with an average reported decrease of approximately 30%.

53.    Simons and Saginor (2010) use a contingent valuation analysis to address commercial property losses attributable to petroleum contamination among 127 real estate professionals in Ohio and South Carolina. They find that contaminated source properties have losses of 34% to 59% (42% under moderately soft market conditions), while proximate (non-source) properties have losses that range from 15% to 41% (22% under soft market conditions). Thus, contingent valuation is also available as a technique to determine losses to commercial property in this case, although the losses stated above likely exceed the expected losses in this case.

54.    Most recently, Saginor, Simons and Throupe (2011) have performed a meta-analysis of contaminated commercial properties. By using a data base of 106 contaminated sales from peer reviewed articles, litigation, and appraisals, they find that a number of factors are associated with diminished property values. These include but are not limited to location, contamination types, and remediation status. The underlying contaminated commercial sales data provide potential case examples for this case.

55.    Jackson (2001) surveyed real estate lenders to evaluate their perceptions of risk associated with contamination of commercial and industrial properties. He found that

---

from $20,000 to $8,000 to meet the discounted sale price resulting from the contamination. Therefore, the contaminated land value drops by considerably more than 10%.

prior to cleanup, 93% of lenders would refuse to provide a mortgage loan to a contaminated property. Even after cleanup, 35% of lenders either would not undertake the loan or would require adjustments to their typical loan structure, and that "[m]any of the lending adjustments ... have the effect of lowering the overall value of the contaminated property"[4]. Importantly for this case, he also found that a weak real estate market would significantly increase lenders' perceptions of the risk associated with a contaminated commercial property at every stage in the remediation life cycle, even after remediation was completed.

56.   A study of the effects of groundwater contamination in Wichita, Kansas (Dotzour 1997) appears to illustrate Jackson's survey results, as Dotzour found that upon announcement of the discovery of the contamination, local lenders immediately stopped lending on commercial properties in the affected area.

57.   Jackson (2005) also surveyed commercial real estate investors, who revealed patterns of risk perception and willingness to invest in contaminated property which paralleled those of the lender group. Prior to cleanup, 94% of investors would either refuse to acquire the property or would adjust their purchase criteria; after cleanup, 37% of investors would still require adjustments to the purchase criteria, with the vast majority of those (84%) including discounts to the purchase price among their adjustments. Weak market demand was seen as significantly increasing the investment risk for a contaminated property at all stages of the remediation life cycle, including after cleanup was completed. As long as the BP Refinery remains open, I believe at this time that the situation in this case is closest to the unremediated scenario above.

58.   An earlier survey of lenders and investors (Worzala and Kinnard 1997) found that lenders were less likely to provide financing for, and investors were less likely to purchase, properties with contaminated groundwater than they would properties with soil or building contamination. They also found that only 9% of lenders "would lend" or "would probably lend" on a property located within 300 feet of a contaminated groundwater plume, and only 12% of investors would or would "probably" invest in such a property.

59.   In "Debundling Property Rights in Contaminated Land: A Commercial Case Study," Simons and Throupe (forthcoming) examine the loss of control of the ability to time the sale or develop property as an intrinsic benefit of the bundle of ownership rights. This right, proxied by the real option to control property, can be hindered by the existence of contamination. An empirical analysis of a contaminated site is used to illustrate the cumulative effect of this sell option and a measurement of financial loss. The results of a survey are used to determine the likely value of the real estate option and its effect on the subject property as part of the overall value. The results suggest a value for the sell (call) option which is dependent on the time before expiration. For the case study and ten year time period used in this article, 27% to 40% of the property value is estimated as the value of the loss in ability to sell. Thus, a peer-reviewed methodology is available to

---

[4] Jackson 2001, page 281.

16

determine losses from holding developable property that was prevented from being developed due to the air pollution from the BP Refinery.

60.   To summarize the literature on commercial property, the peer-reviewed literature finds that commercial losses are generally higher than similarly affected residential losses. The literature also finds that obtaining mortgage financing is more challenging for property that suffers from environmental problems, holding all other factors constant. Sale-resale analysis, regression analysis, and contingent valuation analysis are all techniques that are available to determine potential losses to commercial property in this case.

**Summary**

61.   Thus, it has been shown that proximity to a substantial disamenity or source of contamination (including air pollution resulting from releases of industrial chemicals, as in this case) has a negative effect on property values, and can readily be analyzed in a similar manner. Theory and practice tell us that, all else being equal, buyers would avoid purchasing a property believed to be contaminated, or threatened by the potential for future releases of contaminants, because of possible health risks, reduced use, difficulty in reselling the property, uncertainty, and nuisance associated with environmental damages. Therefore, properties suffering from environmental problems can be expected to sell less frequently and at a discounted price compared with properties not believed to be contaminated, impaired, or proximate to potential threats. Formulaic methodologies are available for similar property types that are commonly situated, in order to measure the extent of property damages.

62.   A combination of these well-established, scientifically accepted real estate analytical techniques, including hedonic regression, real estate trends analysis, transaction frequency analysis, resident surveys, application of peer-reviewed literature through case study analysis, and contingent valuation analysis can be used to model the property value losses for this case. Numerous studies support the use of hedonic regression, real estate trends analysis (Simons 2002) and related techniques to determine changes in property value and transaction rates. Contingent valuation and other survey techniques are also commonly accepted in the real estate literature (Mundy and McLean 1998; Simons 2002; McCluskey, Huffaker and Rausser 2002; Jenkins-Smith, Silva, Berrens, and Bohara 2002; Simons and Winson-Geideman 2005; Simons and Throupe 2005; Simons and Karam 2008; Simons, Saginor, Karam and Baloyi 2008; Simons and Saginor 2010).

63.   I have personally directed research on several environmental contamination cases using statistical analysis of real estate markets. For example, I led two studies in Cuyahoga County, Ohio that found a reduction in residential property within 250 feet of a leaking underground storage tank. The results were published in the Journal of Real Estate Research (1997) and The Appraisal Journal (1999). Another matter involving the effect of a pipeline rupture with attendant water pollution was published in The Appraisal Journal (Simons, Winson-Geideman and Mikelbank 2001).

17

64. Several years ago I worked on a PCB (polychlorinated biphenyls) case in Anniston, Alabama, where a plant emitted PCBs over a long period of time. Because sales data were limited, we employed other real estate techniques, such as analysis of real estate trends and list/sales price analysis. We also used contingent valuation analysis (CV). This technique is a form of market survey where a random sample of potential buyers is contacted and asked to respond to various property scenarios to determine market pricing and bid data. As part of this CV study, we conducted about 150 telephone interviews of potential home buyers in Alabama and Ohio to determine their stated preferences for bidding on properties with several types of environmental disamenities, including PCBs. We also asked about price bids, and developed estimates of the percentage discount. This work was published in The Appraisal Journal (Simons 2002). I have another article published in the Journal of Real Estate Research using the same CV methodology that also addressed groundwater contamination and its effects on residential property values (Simons and Winson-Geideman, 2005).

65. I have also lead-authored a book on the effects of environmental contamination on property values. The work, When Bad Things Happen to Good Property, is published by Environmental Law Institute and was released in June 2006. This book contains a summary of my views on the effect of contamination and property values, including the economics and real estate theory, literature, legal case outcomes, and other applications.

## REAL ESTATE SALES TRENDS ANALYSIS PERFORMED FOR THIS CASE

66. For this study, we have collected a substantial amount of data, and have begun to employ several related real estate trend analyses. These procedures are set forth below. For the residential real estate trends analysis, we are using property sales data provided by local state-registered real estate appraiser R. C. Chuoke from the Multiple Listing Service ("MLS"), for the proposed class area (ZIP Codes 77568, 77590 and 77591) and for areas of similar housing stock and proximity to refineries and related industrial developments in portions of Pasadena, Deer Park and Baytown (all in Harris County along the Houston Ship Channel). As of the date of this report, Mr. Chuoke has provided such sales data for the period from January 1, 2003 through mid-October 2011. We model only sales since 2006, to avoid potentially having to deal with the confounding effects of the 2005 BP Refinery explosions.

67. The control areas for this case were determined during, and shortly after, our field visit to the Texas City/La Marque area on September 26, 2011. Based on preliminary demographic analysis of U.S. Census data for communities adjoining the refinery/industrial complex along the Houston Ship Channel, augmented by consultation with Mr. Chuoke, Mr. Curtiss rode through those local neighborhoods with Mr. Chuoke and took photographs of representative homes. After affirming that portions of Pasadena, Deer Park and Baytown contained housing of similar size and character to those typical of the Texas City/La Marque area, we conducted subsequent internet research to delineate potential boundaries for the control areas, focusing on similarities of housing styles (based on street-level images found at Google Maps) and value ranges (as recorded at the Harris County Appraisal District website). I then made the ultimate selection of

18

neighborhoods to use as controls for our real estate analysis. The control areas include a large section of Pasadena, a relatively small neighborhood at the northern border of Deer Park, and three separate clusters of homes in Baytown. Exhibit 3-2 of this expert report depicts the extent of the various neighborhoods comprising these control areas, and Exhibit 3-3 shows sales in these control areas and the case areas, with ZIP codes and SWAPE boundary.

68.   The control area clusters were chosen on the basis of residences which appeared to be of similar styles, sizes, apparent age, and value to the majority of homes in the class area, and because they were located within a similar distance from large petroleum refining and related industrial complexes. Thus, the control group is believed to be subject to the same local and regional economic conditions as the Texas City/La Marque class area, and to similar basic influences of nearby petroleum refineries and related industrial facilities. Our hypothesis is that differences in patterns of real estate sales between the class area and the control areas can be attributed primarily to the effects of the atypically large and frequent releases of airborne chemicals from the BP Refinery. Accordingly, the control group's property appreciation rates reflect the trends line against which property sales patterns in the proposed class area are measured.

69.   Due to time constraints and the very large volume of sales data to be considered in the real estate trends analysis, I have chosen for this expert report to perform certain preliminary analyses which demonstrate the suitability of the data for the analytical techniques employed, and the applicability of the analytical techniques for all residential properties in the proposed class for this case. The real estate trends analysis to be performed during the merits phase of this case will be much more comprehensive than the illustrative analysis summarized in this preliminary expert report. The MLS data which Mr. Chuoke provided to us provide sufficient detail and quantity to perform the sales trends analysis. In addition, the ZIP codes used in the real estate trends analysis pertain to the class definition based on ZIPs.

70.   The essential approach in real estate trends analysis involves comparing real estate sales patterns, in both the class area and the control areas, from a "baseline" period, prior to the event(s) whose effects are being investigated, to a "potentially affected" period subsequent to those event(s). The demarcation between those two periods is the point in time when knowledge of the subject event(s) becomes widespread in the local community, such that it can be reasonably inferred that potential buyers of class area properties would be aware of the existence of the conditions at issue, and thus could reasonably be expected to capitalize those effects into their purchase price for the affected properties.[5] We hypothesize that the sales pattern trend line in the control areas, from the "baseline" (before) period to the "potentially affected" (after) period, reflects the

---

[5] In most real-world situations, that demarcation is more properly considered to be a "transition" period of several months or more, during which public awareness of the event(s) at issue grows from essentially zero to a sufficiently widespread level. During the transition period, it is expected that some class area property sales may be transacted with the buyer's awareness of the event(s) at issue, while other sales are consummated without such awareness. Price trends during that transition period would thus be skewed by incomplete knowledge of the event(s) or conditions at issue. Accordingly, it is appropriate to exclude sales consummated during the transition period from the sales trends analysis.

19

pattern of sales activity that would be expected in the class area *in the absence of the disamenity effects* of the event(s) being investigated, which in this case are the airborne chemical releases from the BP Refinery described in Plaintiffs' Original Class Action Complaint. Any difference from the control area trend line observed in the class area's actual sales performance will then provide a measure of the impact on class area property values of the event(s) at the BP Refinery which are at issue in this case.

71. The primary measure of property value impact used for the real estate sales trends analysis is median appreciation-adjusted sales price per square foot. Use of the median as the measure of central tendency controls for the possible skewing effect of individual sales consummated at extremely high or extremely low prices (outliers).[6] Adjusting sale prices for appreciation[7] allows for meaningful comparison, in constant dollars, between sale prices in multiyear "baseline" and "potentially affected" periods. Using sales price per square foot controls for the inclusion of properties of various size within the MLS sales dataset.

72. As of the date of this expert report I have not yet determined the date ranges which will comprise the "baseline" (pre-awareness) and "potentially affected" (post-awareness) for purposes of our real estate trends analysis. Those periods will be delineated before or during the merits phase of this case. Because of the potential confounding effect of the May 2005 explosion at the BP Refinery (which is outside the purview of this case), it is likely that the "baseline" period will begin sometime between January 1, 2006 and January 1, 2010. Because the 40-day flaring event at the BP Refinery during April and May 2010 did not receive public media attention until the first week of June 2010, it is possible that the "potentially affected" period will not be considered to have begun until some point in the third quarter of 2010, or some other period to be determined. Because the extent of public awareness (if any) of flaring practices and activity at the BP Refinery prior to disclosure of the 40-day event in 2010 is unknown, it is possible that sales consummated from December 22, 2008 through June 30, 2010 will be treated as occurring during a "transitional" period between the true "baseline" (pre-awareness) and "potentially affected" (post-awareness) periods. However, I reserve the right to adjust the dates of these three analysis periods when we perform our comprehensive sales trends analysis during the merits phase of this case, as additional information becomes available about the extent of public awareness of the events and practices at issue in this case.

**Sales Price Analysis**

73. Our approach to sales price analysis is based upon changes in median appreciation-adjusted sales prices per square foot for properties sold in the class area and in the control areas, for both the baseline period (pre-awareness) and the potentially-affected period (post-awareness). After calculating those median values, we determine the percent

---

[6] With the very large number of sales in our MLS dataset, it is expected that the median and mean will tend to converge, particularly if "outlier" sales were to be excluded when calculating the mean.

[7] We plan to use the Federal Housing Finance Agency's House Price Index for the Houston-Sugar Land-Baytown metropolitan area for this purpose (see http://www.fhfa.gov/Default.aspx?Page=81).

20

change in median appreciation-adjusted sales price per square foot from the baseline period to the potentially-affected period, in the class area and in the control area. We calculate a projected "unimpaired" affected-period median value for the class area by applying the control area's percentage change to the class area's baseline-period median value. This projected "unimpaired" class area value answers the question, "If sales experience in the class area mirrored the sales experience observed in the (similar) control area from the baseline to the post-awareness periods, what median adjusted sales price per square foot would we expect to find for class area homes during the post-awareness period?" Comparing the actual affected-period median value observed for class area sales to this projected "unimpaired" value provides a measure of the percentage change in property value for class area properties following public awareness of the airborne chemical release events at the BP Refinery. If the observed affected-period (post-awareness) class area median value proves to be less than the projected "unimpaired" value, we would conclude that the sales price analysis indicates that the buying public is demanding a discount for properties in the class area relative to similar neighborhoods not subject to the unusually frequent and large airborne releases from the BP Refinery. That discount would be a measure of the diminution in class area property values resulting from the home buying market's concern over flaring and other community safety issues at the BP Refinery.

74. We have received MLS sales transaction data from Mr. Cuoke reflecting the following number of residential sales transactions, by year, in the broader class area (ZIP Codes 77568, 77590 and 77591) and in the control areas (portions of Pasadena, Deer Park and Baytown shown in Exhibit 3):[8]

|  | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| • Control areas | 966 | 798 | 732 | 668 | 545 |
| • Class area | 577 | 529 | 415 | 370 | 308 |

75. As of the date of this expert report we have begun, but not completed, our real estate sales trends analysis of the MLS transaction data. I am satisfied that the data are sufficient in scope and detail to enable us to complete our analysis and provide a measure of the change in property value, if any, resulting from airborne chemical releases at the BP Refinery. Accordingly, using the residential property sales data provided by Mr. Chuoke, we plan to continue evaluating the impact of the BP Refinery's releases of airborne chemicals on sales prices and price per square foot for homes in the proposed class area, compared with control areas, for the baseline and potentially-affected periods.

---

[8] The 2008 figures exclude sales consummated from December 22 through December 31. The 2011 figures reflect sales transactions with closing dates through mid-October. These preliminary sales totals reflect the exclusion of certain sales which were recognizable as clearly outside the geographic boundaries of the respective class and control areas. There may be other such sales in the dataset which will require exclusion for the same reason; time constraints have thus far limited our ability to identify additional such sales (if any). During the merits phase of this case, we will refine the sales dataset by means of Geographic Information Systems analysis, to ascertain that all sales included in the analysis are properly located within the respective class area and control area boundaries.

21

76. To illustrate the applicability of the real estate sales trends analysis techniques to this case, and the sufficiency of the available MLS sales transaction data for those purposes, we have performed a preliminary analysis of sales transactions for the years 2008 (the final year of the "baseline" period) and 2011. For these two years, the median sale price per square foot for control area sales declined 14%, from $65.64 (2008, "baseline") to $56.68 (2011, "potentially affected"); in comparison, the median sale price per square foot for class area sales declined 32%, from $59.36 (2008) to $40.34 (2011). Had class area sales trends followed the pattern of the control area sales, we would have expected a 2011 class area median sale price per square foot of $51.26. The observed median value represents a 21% loss from the expected value for properties in the class area.[9] We also performed this same comparison after eliminating sales transactions involving newly-constructed homes from the dataset, and found that class area properties showed a 15% loss from the expected (control-area trend) 2011 post-awareness median sale price per square foot.[10]

77. This preliminary real estate trends analysis provides evidence that since the occurrence of the events at issue in this case, residential properties in the proposed class area (ZIP Codes 77568, 77590 and 77591) have, in aggregate, lost considerably more value than comparable properties with similar proximity to other large petroleum refineries. It also demonstrates the applicability of this analytical technique to this case, and the sufficiency of the available sales data to carry out the analysis.

78. I reserve the right to perform year-by-year comparisons of property sales data between the class area and the control areas, perform additional screening for sales locations, and add additional sales data, before or during the merits phase of this case.

**Analysis of Corroborative Measures**

79. I also plan to consider the impact of certain corroborative indicators of property value impact, available from the MLS transactions data provided by Mr. Chuoke. My approach to analyzing these measures will generally follow the same methodology used in our sales price analysis:

- Calculation of median values for each measure, during the baseline and potentially-affected periods, for transactions in the class area and in the control areas;
- Determination of percentage changes in median value for each measure, from the baseline to the potentially-affected period, for sales in the class area and in the control areas;

---

[9] We did not apply an appreciation adjustment to the sales prices for this preliminary analysis, because neither the "baseline" nor the "potentially affected" periods extended beyond one year. Our comprehensive real estate trends analysis, to be performed during the merits phase of this case, will include appreciation adjustments to properly compare multi-year "baseline" and "potentially affected" period data.

[10] Control area median sale price per square foot declined 14% ($65.50 to $56.67), while median class area value declined 26% ($52.78 to $39.02). The observed class area value is 15% below the expected value ($45.67) based on the control area sales trend.

- Calculation of a projected "unimpaired" post-awareness class area median value for each measure, by application of the corresponding control area percentage change to the class area baseline period median value; and
- Calculation of the difference, if any, in the observed post-awareness class area median value from the corresponding projected "unimpaired" median value.

80. The corroborative measures are not primary indicators of change in property value for class area properties. Furthermore, the results of our analysis of these corroborative measures have in some cases proved inconclusive. However, these corroborative measures can provide additional insight into the home-buying public's perception of class area properties, and I expect that insight to be useful in interpreting and reconciling the results obtained from our primary analytical techniques.

81. **Transaction Frequency:** Comparing the relative frequency of residential sales transactions in the class area and the control area, as measured by annualized number of transactions, from the baseline period to the corresponding "affected" period, can provide qualitative evidence of homebuyer preference for, or avoidance of, a particular neighborhood or geographic area. Although residential transaction frequency may decline in both areas, the reduction in annualized sales is likely to be more severe in the class area than in the control area. If we find such a result in the present case, this would be an indicator that the airborne chemical releases from the BP Refinery are likely contributing to market avoidance of class area properties. Such a finding would tend to push required discounts to close a transaction higher (i.e., greater diminution in class area property values). Our preliminary analysis of the MLS sales data showed that the number of sales transactions in the class area in 2011 ("potentially affected" period) was 15% lower than would have been expected based upon the 2008-to-2011 trend in annual transactions observed in the control areas; when newly-constructed homes are eliminated from the analysis, the class area had 5% fewer sales transactions than would have been expected based upon the control area trend.

82. **Days on Market:** Comparing the relative marketing time for residential sales transactions in the class area and the control area, as measured by median days on market, from the baseline period to the corresponding "affected" period, can provide additional qualitative evidence of homebuyer interest in, or avoidance of, a particular neighborhood or geographic area. Because of the time value of money, longer marketing times translate to reductions in value received. Thus, a finding of longer relative median marketing times for class area properties during the potentially-affected period would be properly interpreted as increasing any percentage loss in value observed through the sales price analysis. Our preliminary analysis of the MLS sales data showed that median days on market increased at comparable rates from 2008 to 2011 in the class and control areas; however, when newly-constructed homes are eliminated from the analysis, the class area showed a median marketing time 9% longer than would have been expected based upon the control area trend.

83. **Sale/List Price Ratio:** Comparing changes in the median ratio between sale price and list price for sales in the class area and the control area, from the baseline period to the

23

"affected" period, can provide other qualitative evidence of market attractiveness or, alternatively, of increasing price discounts required to consummate transactions in a particular neighborhood or geographic area. Declining sale/list price ratios in the class area, relative to the control area, would be indicative of increasing losses in value for class area properties, as sellers would ultimately be agreeing to accept a smaller proportion of their originally desired price. I reserve the right to include an analysis of changes in sale/list price ratios in the class and control areas, during our comprehensive sales trends analysis to be performed during the merits phase of this case.

84.    *Sale/Resale Analysis:* In some cases a sales database reveals that the same class area property has sold both during the "baseline" period and during the post-awareness ("potentially affected") period, with no substantial change in property characteristics during the intervening time. In such a situation the two sale prices can be compared directly (with appropriate adjustment for local appreciation rate), with the property in essence serving as its own control. Such multiple sales can also be compared to the pattern of similar sale/resale transactions in the control area, for additional insight into sale price effects in the class area. During the merits phase of this case, I plan to examine the MLS sales data provided by Mr. Chuoke to determine whether this particular methodology can be applied appropriately to this case.

## Sales of Specific Class Area Homes

85.    The evidence from the real estate trends analysis is expected to indicate that median sales prices (per square foot) for residential properties in the proposed class area have been adversely affected by airborne chemical releases from the BP Refinery. Before or during the merits phase of this case, I may request that Mr. Chuoke perform "unimpaired" (i.e., as if there were no airborne chemical releases from the BP Refinery) appraisals of certain specific class area properties that have sold since December 22, 2008 (or such other date as may appropriate mark the beginning of the period of widespread public awareness of the event(s) at issue in this case), in order to provide additional evidence of the extent of impact to class area property sales prices arising from those event(s). He has demonstrated this technique by conducting appraisals of the five named plaintiff properties.

## REGRESSION ANALYSIS PERFORMED FOR THIS CASE

86.    In addition to real estate trends analysis, we performed a hedonic regression analysis for this case. We used standard hedonic regression techniques (see Rosen 1974; Simons et al. 1999, 2001). The study area is comprised of six cities. The subject area for the regression analysis includes those portions of Texas City and La Marque encompassed by the zone of 10th-highest one-hour concentration of sulfur dioxide, as determined by SWAPE ("SWAPE Boundary"). The control areas for the regression analysis include those portions of Texas City and La Marque outside the SWAPE Boundary;[11] plus the

---

[11] That is, because the regression analysis focuses on residential properties within the SWAPE Boundary, some properties in the proposed class for this case (ZIP Codes 77568, 77590 and 77591) are considered to be part of the control group for the regression calculations.

Harborwalk, Tiki Island, and Bayou Vista waterfront developments in Galveston County; and those portions of Pasadena, Baytown, and Deer Park in Harris County which were selected as control areas for the real estate sales trends analysis. The sales selected for this regression analysis are consistent with those used in the real estate trends analysis.

## Data and Preparation of Variables

87.    Our dataset initially contained 8,246 single-family home sales used for the analysis, including sales in the proposed class area and the control areas. We began with the same MLS dataset provided by Mr. Chuoke and used for the real estate sales trends analysis. The data covered sales during the period from 2006 through mid-October 2011 in the six cities in the two counties. There were 3,068 sales transactions in Galveston County, at sale prices ranging from $5,500 to $1,543,000, with an average of $123,504. Approximately 58% of the sales were in Texas City; the average sales price of $87,196 in Texas City was lower than those in other cities in Galveston County. On the other hand, there were 5,178 sales in Harris County, at sale prices ranging from $5,900 to $560,000, with an average price was $109,299. Sales in Pasadena accounted for 89% of the sales in Harris County; the average Pasadena sale price was $109,143.

88.    The initial dataset contained most (but not all) of the variables required for a regression analysis from each sale, including property address, sale amount and year, square footage of the unit, year built, bedrooms and bathrooms, and lot size. These data were obtained from the real estate sales summary data.

89.    However, certain other variables that may affect value were not included in the real estate sales summary data, so we went to the detailed MLS sale sheets (one page for each sale), and extracted those data that were plausible, given reasonable budget limitations. Using a key word search approach, we extracted the following variables: private swimming pool, sale in December 2008, garage, cooling system, heating system, and foreclosure status[12]. These variables were coded with a dummy variable or other appropriate configuration.

90.    We retained all sales observations with complete data, and therefore deleted 427 observations which were missing essential data. With this dataset, we also transformed certain variables to comply for functional form, consistent with theory and/or prior published regression research (e.g., Simons et al., 1999 and 2001). For technical reasons, we also created certain combination variables, including sales price per square foot, which we utilized in later runs, and year dummy variables for sales between 2006 and 2011, as well as logging age, sales price and lot size[13].

91.    We attempted to geocode all sales for mapping, in order to confirm their locations and to add other variables to the sales. The geocoding process was based on a combination of

---

[12] The foreclosure status includes pre-foreclosure.

[13] A preliminary regression run with the remaining 7,686 observations, prior to geocoding, produced an $R^2$ of 85.8 with an F-stat of 2,890.7.

25

straight address matching, parsing addresses then conducting street prefix and/or number range matching, and visual inspection of property location using Google Maps. After parsing the existing data, 82% of the properties were successfully geocoded. We next deleted outliers for the following variables: missing data for sales price (less than $10,000; more than $1 million); age (less than one year, greater than 90 years old); square footage (less than 500 SF or more than 5,000 SF); lot size (less than 1,500 SF, more than 60,000 SF); bedrooms (at least one and more than 7); and bathrooms (at least one and not more than 5). Working now only with geocoded sales, we calculated age at time of sale by subtracting the year built from the year of sale, and the sales price per square foot variable was calculated using sales price and square footage.[14] [15]

92.    For the remaining geocoded sales, we attached selected neighborhood characteristics, a school quality variable, and locational variables. The neighborhood characteristics were obtained from 2000 U.S. Census data, and included median income and educational attainment in the census tract. For the school quality variable, SAT scores were used, as obtained from the Texas Education Agency for each school district in each year. Locational variables included distance from each sale to the William P. Hobby Airport[16] (calculated through GIS); and sales within 0.1 mile (using a distance buffer ring) from the shoreline of Galveston Bay, from a major road (broadly defined), from an interstate highway, and from a railroad line. These variables are generally expected to carry a negative externality effect due to traffic and noise.

### Analysis of Final Dataset

93.    After deleting the unsuitable sale observations, 6,342 sales with complete data were available and used in the model.[17] Descriptive characteristics of the data set used are presented in Table 6-1. Data show the data had an average sales price of $109,600, on an 8,800-square-foot lot, with 3.15 bedrooms, and 1.7 full bathrooms. Census tract household income was $45,100, and 10% of households had a bachelor's degree. A total of 13% of the properties were sold in 2011, 25% were in foreclosure, and 22% were located within the SWAPE Boundary.

94.    Three models are presented: a baseline model; a model whose subject area is defined by the SWAPE Boundary for the years including both before and after the April 2010 major release event from the BP Refinery; and a more interactive model that demonstrates our ability to model both distance from the refinery (e.g., 1.25 to 1.75 miles away) and year (e.g., only 2011) in a single variable. The models are specified as follows:

---

[14] We used both square footage and listing price per square footage as the potential variables in the model, but the sales price per square footage is better in terms of high t value and $R^2$.

[15] We did another preliminary regression run with the remaining 6,342 observations, after geocoding and removal of unsuitable outliers. The $R^2$ was 85.9, with an F-stat of 2,408.6. Thus, results for both the model with all sales and the model with suitable sales are quite similar, in terms of $R^2$, F-statistic and the sign and the coefficient values.

[16] The distance to Downtown Houston was also calculated, but was not included due to multicollinearity.

[17] 1,478 sales could not be geocoded, and 427 were excluded based on missing variables or outliers.

$$Ln\_HP = \beta_0 + \beta_1 HC + \beta_2 N + \beta_3 LOC + \beta_4 SQ + \beta_5 YEAR + \beta_6 EFF + \varepsilon, \text{ where}$$

- $Ln\_HP$ is the sale price of each home that sold in our data set;
- $\beta_0$ is the model intercept;
- HC is a matrix of physical housing characteristics;
- N is a matrix of neighborhood characteristics;
- LOC is a matrix of dummy variables for sales within 0.1 mile of a major road, railroad, water, and distance to airport;
- SQ is a school quality measure;
- YEAR is a matrix of year dummy variables;
- EFF is the effect of the BP refinery on sales price, which can take different forms as discussed below; and
- $\varepsilon$ is the error term.

## Baseline Model Results

95. The results of a baseline hedonic regression analysis are presented in Exhibit 6-2 before considering the effects of the BP Refinery. Hence, the $\beta 1$-$\beta 5$ indicate the marginal propensity coefficients for the baseline model. We also checked for multicollinearity, and the VIF statistics shown in the far right-hand column are low, beyond normal cutoffs.[18] We reserve the right to conduct additional regression diagnostics and perform additional analysis as more data become available.

96. The model $R^2$ value at 88.0 is highly satisfactory, indicating that the variables used in the model explain 88% of the variation in sale price. Likewise the F-statistic is over 2,014 and is highly significant. The coefficients for housing characteristics and neighborhood characteristics are as expected by theory, at over a 90% level of confidence. The variables of the log of lot size, the square footage per sale prices, the number of bedrooms, and the number of full and half baths have the expected positive signs and significantly high t-values. Further, the log of age variable has the expected negative sign and is statistically significant. Four of the five dummy variables (garage, cool, heat, and pool) have the expected positive signs and are statistically significant, while the foreclosure status shows the expected negative effect on sales prices. The signs and the magnitudes of the neighborhood characteristics, median income, and educational attainment variables are as expected. The median income variable has the positive sign and a significantly high t-value. As expected, the SAT scores are positive related to sales prices and statistically significant. The location variables are also significant, and the foreclosure variable at −16 % is statistically significant. The year 2009 is used as the base year. The years 2008 and 2011 have negative signs and are statistically significant; other years are not different from the base year.

---

[18] We examined the dataset for heteroscedasticity by visual inspection of a scatterplot of sale price and model residuals, and no fanning pattern was evident.

## Model Results Using SWAPE Boundary as Subject Area

97.    The next run shown in Exhibit 6-3 contains the EFF variable (effects of BP Refinery on residential sales price for this case), now defined as inside the SWAPE Boundary (set forth in Exhibit 3) and including all single-family residential sales from 2009 through 2011. The model is of the same format and variables as the baseline model. The $R^2$ value and the signs in the second model are very similar to those of the baseline model. The SWAPE Boundary EFF variable shows a loss of 5%, and this figure is statistically significant.

## Model with Distance and Time Within Class Area

98.    A final demonstration is shown in Exhibit 6-4, where EFF (effect of SWAPE's BP Refinery Boundary on sales price) is defined as only 2011 sales and only those homes sold within a distance band of 1.25 to 1.75 miles from the BP Refinery.

99.    The commonly used distance-rings approach is used in the hedonic model to estimate the effect of proximity to the BP Refinery.[19] The R-squared and the signs in this final hedonic regression model are similar to those of the baseline model regarding the R-squared and the variable signs. The results of this model demonstrate the interactive effect of time and distance. In 2011, the effects coefficient in the half-mile-wide distance ring from 1.25 to 1.75 miles is statistically significant and negative, indicating a price reduction of 8% attributable to the BP Refinery.

100.    I reserve the right to complete and expand our regression analysis before or during the merits phase of this case, as more information becomes available.

## POTENTIAL RESIDENTIAL BUYER MARKET SURVEY

101.    In order to perform the potential buyer study for this case, we are employing contingent valuation analysis. A professional survey firm (NSØN, Inc. of Salt Lake City, Utah) is in the process of conducting the telephone surveys under my direction. The calls are being made to a random sample of homeowners in ZIP Codes 77015, 77017, 77502, 77503, 77506, 77520, 77521, 77536 and 77587, which are believed to be demographically similar to the proposed class area for this case (ZIP Codes 77568, 77590 and 77591). The survey firm is calling names at random, until they reach a homeowner who is willing to participate in our brief 8-to-10-minute survey. Four different survey forms are being used for this case, separated into two paired subgroups (Wave 1 and Wave 2) with identical questions asked in a different order for each pair. The survey plan is to obtain 200 completed interviews to each of the two paired subgroups (i.e., 400 total interviews). This number of responses generates statistically significant results that exceed a 90%

---

[19] Simons and Seo (2011) found a positive externality of a religious facility campus on neighboring housing sale prices. They used hedonic regression analysis using 2,500 sales in Ohio, and identified sales within quarter-mile distance buffers. A similar distance-ring approach was taken by Smolen, Reichert and Nelson in their analyses of the negative amenity from proximity to landfills (in Simons 2006 p 96).

level of confidence. The survey instruments relevant to this case are included as Exhibit 7 to this report.

102. The characteristics of the interview sample are expected to match the profile of Texas City and La Marque residents reasonably closely on basic demographic factors such as race, gender, median household size, median household income, and median home value. There may be certain apparent demographic differences between the interview sample and class area residents, due partly to necessary reliance upon 10-year-old census data for overall households for the class area ZIP Code residents, and partly to differences in home ownership status between the two groups. However, any such demographic differences are not expected to materially affect the survey results.

103. The survey instrument contains a baseline case to establish value, and four scenarios with potential environmental or nuisance-related disamenities. One scenario in each paired survey subgroup relates to this case, describing a large refinery with a recent history of airborne chemical releases located half a mile (Wave 1) or 1-3/4 miles (Wave 2) from the home which the interview respondent is asked to consider. For the Wave 1 paired subgroup, the subject home is described as having polycyclic aromatic hydrocarbons detected in its air conditioning filter system. For the Wave 2 paired subgroup, the scenario makes no mention of chemical presence in the subject home, but specifies that a nearby public school has been ranked as having very poor air quality. With respect to the disamenities, the respondent is asked if they would make a bid on the property and, if so, how much. The instrument is quite detailed, avoids key pitfalls described in Mundy and McLean's contingent valuation articles in The Appraisal Journal (1998) and Journal of Real Estate Practice and Education (1998), and is an identical methodology to that used in peer-reviewed literature (Simons 2002; Simons and Winson-Geideman 2005; Simons and Throupe 2005). The instrument also does not specifically guide the respondent to refinery-sourced air pollution or chemical releases, but "nests" the issue in a broader context.

104. The survey instrument was successfully pretested with 20 respondents (10 for each of the two paired subgroups) before beginning the 400-interview survey protocol. The pretests revealed no issues regarding survey design or respondent understanding.

**Interpreting the Survey Results**

105. Two factors are of key importance in evaluating the results. The first is the portion of respondents that would bid on a scenario. The ratio of "no bid" to total responses reflects the loss of market demand associated with the respective scenarios. The second factor pertains to value loss in the event of a bid. Of those that bid, the ratio of maximum bid to baseline case reflects the percentage they would pay. One minus this percentage reflects the discount. For example, if the person's baseline house price was $75,000, and the maximum they would bid on a particular scenario is $50,000, then that bid would reflect a 33% discount.

29

106.    The first part of the survey sets the stage and allows the respondent to become comfortable with the bidding scale. It also determines the average price of a property they are looking for, in the context of a job move.

107.    In addition to the refinery scenario related to this case, each survey respondent is presented with three other scenarios to consider: a house near a business park; a house near a leaking underground storage tank ("LUST"); and a house near a landfill (Wave 1) or near a hydraulic-fracturing natural gas well (Wave 2). These scenarios are presented for benchmarking purposes and to familiarize respondents with the evaluation and bidding process. Bid percentages for these three comparative scenarios will be reported once the survey is completed and we analyze the final response data from the professional survey firm.

108.    As mentioned above, two variations of a refinery-sourced, airborne chemical release scenario are being presented, each to 200 respondents. This scenario, in those two variations, provides a measure of the discount on class area properties related to the airborne chemical releases from the BP Refinery. As of the writing of this report, the 200 surveys in Wave 1 have been completed, and we had received data from 111 completed survey interviews for Wave 2. This represents approximately 78% of the planned total number of respondent interviews. I report herein our analysis of those 311 data points as preliminary survey results, subject to update and revision upon the completion of all 400 interviews.

## The First Refinery Scenario (Wave 1)

109.    Respondents to the first paired subgroup of surveys were asked to consider the following refinery-sourced, airborne chemical release scenario: *"The home is located about half a mile from an operating petroleum refinery, which is in an industrial area. The 1,200 acre refinery processes crude oil and produces a variety of gasoline and energy products. About a year ago, the plant had an equipment malfunction that led to the release of over 500,000 pounds of PAH (Polycyclic Aromatic Hydrocarbons), toluene and benzene (hazardous substances regulated by the United States Environmental Protection Agency) and potentially other chemicals, into the air. The refinery reported over 70 releases into the air since 2009, including a dozen over the amount allowed by their permits. Because of this, the refinery faced more than 45 enforcement actions from the Texas Commission on Environmental Quality. The house you are looking at buying was tested and detectable levels of PAH were found in the air conditioning filter system. Except for this issue, the neighborhood is like yours, and the house is very similar to your house."*

110.    The bidding issue was determined by the following question: *"Using the scale below, where –3 means you definitely would not bid and +3 means you would, how likely is it that you would make any offer on this home?"*

111.    Of the 200 respondents to this Wave 1 scenario, only 67 (or 34%) expressed a willingness to offer any bid on this scenario. In other words, 64% of the respondents would not even

30

consider living in the house described in this scenario. This latter percentage reflects the reduction in the market demand for this type of property.

112. Of those who bid, the following question is asked: *"What is the most you would be willing to pay for the home?"*

113. Of the 67 bids on this first refinery scenario (PAH detected in the air conditioning filter system), the prices offered were discounted by amounts between 0% (that is, no discount, or full price) and 99.9%. The average bid discount (i.e., value loss) for the property affected by PAH from a nearby refinery was 40%.

114. However, not all these bids necessarily would be in the market. Due to search costs, and the smaller number of bidders, the chances are reduced that any of the potential bidders would find a suitable home and place a bid that would be accepted by a seller. On the other hand, hugely discounted "bottomfishing" (very low) bids would have little value in the market, because it is the bids with the smallest discounts that would get the attention of likely sellers and culminate in a sale. For this case, due to the reduced percentage of potential buyers (34% willing to make any offer), I will consider market-clearing bids in the top half of the market (average loss of 20%) and the top quarter of the market (average loss of 7%). In other words, for this first refinery scenario, the average discount of the top half of potential bidders is 20% where information about the refinery's recent history of airborne chemical releases is known.

## The Second Refinery Scenario (Wave 2)

115. Respondents to the second paired subgroup of surveys were asked to consider the following subsidence scenario, which relates to properties in Plaintiff Subclass B in this case: *"The home is located about a mile and three-quarters from an operating petroleum refinery, which is in an industrial area. The 1,200 acre refinery processes crude oil and produces a variety of gasoline and energy products. About a year ago, the plant had an equipment malfunction that led to the release into the air of over 500,000 pounds of sulfur dioxide, nitrogen dioxide, sulfuric acid, toluene, benzene, and PAH (Polycyclic Aromatic Hydrocarbons), which are hazardous substances regulated by the United States Environmental Protection Agency. The refinery reported over 70 releases into the air since 2009, including a dozen over the amount allowed by their permits. Because of this, the refinery faced more than 45 enforcement actions from the Texas Commission on Environmental Quality, and recently settled the case for $50 million. A public school within five blocks of the house you are looking at was ranked as being in the worst 5 percent for air quality in the US. Except for this issue, the neighborhood is like yours, and the house is very similar to your house."*

116. We will report how many of the 200 respondents express a willingness to offer any bid on this scenario. Conversely, we will report the percentage of respondents who did not bid. This latter percentage will reflect the reduction in the market demand for this type of property, and I expect that reduction to be substantial. Preliminary results, based on 111 responses received to date (56% of the anticipated total for wave 2), indicate that 31

respondents (about 28%) bid on the property described in this second refinery scenario; at this point the corresponding reduction in market demand would be 72%.

117.    Of the 31 bids on this second refinery scenario (home 1-3/4 miles from the refinery, with air quality at a nearby school ranked among the worst 5% in the nation) included in the preliminary results to date, the prices offered were discounted by amounts between 0% (that is, no discount, or full price) and nearly 100%. The average bid discount (i.e., value loss) for the described property was 32%. We will report final bid totals and discounts once the survey is completed and we have analyzed all the responses. Again I will ignore "bottomfishing" offers and consider only market-clearing bids in the top half of the market (preliminary average loss of 11% to date), and the top quarter of the market. Thus, for this second refinery scenario, relating primarily to poor air quality perhaps resulting from proximity to the refinery, the preliminary average discount of the top half of potential bidders is 11% where information about circumstances at the refinery and air quality in the neighborhood is known. These initial results are being updated as new data are collected, and full results of the second wave will be reported at a later date.

## Analysis of the Residential CV Survey

118.    I summarize in Exhibit 8 the results (complete for Wave 1 and preliminary for Wave 2) for the two refinery scenario variations presented in the residential CV survey. Final results will be reported at a later date, once Wave 2 of the survey has been completed and all 400 anticipated responses have been tabulated and analyzed.

119.    These results demonstrate the relative undesirability of residences in the proposed class area, proximate to a refinery with a recent history of airborne chemical releases, for purchase by homeowners. Based on preliminary survey results to date, only 34% and 28% of prospective homebuyers with full information would provide a bid to buy a home situated similarly to those in the proposed class for this case, and many of those that do bid would discount their offers so much that many sellers would probably refuse to honor them. In light of the stated reduction in market demand revealed to date by these preliminary results of the residential CV survey, and noting the losses suggested by preliminary results of the real estate trends analysis and the regression analysis, I expect the loss on this type of property calculated using this market survey approach to be substantial, with an approximate range from 5% to 20% currently being indicated.[20]

120.    This reduction in bid value disclosed by the CV survey is a way to measure the reduction in housing services, the flow of enjoyment from owner-occupied housing. It also typically assumes more complete information than is often the case among actual buyers and sellers of homes.

121.    The CV methodology used in this case is essentially identical to the ones I had published in The Appraisal Journal (October 2002 and Spring 2005), the Journal of Real Estate

---

[20] It is understood that final results from the CV survey, once all 400 responses have been received (200 to Wave 1 and 200 to Wave 2), may differ from the preliminary results reported herein.

32

Research (2005), and the International Real Estate Review (2008). At this preliminary stage of the survey, the results are also consistent with other CV studies I have performed. For example, the LUST scenario figures from the 78% of the survey completed to date are within the range reported in Simons and Winson-Geideman 2005. The benchmarking of the LUST scenario to peer-reviewed literature affirms the validity (at least thus far) of this component of the research for this case.

## PROPERTY OWNER SURVEYS

122. In early October of 2011 we asked Plaintiffs' counsel to provide written property use surveys (see Exhibit 9) to the five named Plaintiffs who are the class representatives for this case, and to 95 additional Plaintiffs selected at random from the entire Plaintiff group. Completed surveys from 68 Plaintiffs (including all five class representatives) have been returned to us as of the date of this report. The vast majority of the survey forms which we have received to date show completion dates from mid-November to late December of 2011. I summarize in this section, on a preliminary basis, the information provided by those 68 Plaintiffs. I plan to update this summary to incorporate the responses of additional Plaintiffs in the proposed class, as completed survey forms are provided to us during the merits phase of this case.

123. Sixty-four (64) of the 68 responding Plaintiffs are owner-occupants.[21] Forty-six (46) respondents (68%) believe that emissions/contamination from the BP Refinery have had an impact on their property values, with 36 expressly affirming their belief that their property value had declined.

124. Only one respondent has listed their property for sale since 2008; this owner received no offers. Seven respondents have attempted to refinance their properties since 2008, but only two were granted the loan. One Plaintiff's loan application turned down after disclosing the contamination information to the bank.

125. Respondents indicated being required to stay indoors due to contamination issues anywhere from 0 to 182 days per year; the median response was 7 days per year. Four respondents have submitted a claim for house-washing to BP; three of those four had filed the paperwork in August 2011. (Many respondents who had not submitted a claim were unaware they could do so.)

126. Forty-six (46) of the 68 respondents (68%) described specific damage to their property as a result of chemical releases from the BP Refinery. Landscaping issues (diseased or dying vegetation; inability to garden) predominated, with unusually rapid corrosion of outside metal or roofing reported by 24 respondents and another 18 reporting discovery of unclean material on their property.

127. Fifty-five (55) respondents (i.e., 81%) indicated that they had noticed unusual odors since December 2008, and 42 respondents (62%) indicated that their use and enjoyment of their

---

[21] Three respondents failed to answer this question, and one answered "neither" (live in the house nor rent it out).

property has changed because of the contamination issues. The most common change in the use of their property was not being able to spend time outdoors due to chemical releases and poor air quality. Respondents also noted health concerns arising from poor air quality, including asthma, skin irritations and other respiratory problems. Twenty-two (22) respondents (32%) have halted improvement project(s) to their property since December 2008; the most common deferred maintenance involved exterior home improvement projects like re-siding, painting, installing new windows, landscaping and gardening.

128. Fifty-seven (57) of the 68 Plaintiffs submitting completed surveys to date (i.e., 84%) affirm that they would disclose the emissions from the BP Refinery to any potential future buyer of their property. Economic theory would predict that such disclosure would, at the least, lead a rational buyer to reduce their offer price for the home, if not to walk away entirely and look elsewhere.

## RECONCILIATION OF LOSS ESTIMATES

129. For residential properties in the proposed class for this case, the primary loss estimate data will come from the hedonic regression analysis, the real estate sales trends analysis, and the residential contingent valuation survey, as well as a general reference to published literature and case studies. Based on preliminary analysis conducted to date, both the regression analysis and the sales trends analysis show property value losses of 5% (all sales, all years), 8% (2011 sales in a half mile band about 1.5 miles from the BP Refinery) and over 15% (ZIP codes, 2008 base year and 2011 sales) to homes in the proposed class area, since the time that knowledge of the severity and frequency of airborne chemical releases at the BP Refinery became widespread among the general public. Based on preliminary results to date, and due to soft market real estate conditions the CV survey is expected to indicate losses likely equivalent to the average discount of the top half of the market. The CV survey also assumes that complete information is known to the potential buyer with respect to the history and effects of the airborne chemical releases from the BP Refinery. None of these figures considers the ease with which these properties could be financed, and there is room to question whether lenders would readily extend financing to properties with exposure to air pollution concerns if the issue was disclosed, particularly in a weak real estate market. Evidence from Plaintiff surveys is expected to indicate that the vast majority of property owners in the proposed class would disclose the history and effects of the airborne chemical releases from the BP Refinery to a potential buyer. (Responses in the 68 Plaintiff surveys received to date support this expectation.) The regression, real estate sales trends and CV survey results are also expected to be consistent with evidence reported in the peer-reviewed and other literature about the impact on residential property values of proximity to negative environmental amenities in general, and to air pollution and noxious chemicals in particular. I plan, and reserve the right, to refine and update my opinion as more data become available.

130. Applying my experience and professional judgment to these key data points, at the present time my opinion of loss for residential properties in the proposed class for this

34

case, attributable to the frequency and severity of airborne chemical releases from the BP Refinery, is a permanent reduction in value of at least 5-20% for residential parcels owned by members of the proposed class in this case. All loss figures are subject to new data inputs, and assume that complete information about the subsidence conditions, history, and buyout and demolition activities is available to buyers and sellers. This common outcome demonstrates the successful application of peer-reviewed methodologies to residential properties in the defined class for this case, in the context of class certification. I reserve the right to update my opinion when more information becomes available.

## BASELINE PROPERTY VALUES AND APPLICATION TO CLASS PROPERTIES

131.   At the date of this report I have chosen, for preliminary purposes, to adopt the January 1, 2011 market value, found in parcel data downloaded from the Galveston Central Appraisal District's ("GCAD") internet website, to demonstrate that it can be used as a measure of the minimum baseline (i.e., unimpaired) property value for residential parcels included in the proposed class for this case.[22] While this source may be adequate to estimate minimum baseline property values as of December 21, 2008 (the day before the beginning of the period for which property value losses are at issue in this case), I reserve the right to evaluate and utilize January 1, 2008 market value data for class parcels, and to recalculate baseline property values from those data.[23] I also reserve the right to compare the GCAD recorded market values to actual sale prices for properties in the MLS sales transaction data provided by Mr. Chuoke, located outside the SWAPE Boundary, and to develop ratios from those comparisons for the purpose of formulaically adjusting the GCAD recorded market values to reflect actual sales performance as recorded in the MLS sales transaction data.

132.   With respect to non-residential property included in the proposed class in this case (i.e., located in ZIP Codes 77568, 77590 and 77591), I reserve the right to develop similar adjustment ratios from any property sales data which may become available after the date of this expert report or during the merits phase of this case, and to apply those ratios to GCAD recorded market values for those properties.

133.   For illustration purposes only, as an illustration of the methodology which can be used to calculate adjustment ratios, I present the following comparison of the baseline appraisals prepared by Mr. Haithcoat for the homes owned by the five class representatives, to their respective January 1, 2008 and 2009 GCAD market values:

---

[22] This data can be accessed at http://www.galvestoncad.org/PA/Shapeidx/shapes.htm .

[23] Assuming it is legally permissible in this case to use the GCAD market value as of January 1, 2009 as a measure of unimpaired value for class area properties (as being much more closely related in time to the December 22, 2008 beginning point of the period at issue in this case than is January 1, 2008), I will also reserve the right to do so.

35

| | Appraisal 12/21/2008 | GCD Mkt. Val. 1/1/2008 | Ratio | GCAD Mkt. Val. 1/1/2009 | Ratio |
|---|---|---|---|---|---|
| • 1219 Main St., La Marque | $ 85,000 | $ 80,940 | 1.05 | $ 80,940 | 1.05 |
| • 1219 19th Ave. N. Texas City | $105,000 | $ 90,370 | 1.16 | $ 75,670 | 1.39 |
| • 2126 8th Ave. N., Texas City | $ 77,000 | $ 58,700 | 1.31 | $ 47,060 | 1.64 |
| • 2822 19th Ave. N., Texas City | $115,000 | $127,170 | 0.90 | $104,330 | 1.10 |
| • 903 Ruth Cir., Texas City | $125,000 | $161,210 | 0.78 | $161,210 | 0.78 |
| • Mean: | | | 1.04 | | 1.19 |
| • Median: | | | 1.05 | | 1.10 |

134. For residential class properties currently under the same ownership as at December 21, 2008, we will calculate the diminution in property value resulting from the airborne chemical releases at the BP Refinery by applying the appropriate residential loss percentages (which percentages are to be determined when our research is completed) to the baseline unimpaired market value of the respective properties (determined by formulaically applying the adjustment ratio calculated from our sales dataset to the respective GCAD market value).

135. For residential class properties which have been sold on or after December 22, 2008, I will determine the loss, if any, suffered by the seller on sale. For such properties I reserve the right to obtain contemporaneous appraisals on an unimpaired basis, and to calculate the difference between that unimpaired appraised value and the sale price. If the number of such property sales is so large as to make it economically unfeasible to obtain individual appraisals, I reserve the right to use GCAD market value, adjusted by the adjustment ratio determined as described in the first paragraph of this section (i.e., paragraph 131 above) as a measure of the property's unimpaired market value at the beginning of the period at issue in this case, and to adjust that beginning-of-the-case-period market value to account for local residential appreciation rates to the date of sale, thereby calculating an unimpaired market value at the date of sale for comparison to the sale price, as a means of determining the property owner's loss (if any) on sale.

136. We will adjust the calculated property value losses for all properties in the proposed class for this case to their present values as of a designated trial date, using an appropriate interest rate, price index, or other appropriate performance measure to account for the time value of money.

137. I also reserve the right to calculate direct temporary losses resulting from airborne chemical releases from the BP Refinery, as reported by Plaintiffs in their surveys.

138. Application of this formulaic methodology will identify the permanent diminution in property value suffered by residential property owners in the defined class for this case. I will provide an electronic spreadsheet containing a parcel-by-parcel listing of these properties, with their associated unimpaired values, loss percentages, and estimated loss

36

in value. I reserve the right to update these calculations and loss estimates if new information becomes available.

139. For demonstration purposes, by applying Geographic Information System protocols to January 1, 2011 market value data downloaded from GCAD, we have calculated the following minimum aggregate baseline market value for properties in the SWAPE Boundary for this case. The data indicate there are over 21,000 total parcels with an aggregate value of 1.6 billion within the SWAPE Boundary area. This process can be replicated for earlier years after 2008 as needed.

| | Land Use Codes | Total Parcels | Mean Value | Total Value |
|---|---|---|---|---|
| • Single-family residential | A1-A9 | 13,920 | $ 66,658 | $ 927,875,000 |
| • Multifamily residential | B1-B9 | 447 | 197,732 | 88,386,000 |
| • Vacant Commercial | C1-C9 | 4,946 | 7,345 | 36,328,000 |
| • Acreage Vacant land | D1-D9 | 305 | 207,836 | 63,390,000 |
| • Commercial | F1 | 1,125 | 203,772 | 229,243,000 |
| • Exempt commercial | F9 | 263 | 742,980 | 195,404,000 |
| • Other property | E1,F2,J2-O1 | 139 | 444,928 | 61,845,000 |
| • Totals | | 21,145 | $ 75,785 | $ 1,602,472,000 |

## LOSSES TO NON-RESIDENTIAL PROPERTY

140. At this stage in the class certification process, we have focused on demonstrating the formulaic techniques we are applying to residential housing affected by air pollution releases from the BP Refinery in Texas City. The peer-reviewed literature generally finds that losses to investment and non-residential property (retail, office, institutional, not for profit, and other property) are higher than similarly affected residential losses, holding all else constant. The literature also finds that obtaining mortgage financing is more challenging for commercial property that suffers from environmental problems, holding all other factors constant. Sale-resale analysis, regression analysis, and contingent valuation analysis are all techniques set forth in the peer-reviewed literature that could be available to determine potential losses to commercial property in this case. My preliminary opinion at this time is that investment and non-residential properties in this case have sustained losses between 5% and 40%. It is likely that we will find that there are subclasses of non-residential property owners. I reserve the right to collect more data and update this opinion as more information becomes available.

141. With respect to the number of non-residential properties, from the limited preliminary work we have conducted to date, it is apparent that there are over 6,700 property owners of non-residential and investment property within the SWAPE Boundary that have been affected by the air pollution from the BP Refinery in the proposed class for this case. With respect to baseline property values, using techniques similar to those demonstrated

37

above in the residential analysis, we plan to identify their unimpaired market value as per the appropriate date on or after December 22, 2008, based upon information provided by the Galveston Central Appraisal District. It is my opinion that these properties have sustained economic damages in the form of permanently reduced property values. Because of the many commonalities, the damages to commercial property in this case can be handled as a class, in a formulaic approach, and generally accepted methodologies and data are available to perform this analysis. I reserve the right to update my opinion when new information becomes available.

## CONCLUSION

142.    In my opinion, for the purpose of class certification, the frequency and volume of airborne chemical releases from the BP Refinery have, to a reasonable degree of scientific certainty, adversely affected and will continue to adversely affect real estate values of residential and non-residential properties in Texas City and La Marque, Texas. Well-accepted formulaic methodologies exist for quantifying the impact of such air pollution-related damages, conditions and concerns on classes of property owners within a defined geographic area. These property owners are commonly affected by the airborne chemical release issues, and it is my opinion that their losses, in percentage of property value, are consistent when knowledge of the air pollution and chemical release issues is known.

143.    I have used my professional knowledge and experience, and use (or plan to complete my analysis using) generally accepted methods including evaluation of the peer-reviewed literature, regression analysis, real estate trends analysis, transaction frequency analysis, days on market analysis, sale/list price ratio analysis, sale/resale analysis, contingent valuation analysis, and property-owner surveys to arrive at my opinion. I opine, to a reasonable degree of scientific certainty, that Plaintiffs in the proposed class for this case face common issues stemming from Defendant's airborne release of chemicals at the BP Refinery, and that generally accepted and formulaic methods and data exist to carry out this analysis for this proposed class action case. My preliminary loss opinion pertains to the three ZIP codes (as per the real estate trends analysis) and the SWAPE Boundary (regression analysis). Further delineation of the class into subclasses is expected. My opinion at this time is that the Plaintiffs owning real property in the defined class in this case have incurred substantial common damages to their real estate, with the exact amount to be determined when my research is completed, and that these damages are permanent.

144.    In addition, it is my opinion that property owners in the proposed class who incurred temporary losses, including but not limited to direct out-of-pocket expenses for repairs and maintenance related to the airborne chemical releases from the BP Refinery during the two-year period beginning December 22, 2008, have suffered additional damages in that they have been, or remain, unable to normally enjoy their real estate. These losses may also be factored into my calculation of property losses. I reserve the right to incorporate these losses in the future.

38

145. All opinions in this expert report are stated to a reasonable degree of scientific certainty. I reserve the right to update my opinion contained in this expert report when more information becomes available.

Signed and dated:   Beachwood, Ohio

January 10, 2012

**Robert A. Simons, Ph.D.**

## REFERENCES

Anstine, Jeff. 2003. "Property Values in a Low Populated Area When Dual Noxious Facilities Are Present," Growth and Change Vol. 34: 2003, pp. 345-358.

Aulds, T.J. 2010.  "Fact or fiction of BP chemical release," *The Galveston County Daily News*; August 9, 2010.

Bell, Randall, Mark Bell and Crell Anderson. 1999.  Bell's Guide: The Comprehensive Real Estate Handbook, 2nd ed. Sequoia Publishers: p. 48.

Berkman, Mark P., Kyle J. Hubbard and Timothy H. Savage. 2012.  "The Adverse Impact of Particulate Matter on Property Values," International Real Estate Review 2012 (forthcoming).

California State Board of Equalization. 1998.  Assessors' Handbook, Section 502:  "Advanced Appraisal" (December 1998), at http://www.boe.ca.gov/proptaxes/pdf/ah502.pdf

Center for Public Integrity and National Public Radio, 2011.  Excel spreadsheet: "EPA_watchlist_data-Sept2011".

Cheremisinoff, N.P., Ph.D. 2011.  "Trends in BP Texas City Refinery Flaring Practices," August 2011.

Dotzour, Mark. 1997. "Groundwater Contamination and Residential Property Values," The Appraisal Journal (July 1997): 279-285.

Figueroa, Eugenio, Jorge Rogat and Luis Firinguetti. 1996. "An Estimation of the Economic Value of an Air Quality Improvement Program in Santiago de Chile," Estudios de Economía Vol. 23: 1996, pp. 99-114.

Flower, Patrick C. and Wade R. Ragas. 1994. "The Effects of Refineries on Neighborhood Property Values," The Journal of Real Estate Research Vol. 9(3): 1994, pp. 319-338.

Jackson, Thomas O. 2001. "Environment Risk Perceptions of Commercial and Industrial Real Estate Lenders," Journal of Real Estate Research (22:3), pp. 271-288.

Jackson, Thomas O. 2005. "Groundwater Contamination and Real Estate Investment Risk," Journal of Real Estate Practice and Education (8:1), pp. 115-131.

Jenkins-Smith, Hank, Carol Silva, Robert Berrens, and Alok Bohara. 2002. "Information Disclosure Requirements and the Effect of Soil Contamination on Property Values." Journal of Environmental Planning and Management, 2002, 45(3) 323-339.

Kilpatrick, John A. 2001. "Concentrated Animal Feeding Operations and Proximate Property Values". The Appraisal Journal, July 2001:  301-306.

40

McCluskey, Jill, Ray Huffaker, and Gordon Rausser. 2002. "Neighborhood Effects and Compensation for Property Value Diminution." Law and Policy, January 2002, V 24 1:

McLean, D. G. and Mundy, B. (1998). "Adding Contingent Valuation and Conjoint Analysis to the Required Body of Knowledge for the Estimation of Environmental Damages to Real Property." Journal of Real Estate Practice and Education, 1(1).

Morris, Jim, Chris Hamby and Elizabeth Lucas. 2011. "Many Americans left behind in the quest for cleaner air," The Center for Public Integrity, November 7, 2011, at http://www.huffingtonpost.com/the-center-for-public-integrity/many-americans-left-behin_b_1079251.html

Mundy, Bill and David McLean. 1998. "Using the Contingent Value Approach for Natural Resource and Environmental Damage Applications." The Appraisal Journal, July 1988: 290-297.

Mundy, Bill. "Stigma and Values," The Appraisal Journal, January 1992: 7-13

Page, G. William, and Harvey Rabinowitz. 1993. "Groundwater Contamination: Its Effects on Property Values and Cities," Journal of the American Planning Association, Volume 59, pp. 471-479.

Patchin, Peter J. "Contaminated Properties: Stigma Revisited," The Appraisal Journal (April 1991): 167-172.

Patchin, Peter J. 1994. "Contaminated Properties and the Sales Comparison Approach," The Appraisal Journal (July 1994): 402-409.

Rosen, Sherwin. 1974. "Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition". Journal of Political Economy: 82 1.

Saginor, Jesse, Robert A. Simons and Ron Throupe. 2011. "A Meta Analysis of the Effect of Environmental Contamination on Non-Residential Real Estate Values" Journal of Property Investment and Finance.

Seo, Youngme and Robert A. Simons. 2011. "Residential Value Halos: The Effect Of A Jewish Orthodox Campus On Residential Property Values." International Real Estate Review.

Simons, Robert A., William Bowen and Arthur Sementelli. 1997. "The Effect of Underground Storage Tanks on Residential Property Values in Cuyahoga County, Ohio." Journal of Real Estate Research, 14 1/2: 29-42.

Simons, Robert A., William Bowen and Arthur Sementelli. 1999. "The Price and Liquidity Effects of UST Leaks from Gas Stations on Adjacent Contaminated Property." The Appraisal Journal, April 1999: 186-94.

41

Simons, Robert A.  1999a. "Settlement of an Oil Pipeline Leak With Contaminated Residential Property: A Case Study." Real Estate Issues 24 2: 46-52.

Simons, Robert A.  1999b. "The Effects of Oil Pipeline Ruptures on Non-Contaminated Easement-Holding Property." The Appraisal Journal, July 1999:

Simons, Robert A., Kimberly Winson-Geideman and Brian Mikelbank. 2001. "The Effects of An Oil Pipeline Rupture on Single-Family House Prices." The Appraisal Journal, October 2001.

Simons, Robert A. 2002. "Estimating Proximate Property Damage From PCBs In A Rural Market: A Multiple Techniques Approach." The Appraisal Journal, October 2002:

Simons, Robert A. 2005. "Determining Market Perceptions On Contaminated Of Residential Property Buyers Using Contingent Valuation Surveys" (with Kimberly Winson-Geideman), Journal of Real Estate Research 27 2:193-220.

Simons, Robert A. and Ron Throupe. 2005. "Toxic Mold Issues and Effects on Property Values" The Appraisal Journal, Spring 2002: 156-166.

Simons, Robert A. 2005. When Bad Things Happen to Good Property (lead author). Washington DC: Environmental Law Institute Press (released 2006).

Simons, Robert A., and Aly Karam. 2008  "Affordable and Middle Class Housing On Johannesburg's Mining Sites: A Benefit-Cost Analysis," Development Southern Africa. 2008.

Simons, Robert A., Jesse Saginor, Aly Karam and Hlengani Baloyi. 2008.  "Use of Contingent Valuation Analysis in A Developing Country:  Market Perceptions of Contamination on Johannesburg's Mine Dumps," International Real Estate Review. 2008.

Simons, Robert A. and Jesse Saginor. 2010. "Determining Offsite Damages to Non-residential property From Leaking Underground Storage Tanks". International Real Estate Review 13 2 p 134-156.

Simons, Robert and Ron Throupe. Forthcoming 2011. "Debundling Property Rights In Contaminated Land: A Commercial Case Study".International Real Estate Review.

Smith, V. Kerry and Ju-Chin Huang. 1995. "Can Markets Value Air Quality?:  A Meta-Analysis of Hedonic Property Value Models," The Journal of Political Economy Vol. 103(1): 1995, pp. 209-227.

USA Today. 2008.  "The Smokestack Effect:  Toxic Air and America's Schools," at http://content.usatoday.com/news/nation/environment/smokestack/index.

Worzala, E.M., and W.N. Kinnard, Jr. 1997. "Investor & Lender Reactions to Alternative Sources of Contamination," Real Estate Issues (60:3), pp. 42-47.

**EXHIBIT 1**
**CURRICULUM VITAE**

**ROBERT A. SIMONS, Ph.D.**
December 2011

# Professor
# of Urban Planning and
# Real Estate Development

Levin College of Urban Affairs
Cleveland State University
1717 Euclid Avenue
Cleveland, Ohio 44115-2440
(216) 687-5258, 687-2136
(216) 687-9342 fax
e-mail r.simons@csuohio.edu

# Principal, RS&A, Inc.

23101 Wendover Drive
Beachwood OH 44122
(216) 691-0755 tel. and fax
cell (216) 401-1700
www.rasimons.com
roby@rasimons.com

## EDUCATION

Ph.D., (1990) City and Regional Planning
University of North Carolina at Chapel Hill
Field: Real Estate.

M.S., Economics (1989)
University of North Carolina at Chapel Hill
Field: Public Finance.

M.R.P., City and Regional Planning (1980)
University of North Carolina at Chapel Hill
Fields: Environmental and Land Use Planning

B.A., Anthropology (1976)
Colorado State University, Fort Collins, CO

## ACADEMIC POSITIONS

**Professor, with Tenure,** Cleveland State University, 2000 to present.

**Visiting Professor**, and Lady Davis Scholar. Fall 2010-Spring 2011, Israel Institute of Technology (Technion), Haifa.

**Fulbright Scholar**, (Lecturing and research) University of the Witwatersrand, Johannesburg, Department of Town and Regional Planning, South Africa, July-December, 2005.

**Associate Professor with Tenure,** Cleveland State University 1996-2000,

43

**Visiting Associate Professor**, and Lady Davis Scholar, Fall semester 1999, Israel Institute of Technology (Technion), Haifa.

**Assistant Professor** CSU,1991-1996

**Instructor** CSU, Fall 1990.

Courses include: (undergraduate) Contemporary Urban Issues and Megacities of Asia; (graduate) Public Finance and Economics, Urban Development Finance, Plan Implementation, Environmental Finance, and Urban Development Process/Market Analysis, Planning Capstone studio, Ph.D. Urban Research methods.

**Temporary Part Time Professor**, (real estate development) Kent State University (2001-2004).

**Director,** Master's of Urban Planning Design and Development (MUPDD) degree, September 2000- May 2003, and Spring 2005.

**Director** Master's of Arts in Environmental Studies (MAES) August 2002-May 2003**.**

**Coordinator,** Certificate in Urban Real Estate Development and Finance (2000-present).

## *PROFESSIONAL EXPERIENCE*

**Principal, Robert Simons & Associates, Inc.** (RS&A), Cleveland, Ohio, and Chapel Hill, N.C., real estate and housing market and financial research, loan defaults, contaminated land redevelopment, environmental damages, public and private real estate consulting, expert testimony (part-time) 1987-present.

Associate, Laventhol & Horwath, Denver, Colorado, real estate market and financial analysis, appraisal, 1985-1986.

Director of Real Estate Economics, David Jensen and Associates, Denver, Colorado, multidisciplinary land planning and architectural firm, housing and mixed-use real estate developments, 1984.

Associate, Browne, Bortz & Coddington, Denver, Colorado, economic, financial, real estate and land use analysis, 1980-1983.

Planner, Robert Borg and Associates, Planners and Architects, Breckenridge, Colorado, land planning and site design, 1980.

## CONSULTING CONTRACTS/GRANTS (RS&A or Principal Investigator)

The effect of air pollution from the BP refinery in Texas City, Texas on property values for Buzbee Law Firm (2011, underway)

44

The effect of salt mine subsidence on nearby property values, Hutchinson, Kansas, for Bretz Law Firm (2010, underway)

The effect of PCB contamination on residential property values, Pensacola FL, for Stewart Law firm, (2010 underway)

The effect of mold contamination on one residential property, Longport, NJ, for Basile & Testa Law firm, (2010 underway)

State of the Ohio economy with respect to demand for to real estate, construction, and concrete products, for Thompson Hine Law firm, (2010)

The effect of PCB and related contamination on residential property values, East St. Louis, IL for ELG Law firm, (2010)

The effect of TCE and related contamination on residential property values, Sarasota FL, for Motley Rice Law firm, (2009)

Real Estate environmental damages in a commercial property dispute in Sacramento, CA, for Girardi Keese Law firm (2009)

The effect of contamination on residential property values, Houston TX, for Hall Law firm, (2008)

Real Estate damages in an industrial property dispute, for Taft Stettinius Law firm (2008, underway)

The effect of contaminated soil on residential property values, Port Richmond, PA, for Levin Fishbein Law firm, (2008, underway)

Impact analysis of proposed shopping center on residential property values in Solon, Ohio (for Coral Company, through CSU, 2008)

Real estate property damages from a chemical plant in Plant City, Florida for the Weitz Luxemburg Law Firm, (2008, underway).

Effect of a lead Smelter on residential property values in Detroit, Michigan, for Doffermyre Shields law firm (2008).

Industrial Property Data Base Enhancement Analysis (through CSU), for Cuyahoga County Department of Development, (2008).

The effect of a LUST on residential property values, Toms River, New Jersey for Levin Fishbein Law for, (2007, underway)

45

The effect of a flood on residential property values, Fairfax County, Virginia, for Levin Fishbein Law for, (2007, underway)

Real estate property damages from coal gasification waste contamination in Tiverton, Rhode Island for the Motley Rice Law Firm, (2007)

Real estate property damages from groundwater contamination in Parkersburg, West Virginia for the Hill Law Firm, (2007)

Real estate property damages from a landfill site in Canton Ohio for the Weitz Luxemburg Law Firm, (2007, underway).

Analysis of fiscal impacts of Lakeview Bluffs Development project in Lake County, Ohio (through CSU Urban Center), for Hemisphere Development Corp (2007).

Strategic Industrial retention Analysis for the City of Bedford Heights, Ohio  (through CSU Urban Center), for City of Bedford Heights (2007).

Analysis of Office and Service relocation for the Geauga County, Ohio Service Complex, (through CSU Urban Center), for Geauga County Commissioners  (2006)

Real estate property damages from leaking underground storage tanks in suburban Baltimore, Maryland  (4 separate cases) for the Peter G. Angelos Law Firm, (2006, underway)

Real estate property damages from a leaking underground storage tanks in Queens, NY for the Ripka Bern Napoli Law Firm, (2006)

Real estate property damages from a leaking underground storage tank in Smithtown NY for The Armondo Light and Croft Law Firm, (2006)

Real property damages from a CITGO Oil Spill in the Lake Charles Shipping Channel in Lake Charles, Louisiana, for the Lundy & Davis Law Firm, and Wells Watson Law firm, Lake Charles, LA (2006, 2008).

Public Purpose and Blight Analysis for the Flats East Bank Project in Cleveland, Ohio. (through CSU Urban Center), for Cleveland/Cuyahoga County Port Authority (2006)

Analysis of the effect of removing the city employee residency requirement on a City in Ohio, for the Chandra Law Firm, (2006)

Analysis of the effect of removing the city employee residency requirement on the City of Akron, Ohio, for Akron City Law Department, (2006)

Analysis of the effect of removing the city employee residency requirement on the City of Cleveland, Ohio, for Cleveland City Law Department, (2006)

46

Analysis of Multifamily Housing redevelopment options in Cleveland Inner Ring Suburbs, (through CSU Urban Center) for ULI, Cuyahoga County Development and others, (2006).

Real property damages from a groundwater contamination from PFCs from landfills in Oakdale and Lake Elmo, Minnesota for Beasley Allen Law Firm and other attorneys, (2006).

Affordable and Middle Class Housing On Johannesburg's Mining Sites: A Benefit-Cost Analysis, for iProp, PDNA, and National Nuclear Regulator (South Africa), through Wits University, (2005).

Real Property Damages to the Twee Jonge Gazellen Vineyard in Tulbagh, South Africa, resulting for contaminated bottles, for The Mason Law Firm. (2005).

Real property damages from a groundwater contamination in Endicott, NY, for Phil Johnson and other attorneys, Endicott, NY (2005, underway).

Real property damages from a rail yard spill contamination in Lake Charles, Louisiana, for the Lundy & Davis Law Firm, Lake Charles, LA (2005).

Real property damages from creosote contamination in Pineville and Alexandria Louisiana, for the Lundy & Davis Law Firm, Lake Charles, LA (2005, underway).

Real property damages from DDT contamination on residential and commercial property values in McIntosh, Alabama.  For Lambert & Nelson Law firm, (2005).

Real property damages from environmental contamination on residential property values in Crystal Springs, Mississippi  For David Nutt and Associates (2005).

Real property damages from water contamination on residential and commercial property values in Moss Point, MS.  For Mithoff Jacks Law firm, (2005).

Location analysis of the Cuyahoga County Office Building in Cleveland, OH, for Staubach Company (2005)

Economic and fiscal impacts of Cuyahoga County Airport, Master Plan Update, for C&S Consultants and Cuyahoga County Airport (2005)

Real property damages from a refinery pollution event in Hooven, Ohio, for the  Lundy & Davis Law Firm, Lake Charles, LA (2004).

Real property damages for lake pollution in east Texas, for the Condrey Law Firm, LA (2004).

47

Real property damages from a factory pollution event in Grenada, MS, for the Lundy & Davis Law Firm, Lake Charles, LA (2004).

Real property damages from pollution from a factory in Columbus, MS, for the Lundy & Davis Law Firm, Lake Charles, LA (2004, underway).

Real property damages from a leak of a Shell pipeline in Kankakee, Illinois, for the Cashion Law Firm, Chicago, IL (2004).

Real property damages from a superfund landfill in Jacksonville, FL, for Doffermyre Shields Canfield Knowles & Devine LLP, Atlanta, GA (2004).

Impacts of relocation of a Buick dealer in Lorain Ohio, for Nick Abraham Dealership, Elyria, OH (2004)

Real property damages from a BP refinery in Neodesha, Kansas, for the Edgar Law Firm, KC. MO. (2004).

Real property damages from mercury contamination on residential and commercial property values in McIntosh, Alabama.  For Lambert & Nelson Law firm, (2004).

Real property damages from lead contamination on residential and commercial property values in Picher/Cardin Oklahoma. For Seeger Weiss et al Law firm, (2004, underway).

Real property damages from environmental contamination on residential property values in Crystal Springs, Mississippi (2004).

Analysis of land rent increases and associated real estate losses at Columbia Park, in Olmsted Township, Ohio, for Columbia Park Homeowners Association and Kirk Stewart, Attorney, (2003).

Impact of Coal Sludge release on real property in Kentucky, for Foote Law Firm, (2003).

Real property damages from chicken farms on residential and commercial property values for littoral property owners on Grand Lake of the Cherokees in Oklahoma. For Milstein Weiss et al Law firm, (2004).

Real Property Damages caused by a leak from a Pipeline in Parker County, Texas, for Puls Law Firm, (2003).

Origin and Destination study of 4,000 Downtown Bus Riders, for Greater Cleveland Regional Transportation Authority (Principal Investigator) through CSU (2003)

Retail Market and Tax Base Analysis of the Kamm's Corners neighborhood in Cleveland, OH, for Kamm's Corners CDC, (2003).

Impact of leaking underground storage tanks in South Carolina on property values, for Speights and Runyan, (2003)

Real property damages from leaking underground storage tanks in Erie County, Ohio, for Murray and Murray (2003).

Real property damages from natural gas explosion in Hutchinson, Kansas. For Bartimus, Frickleton (2004).

Real estate property damages from leaking underground storage tanks in Washington DC for The Mason Law Firm, (2003)

Impact of a FUDS on residential property values in The District of Columbia for Cohen Milstein Hausfeld & Toll PLC (2002)

Cleveland State University Master Plan, economic and market components. For CSU President's office, (through CSU), (2002)

Fiscal and Economic impacts of four brownfield projects on the Local Economy, For Hemisphere Corp. Clean Ohio Fund Applications (2002)

Impact of a petroleum pipeline rupture on contaminated real property in Hunt County, Texas, for N. Schwartz & Co. and for Ted Lyon, Esq. (2003).

Impact of Coal Sludge release on real property in Kentucky, for Lieff Cabraser Heimann and Bernstein LLP (2002).

Impact of Styrene releases on the surrounding neighborhood in Covington, Kentucky, for Doffermyre Shields Canfield Knowles & Devine LLP (2002)

Incidence of Reopeners in Mandatory and Voluntary Brownfield Clean up Programs in the USA, for US EPA, (with Environmental Law Institute, 2002)

Impact of PCB spills on contaminated property in Pennsylvania, for Carey and Danis & Co. (2001).

Impact of a petroleum pipeline spill on contaminated residential property in Maryland, for Cohen Milstein Hausfeld & Toll PLC (2001)

Impact of proposed Southwick new residential construction project on the surrounding neighborhood in Shaker Heights, Ohio, for Centerpoint Properties (2001).

Impact of PCB releases on the surrounding neighborhood in Anniston, Alabama, for Doffermyre Shields Canfield Knowles & Devine LLP (2001).

49

Land Suitability Analysis of 28 acres near Lost Nation Airport in Lake County, Ohio, for Mazanec Raskin & Ryder Co. (1999).

Retail Market Analysis for Bellaire and W. 130th Intersection in City of Cleveland, for Westown Community Development Corporation (1999)

Economic and Fiscal Impacts of Housing Rehabilitation Activities by NeighborWorks Organizations, (with CSU Urban Center), for Neighborhood Reinvestment Corp (1999)

Second Round: Benchmark Survey of Municipal Brownfield Redevelopment in the Great Lakes (with CSU Great Lakes Environmental Finance Center), for USEPA (1999).

Retail Market Analysis of the Emerald Point and Cleveland Business Park on Wards 20 and 21, Builders Housing Project, for Kamm's Corners Development Corp., and Councilman Michael Dolan, City of Cleveland, Ohio (1998)

Strategic Planning on Retail Market Repositioning for Jamison Properties, Euclid, Ohio (1999).

Brownfields Finance Workbook for Great Lakes Practitioners: (with CSU Great Lakes Environmental Finance Center), for USEPA (1998).

Fiscal and Neighborhood Impacts of the Fairview Hospital Expansion and Bosch Builders Housing Project, for Kamm's Corners Development Corp., and Councilman Michael Dolan, City of Cleveland, Ohio (1998)

Effect of a Group Home for Mentally Handicapped on neighborhood property values in Pepper Pike, Ohio, for Janik and Dunn (1998)

Turning Brownfields into Greenbacks: Book Project. Publisher: Urban Land Institute (1998).

Glen Willow Nursing Home Certificate of Need Analysis: Highest and Best use study of two existing Nursing Homes, for Roth, Rolf and Goffman (1997)

The Role of Publicity in Fair Housing Choices in Cuyahoga Falls, Ohio, for Housing Advocates, (1997).

Benchmark Survey of Municipal Brownfield Redevelopment in the Great Lakes (with CSU Great Lakes Environmental Finance Center), for USEPA (1997).

Effects of Pipeline Ruptures on Easement holders and Property Values; Research on property damages attributable to pipeline ruptures. For Reich and Binstock, Colonial Pipeline class action litigation team (1997).

50

Effects of Leaking Underground Storage Tanks on Nearby Property Values; Research on property damages attributable to underground storage tanks. For Reich and Binstock, UST class action litigation team (1997 through 2000).

Fiscal and Economic Impact Analysis of the Northwest Quadrant Project (with CSU Urban Center). Client: Village of Mayfield, Ohio (1996).

Supply and Demand For Brownfields in Six Great Lakes Metropolitan Areas, (with Don Iannone and CSU Great Lakes Environmental Finance Center), for USEPA (1996).

The Value Impact of Neighborhood Transition on Residential Sales Price (With Roberto Quercia), for Fannie Mae (1996).

The Case for Multifamily Housing: Economic Impact and Planning Issues (with James Webb and Ron Witten), for National Multi Housing Council (1996).

Jump Starting New Urban Housing Markets: Do the Fiscal Benefits Justify the Public Costs? with David Sharkey, for Fannie Mae (1996).

Financing Contaminated Land in Empowerment Zones, with CSU Great Lakes Environmental Finance Center, for USEPA (1996).

The Effects of Leaking Underground Storage Tanks on Residential Property using a Matched Pairs Approach, for Austin Valuation Counselors, Inc. (1995).

New Housing in Cleveland: Determining Market Demand and Impact; with Ivan Maric, Housing Policy Research of CSU Urban Center, for Cleveland Foundation, the City of Cleveland Department of Community Development, and Neighborhood Progress, Inc. (1995).

Identification of "Orphan" Underground Storage Tank Sites in Cuyahoga County; with CSU Urban Center, for State of Ohio, Department of Commerce, Fire Marshal, Bureau of Underground Storage Tank Regulations (1995).

The Effects of Underground Storage Tanks and Toxic Emissions on Residential Sales Values, with CSU Urban Center, funded by Ohio State University Center for Real Estate Education & Research, and the Urban University Program (1994).

Market and Financial Analysis of Proposed Shopping Center at 131st and Miles Avenue in Cleveland, Ohio; for Union Miles Development Corporation (1993).

Cleveland Land Bank Study: various analyses of city Land Bank property policies including housing lot intake, environmental risk issues, housing subsidy costs, and housing lot redevelopment strategies. With CSU Urban Center, for City of Cleveland, Department of Community Development in Cleveland, Ohio (1993).

51

Site Analysis and Market Assessment of Joint Development Potential of Brookpark and Triskett Rapid Stations in Cleveland, Ohio. For Greater Cleveland Regional Transit Authority (1993).

Cost Minimizing and Land Acquisition Strategies for Residential Lot Development: A Case Study of Cleveland's Glenville Neighborhood; with CSU Urban Center, Cleveland, Ohio (1992).

Inventory and classification of development potential of the real estate portfolio owned by the Greater Cleveland Regional Transit Authority; with CSU Urban Center, Cleveland, Ohio (1991).

Review and expansion of study to identify U.S. cities with substantial growth potential in the 1990s (with Norm Krumholz), for Landauer Real Estate Counselors (1991).

Market Study and Financial Analysis for a Retail and Local Services Shopping Center Near the Lake Monticello Development in Fluvanna County, Virginia (1989).

Review of the Retail Market in Greenville, N.C. (1988).

Loan Loss Experience of the New York Job Development Authority and Connecticut Development Authority: Preliminary Report (1988).

Analysis of Hotel Supply and Potential Hotel Acquisition Opportunities in Raleigh-Durham-Chapel Hill, N.C. (1987).

Apartment Vacancy Survey in Northeast Raleigh, N.C. (1987).

An Econometric Analysis of Locational Attributes of Subshop Franchises in NC (1987).

## ARTICLES

"Debundling Property Rights In Contaminated Land: A Commercial Case Study" (with Ron Throupe), International Real Estate Review, (forthcoming) .

"Community/Tribal Land Claims In Africa: A Survey, Journal of African Real Estate Research (forthcoming).

"Professional Real Estate Activities And Academic Journal Importance Among African Scholars: A Snapshot Of The 2008 African Real Estate Society Meeting" (with Aly Karam) Journal of African Real Estate Research (forthcoming).

"A Meta Analysis of the Effect of Environmental Contamination on Non-Residential Real Estate Values" (with Ron Throupe and Jesse Saginor) Journal of Property Investment and Finance. (2011)

52

"Residential Value Halos: The Effect Of A Jewish Orthodox Campus On Residential Property Values." (with Youngme Seo) <u>International Real Estate Review,</u> (forthcoming).

"Determining Offsite Damages to Non-residential property From Leaking Underground Storage Tanks" (with Jesse Saginor) <u>International Real Estate Review</u> 13 2  p 134-156 (2010)

"The Effect of Green Policy on the Market Penetration of Green Commercial Buildings". (with Eugene Choi and Donna Meister Simons).  <u>Journal of Sustainable Real Estate,</u> (2009).

"Determinants of Redevelopment of Abandoned Churches and Schools" (with Eugene Choi), International Real Estate Review (2009).

"The Effect of School Quality on Residential Sales Prices" (with Youngme Seo) <u>Journal of Real Estate Research,</u> 2009.

"Use of Contingent Valuation Analysis in A Developing Country:  Market Perceptions of Contamination on Johannesburg's Mine Dumps" (with Aly Karam, Jesse Saginor and Hlengani Baloyi), <u>International Real Estate Review</u>. 2008.

This Land Is Your Land, This Land Is My Land: Toward A Global Analysis Of Indigenous Tribal Land Claims (with Rachel Malmgren), <u>American Real Estate Society Research Monograph on Indigenous Peoples and Real Estate Valuation,</u> 2008.

"Affordable and Middle Class Housing On Johannesburg's Mining Sites: A Benefit-Cost Analysis" (with Aly Karam), <u>Development Southern Africa</u>. 2008.

"Introduction to the Indigenous Property and Valuation Monograph" (with Rachel Malmgren and Garrick Small), <u>American Real Estate Society Research Monograph on Indigenous Peoples and Real Estate Valuation,</u> 2008.

"Real Estate Practices Among Indigenous Peoples in South Africa: Pressure on the Urban Fringe" (with Francois Viruly). <u>American Real Estate Society Research Monograph on Indigenous Peoples and Real Estate Valuation.</u>  2008.

"The experience of Canadian Tribal Land Claims" (with Shwetha Pai) <u>American Real Estate Society Research Monograph on Indigenous Peoples and Real Estate Valuation.</u> 2008.

"A Meta Analysis of the Effect of Environmental Contamination and Positive Amenities on Residential Property Values "(with Jesse Saginor) <u>Journal of Real Estate Research</u>.. 28 1:71-104. (2006).

"Toxic Mold Issues And Effects On Property Values: A Preliminary Analysis" (with Ron Throupe) <u>The Appraisal Journal ,</u> Spring 2005: 156-166.

53

"Determining Market Perceptions On Contaminated Residential Property Buyers Using Contingent Valuation Surveys" (with Kimberly Winson Geideman), Journal of Real Estate Research.27 2:193-220. (2005.)

"The Effect of Freight Railroad Track Activity on Residential Property Values in Cuyahoga County, Ohio". (with Abdelaziz El Jaouhari), The Appraisal Journal (Summer 2004: 223-233).

"Understanding the Outcomes Of Brownfield Cleanup Programs" (with John Pendergrass and Kimberly Winson) Journal of Environmental Planning and Management (2004).

"The Fiscal and Economic Impacts of Housing Rehabilitation on the Local Economy," (with A.J. Magner and Esmail Baku) Journal of Real Estate Research (2003). Vol 25 no 1. p 431-461.

"Are Reopeners really an Issue in Brownfield Redevelopment?: A survey of State Voluntary Clean up Programs." (with John Pendergrass and Kimberly Winson); Journal of Environmental Planning and Management ( 2003). 46 (2) p 257-269.

"Estimating Proximate Property Damage From PCBs In A Rural Market: A Multiple Techniques Approach." The Appraisal Journal, (October 2002).

"Brownfield Redevelopment Activities in Great Lakes Communities: A Benchmark Assessment"(with Abdelaziz El Jaouhari) Economic Development Commentary, vol 25 no 3 (Fall 2001).

"The Effects of An Oil Pipeline Rupture on Single Family House Prices". (with Kimberly Winson and Brian Mikelbank), The Appraisal Journal October 2001.

"The Effect of Residential Investment on Nearby Property Values: Evidence from Cleveland, Ohio", (with Chengri Ding and Esmail Baku) Journal of Real Estate Research 19 1/2 . 2000.

"Deed Restrictions and Other Institutional Controls as Tools to Encourage Brownfield Redevelopment" (with Heidi Gorovitz Robertson) Environmental Law and Practice 7 1 Summer 1999.

"The Effects of Pipeline Ruptures on Non-Contaminated Residential Easement Holding Property in Fairfax County" Appraisal Journal, July 1999.

"The Price and Liquidity Effects of UST leaks from Gas Stations on Residential and Commercial Property Values" (with William Bowen and Arthur Sementelli), Appraisal Journal, April 1999

54

"The Effects of Pipeline Ruptures on Rural Residential Property with groundwater Contamination and a Negotiated Settlement Package", Real Estate Issues, 1999.

"Contaminated Land: Do Property Registers Do More Harm Than Good? An Analysis of the UK and USA Approaches to Public Management of Brownfields". (with Paul Syms) (UK). 1999.

"Government Regulation of Contaminated Land: A Tale of Three Cities" (with Nelson Chan and Rodney Jefferies), Environmental and Planning Law Journal (Australia), 1998.

"How Many Brownfield Sites are There?" Journal of Public Works Management and Policy, Vol 2, no 3 1998.

"Brass Mill Mall: Bringing New life to a Brownfield Site in Waterbury, Connecticut" (with Michael Leccese), Urban Land, June 1998.

"The Value Impact of Neighborhood Transition on Residential Sales Price", Journal of Real Estate Research, Vol. 15 No 2. (With Roberto Quercia and Ivan Maric) 1997.

"The Effect of Underground Storage Tanks on Residential Property Values." Journal of Real Estate Research, Vol 14 No.1/2 (with William Bowen and Arthur Sementelli), 1997.

"Liquidity and Delayed Transactions with Leaking Underground Storage Tanks: Some Evidence from Cleveland, Ohio" The Appraisal Journal, (with Arthur Sementelli), July 1997.

"Regulation of Leaking Underground Storage Tanks: Unintended Side Effects" Economic Development Quarterly, (with Arthur Sementelli), August 1997.

"Supply and Demand for Brownfields in Great Lakes Cities" (with Don Iannone), Urban Land, June 1997.

"Jump Starting New Urban Housing Markets: Do the Fiscal Benefits Justify the Public Costs?"(with David Sharkey), Housing Policy Debate, Spring 1997. vol 8 no 1. p143-171.

"Financing Environmentally Contaminated Land in the Great Lakes Empowerment Zones", Economic Development Commentary, Fall 1996.

"The Market for Quantitative and Research Methods in Planning: Do Schools Teach What Practitioners Practice?" Journal of Planning Education and Research (with Sanda Kaufman), (Fall 1995).

"Using GIS To Make Micro-Level Real Estate Decisions for Local Government: A Financial and Environmental Analysis of Residential Lot Redevelopment in a Cleveland Neighborhood." (with Mark Salling), URISA Journal, (Spring 1995).

"Industrial Real Estate Mortgage Default Experience of the New York State Job Development Authority Second Loan Program:  A Preliminary Investigation, <u>AREUEA Journal</u>, (Winter 1994).

"Public Real Estate Management and the Planner's Role," <u>Journal of the American Planning Association</u>, (Summer 1994).

"How Clean is Clean?  The Effect of Proposed Governmental Regulations on Vacant and Under-Utilized Inner-City Land Being Recycled in the Residential Market," <u>The Appraisal Journal</u>, (July 1994).

"Public Real Estate Management--Adapting Corporate Practice to the Public Sector:  The Experience in Cleveland, Ohio," <u>Journal of Real Estate Research</u>, (Fall 1993).

"State Public Lending Practice and Industrial Real Estate Mortgage Default:  The New York Experience," <u>Economic Development Quarterly</u>, (February 1993).

"What Can Public Real Estate Managers Learn from Corporate Practice?  The Experience in Cleveland, Ohio," <u>Journal of Property Management</u>, (January 1993).

"Site Attributes in Retail Leasing:  An Analysis of a Fast Food Restaurant Market," <u>The Appraisal Journal</u>, (October 1992).

"Comparing Regional Classifications for Real Estate Portfolio Diversification" (with Emil Malizia), <u>Journal of Real Estate Research</u>, (Spring 1991).

"Private Prisons--A Real Estate Investment and Management Opportunity," <u>Real Estate Insight</u>, N.Y., Laventhol and Horwath (April 1986).

"Emerging Trends in the Homebuilding Industry," <u>Colorado Builder</u> (September 1984).

## <u>BOOK CHAPTERS</u>

"Creative Financing for Brownfield Redevelopment" In <u>Brownfields: A Comprehensive Guide to Redeveloping Contaminated Property</u> book chapter (with Adam Saurwein), Todd Davis, ed., 3rd edition, Chicago: American Bar Association, chapter 7  (2010).

"Brownfield Voluntary Remediation Programs in the USA: Orphan Stepchild or Gifted Protege?" (with Kimberly Winson) book chapter in <u>Environmental Policy Issues</u> (Dianne Rahm, Ed.), (2002).

"Creative Financing for Brownfield Redevelopment" In <u>Brownfields: A Comprehensive Guide to Redeveloping Contaminated Property</u> book chapter, Todd Davis, ed., Chicago: American Bar Association, chapter 7  (2002).

"Financing Public Investment in Retail Development",  In: <u>Financing Economic Development</u> (Sammis White, Ed.) with Kimberly Winson and William Bowen (2002).

"Development and Issues of Inner-City Retail Niche Markets", (with John Brennan) peer-reviewed book chapter in ARES/ICSC sponsored <u>Megatrends in Retail Property</u>, John Benjamin, ed., Boston: Kluwer, 1996.

"Planning Issues of Retail Development", peer-reviewed book chapter in ARES/ICSC sponsored <u>Megatrends in Retail Property</u>, John Benjamin, ed., Boston: Kluwer, 1996.

## LEAD-AUTHORED BOOKS

Lead Editor, <u>American Real Estate Society</u> <u>Research Monograph on Indigenous Property and Valuation</u> (2008).

<u>When Bad Things Happen To Good Property</u>, (lead author) Washington DC: Environmental Law Institute. 2005. (released 2006)

<u>Turning Brownfields into Greenbacks: Redeveloping and Financing Contaminated Urban Real Estate</u>. Washington DC:  Urban Land Institute 1998.

## RESEARCH IN PROGRESS

"Recovery Of Collective Land Claims:  An International Comparative Case Study Of The Negev Bedouin In Israel" (with 3 masters students from Technion Planning Program, 2011)

"Explaining The Gap Between Capitalized Rental Values And Sales Price In Residential Markets"  (with Yuval Arbel, Eugene Choi and Danny Ben Shahar 2011).

<u>No Building Left behind: Recycling Religious Buildings And Schools</u> (with Gary DeWine and Larry Ledebur, and others), (past peer-review, working with Kent State University press).

"Housing Satisfaction in Johannesburg, South Africa" (with Aly Karam), working paper (2007).

"The Equity and Efficiency implications of the National Clean Air Act Acid Rain Program." (with Kathleen Gaiser and Kevin Snape), Working paper (2001).

"The Effect of Rapid Transit Stations and Railroad Track Activity on Residential Property Values in Cuyahoga County, Ohio". (with Abdelaziz El Jaouhari), conference paper (2002).

## BOOK REVIEWS

Environment And Social Justice: An International Perspective, edited by Dorceta E. Taylor. In <u>Journal Of Planning Education and Research </u>(forthcoming 2011).

The Lexus and the Olive Tree, By Thomas Friedman, in <u>The Appraisal Journal</u> 2004.

Insurance Redlining, By Gregory Squires, (ed), in <u>Journal of the American Planning Association</u>, 1999.

Contaminated Land: Reclamation, Redevelopment and Reuse in the USA and European Union, by Peter Meyer, Richard Williams and Kristen Yount, in <u>Journal of the American Planning Association</u>, (Summer 1996).

## PEER REVIEWS AND EDITORSHIPS

Associate Editor: Journal of Sustainable Real Estate

Editorial Board: American Real Estate Society, Journal of African Real Estate

Occasional reviewer for a dozen or more journals since 2000.

## DOCTORAL DISSERTATIONS

<u>Determinants of the Redevelopment of Religious Buildings</u>. Chair. Dr. Eugene Choi. 2010.

<u>Who Cares about School Quality</u>? Chair. Dr. Youngme Seo. 2009.

<u>Historic Preservation and Residential Property Values</u>. Dr. Akram Ijla. reader. 2008.

<u>Eminent Domain And Its Use As An Economic Development Tool</u>. Chair. Dr. Jesse D. Saginor. 2006

<u>Infill Housing Determinants In Cleveland, Ohio</u>. Dr. J.W. Kim, reader. 2006

<u>Primary Cities and Trade Policy in Economic development.</u> Chair. Dr. Abdelaziz El Jaouhari. 2004.

<u>Residential Redevelopment on Brownfields in Chicago</u>. Chair. Dr. Kimberly Winson-Geideman. 2003.

<u>Public Real Estate Investment Trusts.</u> Reader. Dr. Michael Seiler. 2000.

## AWARDS

Sabbatical, one year from Cleveland State University, 2010-2011.

Lady Davis Fellowship for teaching and research at the Technion-Israel Institute of Technology, ¼ time with stipend, ¾ time without stipend, 2010-2011 AY.

Fulbright Scholarship, for six months starting July 2005, at the University of the Witwatersrand, Johannesburg, South Africa, Faculty of Town Planning

58

Sabbatical, one year from Cleveland State University, 2003-2004.

Lady Davis Fellowship for teaching and research at the Technion-Israel Institute of Technology, fall semester 1999.

ARES Manuscript prize for best paper presented at the 1999 annual ARES meeting.(with Chengri Ding and Esmail Baku)

Sabbatical, for two quarters, from Cleveland State University, Levin College of Urban Affairs, Fall 1996 and Winter 1997.

Tenure, at Cleveland State University, Levin College of Urban Affairs, 1996.

Highest Instructor Rating (out of 37 instructors) for Presentation of "Planners in Economic Development: Friend or Foe?" at the Ohio Economic Development Training Course, March 1994.

IREM/ARES Manuscript prize for best paper presented at the 1992 annual ARES meeting on Asset/Property Management.

## PRESENTATIONS

"Recovery Of Collective Land Claims:  An International Comparative Case Study Of The Negev Bedouin In Israel" (with Dan Berkowitz, Lior Glick, Nir Ben Simon and Anil Kashyap), at the ACSP meeting in Salt Lake City, Utah October 2011.

"Explaining Residential Global Cap Rates Worldwide" (with Yuval Arbel, Eugene Choi and Danny Ben Shahar) at ERES meeting in Eindhoven, Netherlands,  June 2011.

"Debundling Property Rights In Contaminated Land: A Commercial Case Study" (with Ron Throupe) at ARES meeting in Seattle WA. April 2011.

Panel Chair: Tribal Land Claims, at the African Real Estate Society (AfRES) meeting in Naivasha, Kenya, October 2010.

AfRES Conference Wrap Up Session, presented in plenary session to participants at the African Real Estate Society meeting in Naivasha, Kenya, October 2010.

New Trends in Mortgage Financing: The Current Lending Crisis, presented in plenary session to participants at the Middle Eastern and North African Real Estate Society (MENARES) meeting in Dubai, UAE, October 2010.

Panel organizer: Religious attitudes toward mortgage lending. ARES meeting in Naples, Florida, April 2010.

Alternative to Mortgage Default: Trading Down and Staying On the Equity Ladder" (With Michael Zelin), ACSP, Crystal City, VA, October 2009.

The Effect Of Schools on Residential Property Values. (with Youngme Seo) ARES meeting in Monterey, California April 2009.

The Effect Of Churches on Residential Property Values. (with Eugene Choi) ARES meeting in Monterey, California April 2009.

The Effect of Green Policy on the Market Penetration of Green Commercial Buildings (with Eugene Choi and Donna Meister Simons), ARES meeting in Captiva Island, Florida April 2008.

AfRES Conference Wrap Up Session, presented in plenary session to participants at the African Real Estate Society meeting in Johannesburg, South Africa, August 2008.

Residential Value Halos: The Effect Of A Jewish Orthodox Campus On Residential Property Values. (with Youngme Seo) ARES meeting in Captiva Island, Florida April 2008.

Adaptive Reuse of Historical Buildings: determinants of Project Outcomes  (with Eugene Choi), ARES meeting in Captiva Island, Florida April 2008.

Effect Of Rescinding Employee Residency Requirements On Three Cities In Ohio.  (with Jesse Saginor and Pitt Curtiss), ACSP, Milwaukee, November 2007.

Housing Satisfaction in Johannesburg, South Africa (with Aly Karam), ERES meeting in London, UK June 2007.

The Effect of School Quality on Residential Sales Price (with Youngme Seo), ARES meeting in San Francisco, CA April 2007.

This Land Is Your Land, This Land Is My Land:  Toward A Global Analysis Of Indigenous Tribal Land Claims (with Rachel Malmgren) ACSP, Fort Worth, TX, November 2006.

Real estate Practices Among Indigenous Peoples in South Africa: Pressure on the Urban Fringe" (with Francois Viruly) at ARES, April 2006, Key West, Florida.

Use of Contingent Valuation Analysis in A Developing Country: Market Perceptions of Contamination on Johannesburg's Mine Dumps" (with Aly Karam and Jesse Saginor) at ARES, April 2006, Key West, Florida.

A Meta Analysis of the Effect Of Environmental Contamination on Commercial Property Values" (with Jesse Saginor and Ron Throupe) at ARES, April 2005, Santa Fe, New Mexico.

60

A Meta Analysis of the Effect Of Environmental Contamination on Residential Property Values" (with Jesse Saginor) 2004. at ARES, April 2004, Captiva Island, Florida.

"The Impact Of Leaking Underground Storage Tanks On Residential Property Buyers" (with Kimberly Winson-Geideman), at ARES Monterey, CA April 2003.

" Understanding the Outcomes Of Brownfield Cleanup Programs" (with John Pendergrass and Kimberly Winson) ACSP, Baltimore, Maryland, November 2002.

"The Effect of Rapid Transit Stations and Railroad Track Activity on Residential Property Values in Cuyahoga County, Ohio". (with Abdelaziz El Jaouhari), ACSP, Baltimore, Maryland, November 2002.

"The Effect of Freight Train Activity on Residential Property Values in Cuyahoga County, Ohio". (with Abdelaziz El Jaouhari), presented at the annual meeting of the American Real Estate Society in Ft. Myers, Florida, April 2002.

"The Equity and Efficiency implications of the National Clean Air Act Acid Rain Program." (with Kathleen Gaiser and Kevin Snape), ACSP meeting, Cleveland, OH November 2001.

"The Effects of An Oil Pipeline Spill on Residential Property Values on the Patuxent River in Maryland" (with Kimberly Winson and Brian Mikelbank), presented at the annual meeting of the American Real Estate Society in Coeur D'Alene, Idaho, April 2001.

"The Effect of Railroad Track Activity on Residential Property Values in  Cuyahoga County, Ohio" (with Abdelaziz El Jaouhari), presented at the annual meeting of the American Real Estate Society in Coeur D'Alene, Idaho, April 2001.

"The Fiscal and Economic Impacts of Housing Rehabilitation on the Local Economy," (with AJ Magner and Esmail Baku), ACSP, Atlanta, Georgia November 2000.

"The Effects of Leaking Underground Storage Tanks on Residential and Commercial Property Values: Statistical Issues" at the MEALEY'S Publications meeting on UST Litigation, Phoenix, Arizona, October 2000

"Reopeners in State Voluntary Clean Up Programs", at Brownfields 2000 in Atlantic City, New Jersey, October 2000 (with John Pendergrass)

"Brownfields In Israel", Organizer and Kick-off Speech at ISRAEL BROWNFIELDS 2000, at the Technion University, Haifa, Israel, January 2000.

"Introduction to Brownfields", and "Local Initiatives to Finance Brownfields: the Great Lakes Experience", at the CUED Brownfields Workshop In Cincinnati, Ohio, July 1999.

"Brownfields in Florida", Keynote speaker at 2nd Annual Florida Brownfields Conference in Jacksonville, Florida, May 1999.

"The Effects of Pipeline Ruptures on Non-Contaminated Residential Easement Holding Property in Fairfax County" <u>ARES meeting in Tampa, Florida April 1999.</u>.

The Long Road Ahead for Brownfields, and What's in it for US?: Public Investment in Brownfields, at the Brownfields 1998 conference in Los Angeles, California, November 1998.

Home Building Forecast for 1999. Greater Cleveland Homebuilders Association, November 1998.

The Effects of Leaking Underground Storage Tanks on Residential and Commercial Property Values at the MEALEY'S Publications meeting on UST Litigation, Jacksonville, Florida, June 1998

The Price and Liquidity Effects of UST Leaks on Adjacent Contaminated Residential and Commercial Property (with William Bowen and Arthur Sementelli), at the annual meeting of The American Real Estate Society in Monterey, California, April 1998.

"Brownfields in Northeastern Ohio" at the 1997 meeting of the Cleveland Engineering Society, October 1997.

"Economic Reality Check: Lessons From Brownfield Redevelopment Cases", at the Brownfields '97 conference in Kansas City, MO, September 1997.

"Lessons From Brownfield Redevelopment Cases: 13 Deals in 7 Venues", at the annual meeting of The American Real Estate Society in Sarasota, Florida, April 1997.

"Supply and Demand for Brownfields in Great Lakes Cities," presented at Cuyahoga County Brownfields Finance working Group, and Ohio Land Use Conference, Columbus, Ohio, March 1997.

"Contaminated Land: Do Property Registers Do More Harm Than Good? An Analysis of the UK and USA Approaches to Public Management of Brownfields". (with Paul Syms) at the Pacific Rim Real Estate Society Meeting in Palmerston, North, New Zealand, January 1997.

"Supply and Demand for Brownfields in Great Lakes Cities: Implications for community Involvement." and "Financing Environmentally Contaminated Land in the Great Lakes Empowerment Zones", at the Small Cities Conference in Louisville, Kentucky, October 1996.

"Supply and Demand for Brownfields in Great Lakes Cities: Implications for Community Involvement." Brownfields '96 conference in Pittsburgh PA, September 1996.

"Financing Environmentally Contaminated Land in the Great Lakes Empowerment Zones", at the annual meeting of The American Real Estate Society in Lake Tahoe, CA, April 1996.

"Emerging Issues in Brownfields Finance and Development", at the annual meeting of The American Planning Association in Orlando, Florida, April 1996.

"The Value Impact of Neighborhood Transition on Residential Sales Price", (With Roberto Quercia and Ivan Maric). Presented at the annual meeting of the American Collegiate Schools of Planning in Detroit MI, October, 1995.

"Negative Proximity Influence of Leaking Underground Storage Tanks/Toxic Neighbors on Residential Property: Issues of Information and Measurement." (with Rudy Robinson), at the annual meeting of The American Real Estate Society in Hilton Head, SC, April 1995.

"Two Urban Environmental Real Estate Research Issues in the United States of America: Brownfields and Underground Storage Tanks" Presented to the Faculty of the Department of Property, Univ. of Auckland, New Zealand, February, 1995.

"Management Issues For Leaky Underground Storage Tanks: How Are Property Transactions and Sales Prices Affected by Regulation of Contamination?" (with Arthur Sementelli), Presented at the annual meeting of the American Collegiate Schools of Planning in Phoenix, AZ, November, 1994.

"Economics, Finance and Budgeting Topics for the AICP Exam." Presented at the annual meeting of The American Planning Association in San Francisco, CA, April 1994, and at the 1996 meeting in Orlando, Florida.

"Using GIS to Make Micro-Level Real Estate Decisions for Local Government: A Financial and Environmental Analysis." Presented at the annual meeting of The American Real Estate Society in Santa Barbara, CA, April 1994.

"The Effect of Underground Storage Tanks and Toxic Emissions on Residential Sales Values." Presented at the annual meeting of The American Real Estate Society in Santa Barbara, CA, April 1994.

"The Market for Quantitative and Research Methods in Planning Practice: Do Schools Teach What Practitioners Practice?" Presented at the annual meeting of the American Collegiate Schools of Planning in Philadelphia, PA., October, 1993.

63

"Inner City Property Abandonment, Property Tax Delinquency and Net Equity: A Test of the Option-based Model in Cleveland, Ohio." Presented at the annual meeting of the American Real Estate Society in Key West, Florida, April, 1993.

"Public Real Estate Management and the Planner's Role: The Experience in Cuyahoga County, Ohio." Presented at the annual meeting of the American Collegiate Schools of Planning in Columbus, Ohio, October, 1992.

"Public Real Estate Management." Presented at the annual meeting of the American Real Estate Society in San Diego, California, April 1992.

"Borrower Net Equity as a Decision Variable in Industrial Real Estate Mortgage Default." Presented at the annual meeting of the American Real Estate and Urban Economics Association Meetings in New Orleans, LA, January, 1992.

## COMMUNITY SERVICE PROJECTS

Update of the Cleveland Lakefront Plan (class Project spring 2009).

Regional Development Plan for Western Cuyahoga and Eastern Lorain Counties, Ohio (class project) Spring 2008.

Lower Big Creek Recreation Trail, Cleveland, Ohio (class project) for Cleveland Metroparks, Spring 2006.

Regional Government Alternatives for Greater Cleveland, Ohio (class project) Spring 2005.

Burke Lakefront Airport: Comprehensive land use and Alternatives Analysis, For City of Cleveland, Planning Commission (class project) Spring 2003.

EcoVillage Cleveland: Comprehensive Planning and real estate analysis, Ohio City, Cleveland, for EcoCity Cleveland and Detroit Shoreway Community Development Organization (class project) Spring 2001.

Housing Market Analysis for the NEC site in Ohio City, Cleveland Ohio, for Cleveland Urban Properties, (Class Project) Summer 2000.

Financial analysis for the commercial and industrial redevelopment in the Fairfax neighborhood, Cleveland, Ohio. Client: Fairfax Renaissance Development Corporation. (Class Project) Spring 1997.

Financial Analysis for the Retail Component of Hispanic Village. Client: Hispanic Business Association of Greater Cleveland. (Class Project) Spring 1996.

64

Market Development Potential for Retail and Local Services for Hispanic Village. Client: Hispanic Business Association of Greater Cleveland. (Class Project) Winter 1996.

Financial Analysis of Low Income Housing Tax Credit Sites in the St. Clair area of Cleveland, Ohio. Client: Enterprise Foundation (Class Project) Spring 1995.

Financial Analysis of Three Infill Housing Sites in the Ohio City Neighborhood of Cleveland, Ohio. Client: Near West Housing Corp. (Class Project) Spring 1994.

Retail Leakage Analysis and Evaluation of Alternative Retail Development Sites in Garfield Heights. Client: City of Garfield Heights, Ohio. (Class Project) Winter 1994.

Financial Analysis of Proposed Shopping Center at 152nd and St. Clair Avenue in Cleveland, Ohio. Client: City of Cleveland, Department of Community Development. (Class Project) Spring 1993.

Market Redevelopment Potential for Retail and Local Services at the Van Aken Rapid Station in Shaker Heights, Ohio. Clients: The Greater Cleveland Regional Transportation Authority and Planning Department, City of Shaker Heights. (Class Project) Winter 1993.

Financial Analysis of Converting the Noble School Site to a Proposed Hotel Project at I-90 and Babbitt Road. Client: City of Euclid, Ohio. (Class Project) Spring 1992.

Market Redevelopment Potential for Retail and Local Services at the Windermere Rapid Station in East Cleveland, Ohio. Clients: The Greater Cleveland Regional Transportation Authority and Department of Community Development, City of East Cleveland. (Class Project) Fall 1991.

Financial Analysis of Proposed Shopping Center at 131st and Miles Avenue in Cleveland, Ohio. Client: Union Miles Development Corporation. (Class Project) Spring 1991.

## PROFESSIONAL ORGANIZATIONS

American Real Estate Society (ARES) (Distinguished Fellow; member of board of directors; Director of Career Development and Jobs website, 2004-2009; vice program Chair for 2008-9; Vice President and National Program Chair 2009-10; President-Elect in 2010-2011, President 2011-2012.

Advisory Board Member, Tiferet Village Project, Cleveland Heights, Ohio, 2007.

American Institute of Certified Planners (AICP), 1983-2009.

American Planning Association (APA), 1983-2009.

65

Appraisal Institute, Academic Review Panel, <u>The Appraisal Journal</u> (2001-2005).

Clean Air Conservancy, Cleveland Ohio (Board Member 1997-2003)

Corporate Real Estate Executives Network (CORENET), Northeast Ohio Board Member (2000-2003)

Cleveland Hillel, Board member 2002-2005

Urban Land Institute (ULI), Member, (National) Sustainable Development Council (2004)

## EXPERT WITNESS

The effect of air pollution from the BP refinery in Texas City, Texas on property values for Buzbee Law Firm (2011, underway)

The effect of salt mine subsidence on nearby property values, Hutchinson, Kansas, for Bretz Law Firm (2010, report, deposition, underway)

The effect of PCB contamination on residential property values, Pensacola FL, for Stewart Law firm, (2010 underway).

The effect of mold contamination on one residential property, Longport, NJ, <u>Pitt and Meloff vs. Longport Seaview Condo Assoc.</u> for Basile & Testa  Law firm, (report, deposition, videotaped trial testimony, 2010, underway).

State of the Ohio economy with respect to demand for to real estate, construction, and concrete products, Federal Bankruptcy Court, <u>Schwab Industries, Debtor, vs. Keybank.</u> for Thompson Hine Law firm, (videotaped trial testimony, 2010).

The effect of PCB and related contamination on residential property values, East St. Louis, IL for ELG  Law firm, (2010 underway).

The effect of TCE and related contamination on residential property values, Sarasota FL, for Motley Rice Law firm, (report and deposition, 2009, underway).

<u>Cook vs. Shell, for Girardi Keese Law firm, Sacramento, CA, (deposition).</u>

<u>Contamination from CES plant. Litigation vs  CES , Houston, TX, also related Joy Tabernacle case with report, for Hall Law firm</u>

The effect of contaminated soil on residential property values, Port Richmond, PA, for Levin Fishbein Law (2008, report, underway)

Real estate property damages from a chemical plant in Plant City, Florida for the Weitz Luxemburg Law Firm, (2008, report, underway).

66

Effect of a lead Smelter on residential property values in Detroit, Michigan, for Doffermyre Shields law firm (2008, deposition, trial).

The effect of a LUST on residential property values, Toms River, New Jersey for Levin Fishbein Law for, (2007, report, underway)

The effect of a flood on residential property values, Fairfax County, Virginia, for Levin Fishbein Law for, (2007, underway)

Real estate property damages from coal gasification waste contamination in Tiverton, Rhode Island for the Motley Rice Law Firm, (2007)

Real estate property damages from groundwater contamination in Parkersburg, West Virginia for the Hill Law Firm, (2007)

Real estate property damages from a landfill site in Canton, Ohio for the Weitz Luxemburg Law Firm, (2007, underway).

Real estate property damages from leaking underground storage tanks in suburban Baltimore, Maryland  (4 separate cases) for the Peter G. Angelos Law Firm, (2006, underway).  Deposed and report and trial on Tevis Oil Case. Deposed and Report for Parkton Case, report and deposition as consulting witness for Jacksonville case.

Real estate property damages from a leaking underground storage tank in Smithtown NY for The Armondo Light and Croft Law Firm, (expert, report)

Real property damages from a CITGO Oil Spill in the Lake Charles Shipping Channel in Lake Charles, Louisiana, for the Lundy & Davis Law Firm, Lake Charles, LA (2006, underway, report, deposition, trial testimony).

Public Purpose and Blight Analysis for the Flats East Bank Project in Cleveland, Ohio. (through CSU Urban Center), for Cleveland/Cuyahoga County Port Authority (deposition, 2006)

Analysis of the effect of removing the city employee residency requirement on a City in Ohio, for the Chandra Law Firm, (2006, expert, report)

Analysis of the effect of removing the city employee residency requirement on the City of Akron, Ohio, for Akron City Law Department, (expert, report)

Analysis of the effect of removing the city employee residency requirement on the City of Cleveland, Ohio, for Cleveland City Law Department, (expert, report)

67

Real property damages from a groundwater contamination from PFCs from landfills in Oakdale and Lake Elmo, Minnesota for Beasley Allen Law Firm and other attorneys, (deposition and testifying expert, trial testimony).

Real property damages to the Twee Jonge Gazellen Winery in Tulbagh, South Africa related to contaminated bottling problems, for The Mason Law Firm, (expert, 2005).

Real property damages from a TCE groundwater Plume on residential and commercial property values in Endicott NY, For Phil Johnson and other attorneys (expert, 2005 underway)

Real property damages from a rail yard spill contamination on residential property values in Lake Charles, Louisiana, For Lundy Davis Law firm (expert, mediation presentation)

Real property damages from creosote contamination on residential property values in Alexandria, Louisiana, For Lundy Davis Law firm (expert, underway)

Real property damages from creosote contamination on residential property values in Pineville, Louisiana, For Lundy Davis Law firm (expert, underway)

Real property damages from environmental contamination on residential property values in Crystal Springs, Mississippi Williams et al vs. Kuhlman Corp. et al (expert 2005).

Real property damages from dioxin environmental contamination on residential property values on Lake Sam Rayburn, Texas Anderson et al vs. Abitibi et al. (deposition and testifying expert 2005).

Real property damages from DDT contamination on residential and commercial property values in McIntosh, Alabama Adams et al vs. Ciba Specialty Chemicals Corp et al. For Lambert & Nelson Law firm, (underway)

Real property damages from water contamination on residential and commercial property values in Moss Point, MS. Hulbert et al. vs. Morton International, Rohm & Hass et al. For Mithoff Jacks Law firm, (underway).

Real property damages from creosote contamination on residential property values in Grenada Mississippi, Ellis et al. vs. Koppers et al For Lundy Davis Law firm (deposition and testifying expert, underway)

Real property damages from groundwater contamination on residential property values in Columbus, Mississippi, Vaughn et al vs. Johnson Electric Automotive et al For Lundy Davis Law firm (testifying expert)

Real property damages from a pipeline leak in Kankakee, Illinois, Quick et al vs. Shell et al. for the Cashion Law Firm, Chicago, IL (deposition, 2004).

Real property damages from a superfund landfill in Jacksonville, FL, Williams et al vs. City of Jacksonville et al. for Doffermyre Shields Canfield Knowles & Devine LLP, Atlanta, GA (2004, testifying expert and deposition, Doeboy sub-case deposition and trial testimony, 2010, underway).

Impacts of relocation of a Buick dealer in Lorain Ohio, for Nick Abraham Dealership, Elyria, OH (2004, underway, deposition)

Real property damages from a BP refinery in Neodesha, Kansas (2004, expert, underway).

Real Property Damages caused by mercury contamination in McIntosh, Alabama, Dorothy Reed et al vs. Olin Corporation et al. (testifying expert, 2004 underway, deposition).

Real Property Damages caused by lead contamination in Picher/Cardin Oklahoma, Cole et al vs. Asarco Inc. et al. (testifying expert, 2004 underway, deposition, updated reports 2007 and 2010).

Real property damages from environmental contamination on residential property values in Crystal Springs, Mississippi Kellum et al vs. Kuhlman Corp. et al (consulting expert 2004, testified at Daubert heating).

Analysis of land rent increases and associated real estate losses at Columbia Park, in Olmsted Township, Ohio, for Columbia Park Homeowners Association and Kirk Stewart, Attorney, Pojman et al vs. Columbia Brook Park Management LLC et al (2003, underway, consulting expert).

Real property damages from chicken farms to residential and commercial property values for littoral property owners on Grand Lake of the Cherokees in Oklahoma. Thompson et al vs. Tyson Foods et al (2003, testifying expert and deposition).

Real Property Damages caused by a leak from a Pipeline in Parker County, Texas, (2003, underway). McCauley vs. Chevron Pipe Line Company (testifying expert).

Real property damages from leaking underground storage tanks in Erie County, Ohio, VanRaepenbusch et al v. Sunoco, Inc., et al. (2003, testifying expert, deposition).

Real property damages from natural gas explosion in Hutchinson, Kansas. Dodge, Schmidt et al v. Kansas Gas Service Co., ONEOK, Inc. et al. (2003, testifying expert, deposition and trial).

Real property damages from a FUDS on residential property values in The District of Columbia Jach et al v. American University. (2003, expert)

69

Real property damages from leaking underground storage tanks in the District of Columbia Nnadili et al vs.Chevron (2002, testifying expert and deposition expert).

Real property damages from leaking underground storage tanks in South Carolina Fairey vs. Exxon class action suit (2002, testifying expert and deposition).

Real Property Damages caused by a Pipeline Rupture in Hunt County, Texas, (2002, underway). Abundiz et al v Explorer Pipeline et al. (testifying expert and deposition).

Real Property Damages caused by a Pipeline Rupture in Hunt County, Texas, (2002, underway). Browning et al v Explorer et al (testifying expert and deposition).

Real property damages caused by Styrene releases on the surrounding neighborhood in Covington, Kentucky class action suit Wilson v Interplastic Manufacturing Corp. (2001, underway, testifying expert and deposition).

Real property damages caused by PCB releases on the surrounding neighborhood in Anniston, Alabama, Owens v Monsanto Corp., multi-plaintiff lawsuits (2001, testifying expert and deposition).

Real Property Damages caused by PCB spills on contaminated property in Pennsylvania, (2000, underway, expert).

Real Property Damages caused by a Pipeline Rupture in Maryland, In Re Swanson Creek Oil Spill Litigation, (2001, testifying expert and deposition and testimony as an expert in real estate environmental damages in federal court on class certification).

Glen Willow Nursing Home Certificate of Need Analysis: Highest and Best use study of two existing Nursing Homes, for Roth, Rolf and Goffman (1997, testifying expert at administrative hearing in Columbus, OH).

Real Property Damages caused by Leaking Underground Storage Tanks, class action suit Peters et al vs. Amoco et al., (1997, underway, testifying expert and deposition).

Real Property Damages caused by Pipeline Ruptures, class action suit Wesley et al. vs. Colonial Pipeline Co., 1997.

Fair Housing Program needs, based upon residential location decision making and newspaper activity, Buckeye Hope et al. vs. City of Cuyahoga Falls, Ohio, (1997, testifying expert and deposition).

Real Estate analysis of suitable uses for a 29 acre property near Lost Nation Airport, Slyman vs. City of Willoughby, Ohio County Court of Common Pleas, Case # 98CV000619 (1999, expert)

70

Bio: Robert A. Simons, Ph.D.

Robert A. Simons is a Professor and former director of the Master of Urban Planning, Design and Development program at the Levin College of Urban Affairs at Cleveland State University in Cleveland, Ohio. He is also the faculty advisor for the Certificate Program in Real Estate Development and Finance, offered in conjunction with the Nance College of Business at CSU. During Fall 2005, Dr. Simons was a Fulbright Scholar at Wits University in Johannesburg, South Africa. He has also been a Lady Davis Scholar at the Technion (1999 and 2010-11). Dr. Simons received his Ph.D. from the University of North Carolina at Chapel Hill in City and Regional Planning, with an emphasis in real estate. He also holds a Master of Regional Planning and a Master of Science in Economics, both from U.N.C. His undergraduate degree in anthropology was earned at Colorado State University. He was a member of the American Institute of Certified Planners (AICP) from 1983-2009. Dr. Simons is in the inner leadership group of the American Real Estate Society (ARES), and was program chair in 2009-2010 and is President in 2011-2012. At the Levin College of Urban Affairs, Dr. Simons teaches courses in real estate development, market analysis and finance, public economics, Ph.D. research methods, environmental finance and megacities of Asia. Dr. Simons has published over 50 articles and book chapters on real estate, urban redevelopment, environmental damages, sustainable real estate, housing policy and brownfields redevelopment. He authored a book entitled Turning Brownfields into Greenbacks, (published by Urban Land Institute), and When Bad Things Happen to Good Property, (published by Environmental Law Institute in 2006), and was the lead editor for an international research monograph on Indigenous Property and Valuation (2008, ARES). Another Adaptive Reuse book has been completed. He serves as Associate Editor for the Journal of Sustainable Real Estate. Dr. Simons has an active consulting practice, and has served as an expert witness in over 60 matters related to real estate, housing markets, and environmental contamination, including over 30 depositions and several trial appearances.

71

**EXHIBIT 2:**
**DOCUMENTS I REVIEWED IN CONJUNCTION WITH THIS CASE**

Aulds, T.J. "Fact or fiction of BP chemical release," *The Galveston County Daily News*; August 9, 2010.

Center for Public Integrity and National Public Radio, 2011. Excel spreadsheet: "EPA_watchlist_data-Sept2011".

Cheremisinoff, N.P., Ph.D. "Trends in BP Texas City Refinery Flaring Practices," August 2011.

City of La Marque, Texas. Comprehensive Annual Financial Report for the Fiscal Year Ended September 30, 2010.

City of Texas City, Texas. Comprehensive Annual Financial Report for the Fiscal Year Ended September 30, 2010.

Chuoke, R. C. Multiple Listing Service residential property sales records and data sheets for Texas City, La Marque, and portions of Pasadena, Deer Park and Baytown, Texas; from 2003 through mid-October 2011.

District Court of Travis County, Texas; 261st Judicial District. Plaintiff's Original Petition, Case No. D-1-GV-10-001237: *State of Texas, Plaintiff v. BP Products North America Inc., Defendant*; August 9, 2010.

District Court of Travis County, Texas; 201st Judicial District. Plaintiff's Fifth Amended Petition and Application for Permanent Injunction, Case No. D-1-GV-09-000921: *State of Texas, Plaintiff v. BP Products North America Inc., Defendant*; February 18, 2011.

District Court of Travis County, Texas; 201st Judicial District. Agreed Final Judgment, Case No. D-1-GV-09-000921: *State of Texas, Plaintiff v. BP Products North America Inc., Defendant*; 2011.

ESRI. Demographic, Income and Market Profiles; Texas City, Texas; August 27, 2009.

Haithcoat, Michael R. (Texas State Certified General Real Estate Appraiser No. TX-1337695-G). Exterior-Only Inspection Residential Appraisal Reports, for the following properties:
    903 Ruth Circle, Texas City as of December 26, 2008;
    1219 19th Avenue North, Texas City as of December 21, 2008;
    2126 8th Avenue North, Texas City as of December 21, 2008;
    2822 19th Avenue North, Texas City as of December 26, 2008; and
    1219 Main Street, La Marque as of December 26, 2008.

Marathon Petroleum Corporation. "Marathon Texas City Refinery Fact Sheet," July 2011.

72

Morris, Jim, Chris Hamby and Elizabeth Lucas. 2011. "Many Americans left behind in the quest for cleaner air," The Center for Public Integrity, November 7, 2011, at http://www.huffingtonpost.com/the-center-for-public-integrity/many-americans-left-behin_b_1079251.html

Soil / Water / Air Protection Enterprise. (SWAPE) "Analytical Results for Dust Samples Collected at Locations in Texas City and La Marque, Texas Surrounding the BP Texas City Refinery"; letter/report dated December 21, 2010.

Soil / Water / Air Protection Enterprise. Draft emissions dispersion maps: 1-hour, 24-hour and annual concentrations of $SO_2$ (dated September 23, 2011), NOx (dated October 7, 2011) and VOCs (dated October 4, 2011).

Soil / Water / Air Protection Enterprise. Map: "7th Highest 1-Hour Concentration of $SO_2$ Based on 2009 Emissions from BP Texas City Refinery," dated November 29, 2011.

Soil / Water / Air Protection Enterprise. Draft model, "2009 and 2010 10th Highest 1-Hour Concentration of $SO_2$ at 50 $\mu g/m^3$ Threshold," prepared December 2011.

Soil / Water / Air Protection Enterprise. "Draft Summary of BP Refinery Class Action Certification Preliminary Report," December 2011.

Texas Real Estate Commission, "Seller's Disclosure of Property Condition," September 1, 2011.

U.S. Census Bureau, Census 2000 Summary File 3, selected demographic data for ZIP Codes 77590. 77591 and 77568, and other various other ZIP Codes in Texas.

United States District Court, Southern District of Texas, Galveston Division. Plaintiffs' Original Class Action Complaint: Case No. 3:10-CV-00622, *Kyle Cannon et al., Plaintiffs, v. BP Products North America, Inc., Defendant*; December 22, 2010.

**EXHIBIT 3:**
**CLASS AND CONTROL AREA MAPS**

Exhibit 3-1:
Proposed Class Area Defined by SWAPE and Sale of Residential Properties



74

Exhibit 3-2:
Control Areas for Real Estate Sales Trends Analysis



**Pasadena** and **Deer Park** Control Areas



75

Exhibit 3-3:
Class and Control Areas and Residential Sales and Zip Codes



**EXHIBIT 4:**
**PHOTOGRAPHS OF CLASS AND CONTROL AREAS**
**TAKEN ON OUR FIELD TRIP**



BP Refinery Main Entrance



Portion of the BP Refinery Complex
(toward the southwest, from corner of 5th Avenue South and 14th Street)

77



Home of Plaintiff Genaro (Eddie) Ramirez, 2126 8th Avenue North



Home of Plaintiff Eugene P. Donovan III, 1219 19th Avenue North



Home of Plaintiff Harvey Walton, 903 Ruth Circle



Control Area:  3807 Darling Avenue, Pasadena



Control Area:  4514 Sage Circle, Baytown

## EXHIBIT 5:

09-01-2011



APPROVED BY THE TEXAS REAL ESTATE COMMISSION (TREC)

# SELLER'S DISCLOSURE OF PROPERTY CONDITION

CONCERNING THE PROPERTY AT _____
(Street Address and City)

THIS NOTICE IS A DISCLOSURE OF SELLER'S KNOWLEDGE OF THE CONDITION OF THE PROPERTY AS OF THE DATE SIGNED BY SELLER AND IS NOT A SUBSTITUTE FOR ANY INSPECTIONS OR WARRANTIES THE PURCHASER MAY WISH TO OBTAIN. IT IS NOT A WARRANTY OF ANY KIND BY SELLER OR SELLER'S AGENTS.

Seller ⌐ is    ⌐ is not occupying the Property. If unoccupied, how long since Seller has occupied the Property? _____

1. The Property has the items checked below (Write Yes (Y), No (N), or Unknown (U)):

| | | |
|---|---|---|
| ___ Range | ___ Oven | ___ Microwave |
| ___ Dishwasher | ___ Trash Compactor | ___ Disposal |
| ___ Washer/Dryer Hookups | ___ Window Screens | ___ Rain Gutters |
| ___ Security System | ___ Fire Detection Equipment | ___ Intercom System |
| | ___ Smoke Detector | |
| | ___ Smoke Detector-Hearing Impaired | |
| | ___ Carbon Monoxide Alarm | |
| | ___ Emergency Escape Ladder(s) | |
| ___ TV Antenna | ___ Cable TV Wiring | ___ Satellite Dish |
| ___ Ceiling Fan(s) | ___ Attic Fan(s) | ___ Exhaust Fan(s) |
| ___ Central A/C | ___ Central Heating | ___ Wall/Window Air Conditioning |
| ___ Plumbing System | ___ Septic System | ___ Public Sewer System |
| ___ Patio/Decking | ___ Outdoor Grill | ___ Fences |
| ___ Pool | ___ Sauna | ___ Spa    ___ Hot Tub |
| ___ Pool Equipment | ___ Pool Heater | ___ Automatic Lawn Sprinkler System |
| ___ Fireplace(s) & Chimney (Woodburning) | | ___ Fireplace(s) & Chimney (Mock) |
| ___ Natural Gas Lines | | ___ Gas Fixtures |
| ___ Liquid Propane Gas: | ___ LP Community (Captive) | ___ LP on Property |
| Garage: ___ Attached | ___ Not Attached | ___ Carport |
| Garage Door Opener(s): | ___ Electronic | ___ Control(s) |
| Water Heater: | ___ Gas | ___ Electric |
| Water Supply: ___ City | ___ Well    ___ MUD | ___ Co-op |

Roof Type: _____ Age: _____ (approx)

Are you (Seller) aware of any of the above items that are not in working condition, that have known defects or that are in need of repair? ⌐ Yes ⌐ No    ⌐ Unknown    If yes, then describe. (Attach additional sheets if necessary): _____

_____

_____

TREC No. OP-H

80

Seller's Disclosure Notice Concerning the Property at _____    Page 2    09-01-2011

_____
(Street Address and City)

2.  Does the property have working smoke detectors installed in accordance with the smoke detector requirements of Chapter 766, Health and Safety Code?   ☐ Yes   ☐ No   ☐ Unknown   If the answer to this question is no or unknown, explain. (Attach additional sheets if necessary): _____

_____

_____

\*   Chapter 766 of the Health and Safety Code requires one-family or two-family dwellings to have working smoke detectors installed in accordance with the requirements of the building code in effect in the area in which the dwelling is located, including performance, location, and power source requirements. If you do not know the building code requirements in effect in your area, you may check unknown above or contact your local building official for more information. A buyer may require a seller to install smoke detectors for the hearing impaired if:  (1) the buyer or a member of the buyer's family who will reside in the dwelling is hearing impaired; (2) the buyer gives the seller written evidence of the hearing impairment from a licensed physician; and (3) within 10 days after the effective date, the buyer makes a written request for the seller to install smoke detectors for the hearing impaired and specifies the locations for the installation. The parties may agree who will bear the cost of installing the smoke detectors and which brand of smoke detectors to install.

3.  Are you (Seller) aware of any known defects/malfunctions in any of the following?   Write Yes (Y) if you are aware, write No (N) if you are not aware.

| | | |
|---|---|---|
| ___ Interior Walls | ___ Ceilings | ___ Floors |
| ___ Exterior Walls | ___ Doors | ___ Windows |
| ___ Roof | ___ Foundation/Slab(s) | ___ Basement |
| ___ Walls/Fences | ___ Driveways | ___ Sidewalks |
| ___ Plumbing Sewers/Septics | ___ Electrical Systems | ___ Lighting Fixtures |
| ___ Other Structural Components (Describe) | | |

_____

_____

If the answer to any of the above is yes, explain. (Attach additional sheets if necessary): _____

_____

_____

4.  Are you (Seller) aware of any of the following conditions?  Write Yes (Y) if you are aware, write No (N) if you are not aware.

| | |
|---|---|
| ___ Active Termites (includes wood destroying insects) | ___ Previous Structural or Roof Repair |
| ___ Termite or Wood Rot Damage Needing Repair | ___ Hazardous or Toxic Waste |
| ___ Previous Termite Damage | ___ Asbestos Components |
| ___ Previous Termite Treatment | ___ Urea-formaldehyde Insulation |
| ___ Previous Flooding | ___ Radon Gas |
| ___ Improper Drainage | ___ Lead Based Paint |
| ___ Water Penetration | ___ Aluminum Wiring |
| ___ Located in 100-Year Floodplain | ___ Previous Fires |
| ___ Present Flood Insurance Coverage | ___ Unplatted Easements |

TREC No. OP-H

81

Seller's Disclosure Notice Concerning the Property at _____   Page 3  09-01-2011
                                                      (Street Address and City)

____ Landfill, Settling, Soil Movement, Fault Lines          ____ Subsurface Structure or Pits

____ Single Blockable Main Drain in Pool/Hot Tub/Spa*        ____ Previous Use of Premises for Manufacture of
                                                                  Methamphetamine

If the answer to any of the above is yes, explain. (Attach additional sheets if necessary): _____

_____

*A single blockable main drain may cause a suction entrapment hazard for an individual.

5. Are you (Seller) aware of any item, equipment, or system in or on the Property that is in need of repair? ☐ Yes (if you are aware)

   ☐ No (if you are not aware)        If yes, explain. (Attach additional sheets if necessary): _____

_____

_____

6. Are you (Seller) aware of any of the following?  Write Yes (Y) if you are aware, write No (N) if you are not aware.

   ____ Room additions, structural modifications, or other alterations or repairs made without necessary permits or not in
        compliance with building codes in effect at that time.

   ____ Homeowners' Association or maintenance fees or assessments.

   ____ Any "common area" (facilities such as pools, tennis courts, walkways, or other areas) co-owned in undivided interest with
        others.

   ____ Any notices of violations of deed restrictions or governmental ordinances affecting the condition or use of the Property.

   ____ Any lawsuits directly or indirectly affecting the Property.

   ____ Any condition on the Property which materially affects the physical health or safety of an individual.

   ____ Any rainwater harvesting system connected to the property's public water supply that is able to be used for indoor potable
        purposes.

   If the answer to any of the above is yes, explain. (Attach additional sheets if necessary): _____

_____

_____

7. If the property is located in a coastal area that is seaward of the Gulf Intracoastal Waterway or within 1,000 feet of the mean
   high tide bordering the Gulf of Mexico, the property may be subject to the Open Beaches Act or the Dune Protection Act
   (Chapter 61 or 63, Natural Resources Code, respectively) and a beachfront construction certificate or dune protection permit
   may be required for repairs or improvements. Contact the local government with ordinance authority over construction
   adjacent to public beaches for more information.

_____          _____        _____          _____
Signature of Seller                        Date            Signature of Seller                        Date

The undersigned purchaser hereby acknowledges receipt of the foregoing notice.

_____          _____        _____          _____
Signature of Buyer                         Date            Signature of Buyer                          Date

                                                                                                    TREC No. OP-H

## EXHIBIT 6:
## REGRESSION ANALYSIS RESULTS

Exhibit 6-1:  Descriptive Statistics

| Variable | Mean | Std Dev | Minimum | Maximum |
|---|---|---|---|---|
| ln_hp | 11.42 | 0.60 | 9.31 | 13.51 |
| Sale_Price | 109622.67 | 75280.15 | 11000.00 | 734000.00 |
| ln_lot | 8.99 | 0.38 | 7.01 | 11.51 |
| Lot_Size | 8834.20 | 5584.21 | 1104.00 | 100000.00 |
| sf_sp | 64.72 | 31.05 | 10.12 | 272.49 |
| d_garage | 0.82 | 0.38 | 0.00 | 1.00 |
| ln_age | 3.33 | 0.89 | 0.00 | 4.50 |
| BR | 3.15 | 0.63 | 1.00 | 7.00 |
| d_cool | 0.97 | 0.18 | 0.00 | 1.00 |
| d_heat | 0.98 | 0.15 | 0.00 | 1.00 |
| d_pool | 0.06 | 0.24 | 0.00 | 1.00 |
| ba_full | 1.73 | 0.59 | 1.00 | 5.00 |
| ba_half | 0.25 | 0.43 | 0.00 | 1.00 |
| d_fore | 0.25 | 0.43 | 0.00 | 1.00 |
| Income | 45144.10 | 15386.01 | 17552.00 | 84897.00 |
| p_high | 30.06 | 4.61 | 9.09 | 44.57 |
| p_ba | 9.55 | 5.91 | 0.00 | 32.99 |
| Sat | 924.11 | 45.69 | 815.00 | 1031.00 |
| d_2006 | 0.21 | 0.41 | 0.00 | 1.00 |
| d_2007 | 0.18 | 0.39 | 0.00 | 1.00 |
| d_2008 | 0.17 | 0.38 | 0.00 | 1.00 |
| d_2010 | 0.15 | 0.36 | 0.00 | 1.00 |
| d_2011 | 0.13 | 0.33 | 0.00 | 1.00 |
| maj_eff_sw | 0.22 | 0.41 | 0.00 | 1.00 |

83

Exhibit 6-2:  Baseline Model

| Variable | Parameter Estimate | Standard Error | t Value | Pr > \|t\| | VIF |
|---|---|---|---|---|---|
| Intercept | 7.84909 | 0.10358 | 75.78 | <.0001 | 0 |
| ln_lot | 0.17484 | 0.00744 | 23.5 | <.0001 | 1.14151 |
| sf_sp | 0.01103 | 0.000112 | 98.67 | <.0001 | 1.74818 |
| d_garage | 0.05863 | 0.00744 | 7.88 | <.0001 | 1.18974 |
| ln_age | -0.09947 | 0.00366 | -27.15 | <.0001 | 1.54307 |
| BR | 0.13034 | 0.00508 | 25.65 | <.0001 | 1.49014 |
| d_cool | 0.20129 | 0.01786 | 11.27 | <.0001 | 1.42702 |
| d_heat | 0.09275 | 0.02059 | 4.5 | <.0001 | 1.39235 |
| d_pool | 0.05132 | 0.01134 | 4.52 | <.0001 | 1.04633 |
| ba_full | 0.22376 | 0.00593 | 37.73 | <.0001 | 1.80399 |
| ba_half | 0.14149 | 0.00663 | 21.35 | <.0001 | 1.18256 |
| d_fore | -0.15645 | 0.00684 | -22.89 | <.0001 | 1.25922 |
| income | 1.19E-06 | 3.51E-07 | 3.4 | 0.0007 | 4.22173 |
| p_high | 0.00609 | 0.000764 | 7.98 | <.0001 | 1.79958 |
| p_ba | 0.01119 | 0.001 | 11.14 | <.0001 | 5.11797 |
| sat | 0.000284 | 7.52E-05 | 3.77 | 0.0002 | 1.71239 |
| d_2006 | 0.00695 | 0.00892 | 0.78 | 0.4358 | 1.91221 |
| d_2007 | 0.00777 | 0.00912 | 0.85 | 0.3942 | 1.79704 |
| d_2008 | -0.02137 | 0.00921 | -2.32 | 0.0203 | 1.73893 |
| d_2010 | -0.00436 | 0.00961 | -0.45 | 0.6496 | 1.71954 |
| d_2011 | -0.0738 | 0.00993 | -7.43 | <.0001 | 1.60496 |
| dis_air | -1.4E-06 | 7.36E-08 | -19 | <.0001 | 2.11677 |
| d_road | 0.02253 | 0.01475 | 1.53 | 0.1267 | 1.15441 |
| d_railroad | -0.05525 | 0.02514 | -2.2 | 0.028 | 1.14204 |

Dependent variable is log of sales price. DF=6341, Adjusted R-Squared is .880, F-stat is 1935.

84

Exhibit 6-3:  Baseline Model plus Affected Area

| Variable | Parameter Estimate | Standard Error | t Value | Pr > \|t\| | VIF |
|---|---|---|---|---|---|
| Intercept | 7.83515 | 0.10348 | 75.72 | <.0001 | 0 |
| ln_lot | 0.17465 | 0.00743 | 23.51 | <.0001 | 1.14155 |
| sf_sp | 0.01096 | 0.000113 | 97.04 | <.0001 | 1.78832 |
| d_garage | 0.05592 | 0.00746 | 7.5 | <.0001 | 1.19801 |
| ln_age | -0.09828 | 0.00367 | -26.79 | <.0001 | 1.55155 |
| BR | 0.12985 | 0.00508 | 25.59 | <.0001 | 1.49089 |
| d_cool | 0.19631 | 0.01787 | 10.98 | <.0001 | 1.43285 |
| d_heat | 0.09686 | 0.02058 | 4.71 | <.0001 | 1.39526 |
| d_pool | 0.05129 | 0.01133 | 4.53 | <.0001 | 1.04633 |
| ba_full | 0.22371 | 0.00592 | 37.77 | <.0001 | 1.804 |
| ba_half | 0.14142 | 0.00662 | 21.37 | <.0001 | 1.18256 |
| d_fore | -0.15873 | 0.00685 | -23.19 | <.0001 | 1.26651 |
| income | 1.27E-06 | 3.51E-07 | 3.64 | 0.0003 | 4.23424 |
| p_high | 0.00646 | 0.000767 | 8.42 | <.0001 | 1.82126 |
| p_ba | 0.01111 | 0.001 | 11.07 | <.0001 | 5.1198 |
| Sat | 0.000295 | 7.51E-05 | 3.92 | <.0001 | 1.71434 |
| d_2006 | -0.00465 | 0.00929 | -0.5 | 0.6166 | 2.08213 |
| d_2007 | -0.00398 | 0.00949 | -0.42 | 0.6753 | 1.95358 |
| d_2008 | -0.03342 | 0.0096 | -3.48 | 0.0005 | 1.89527 |
| d_2010 | -0.00599 | 0.0096 | -0.62 | 0.5327 | 1.72212 |
| d_2011 | -0.07543 | 0.00993 | -7.6 | <.0001 | 1.60722 |
| dis_air | -1.3E-06 | 7.88E-08 | -16.17 | <.0001 | 2.4344 |
| d_road | 0.02636 | 0.01476 | 1.79 | 0.0741 | 1.15848 |
| d_railroad | -0.0543 | 0.02511 | -2.16 | 0.0306 | 1.14212 |
| maj_eff_sw | -0.04864 | 0.01113 | -4.37 | <.0001 | 1.6299 |

Dependent variable is log of sales price. DF=6342, Adjusted R-Squared is .880, F-stat is 1937.

maj_eff_sw = all sales within SWAPE Boundary,
all sales after January 1, 2009 to mid-October 2011.

Exhibit 6-4:  Baseline **Model With** Interaction **Between Distance And** Sale

| Variable | Parameter Estimate | Standard Error | t Value | Pr > \|t\| | VIF |
|---|---|---|---|---|---|
| Intercept | 7.83582 | 0.10363 | 75.61 | <.0001 | 0 |
| ln_lot | 0.17485 | 0.00744 | 23.51 | <.0001 | 1.14151 |
| sf_sp | 0.01103 | 0.000112 | 98.64 | <.0001 | 1.74897 |
| d_garage | 0.05865 | 0.00744 | 7.89 | <.0001 | 1.18974 |
| ln_age | -0.09924 | 0.00366 | -27.09 | <.0001 | 1.54384 |
| BR | 0.12999 | 0.00508 | 25.59 | <.0001 | 1.49108 |
| d_cool | 0.19956 | 0.01786 | 11.17 | <.0001 | 1.42875 |
| d_heat | 0.09235 | 0.02058 | 4.49 | <.0001 | 1.39241 |
| d_pool | 0.05102 | 0.01134 | 4.5 | <.0001 | 1.04643 |
| ba_full | 0.22372 | 0.00593 | 37.74 | <.0001 | 1.804 |
| ba_half | 0.14162 | 0.00662 | 21.38 | <.0001 | 1.18262 |
| d_fore | -0.15667 | 0.00683 | -22.93 | <.0001 | 1.25938 |
| income | 1.16E-06 | 3.51E-07 | 3.32 | 0.0009 | 4.22513 |
| p_high | 0.00612 | 0.000763 | 8.02 | <.0001 | 1.79992 |
| p_ba | 0.01128 | 0.001 | 11.23 | <.0001 | 5.12376 |
| sat | 0.000299 | 7.54E-05 | 3.97 | <.0001 | 1.7213 |
| d_2006 | 0.00676 | 0.00891 | 0.76 | 0.4484 | 1.91233 |
| d_2007 | 0.00765 | 0.00911 | 0.84 | 0.4009 | 1.79708 |
| d_2008 | -0.02148 | 0.0092 | -2.33 | 0.0196 | 1.73896 |
| d_2010 | -0.00434 | 0.0096 | -0.45 | 0.6511 | 1.71954 |
| d_2011 | -0.06823 | 0.01013 | -6.74 | <.0001 | 1.66997 |
| dis_air | -1.4E-06 | 7.40E-08 | -18.6 | <.0001 | 2.14198 |
| d_road | 0.02434 | 0.01476 | 1.65 | 0.0992 | 1.15663 |
| d_railroad | -0.05829 | 0.02515 | -2.32 | 0.0205 | 1.14419 |
| maj15175_11 | -0.08257 | 0.02963 | -2.79 | 0.0053 | 1.09594 |

Dependent variable is log of sales price. DF=6,342, Adjusted R-Squared is .880, F-stat is 1933.

Maj15175_11 =  all sales within designated class boundary between 1.25-1.75 miles from BP Refinery boundary, only sales between January 1 and mid-October 2011.

**EXHIBIT 7:**
**RESIDENTIAL CONTINGENT VALUATION SURVEY INSTRUMENT**
**USED IN THIS CASE**

**Texas Case #5**

Hello, my name is _____ with _____, a research firm based in Salt Lake City. We are conducting a brief survey for a professor from a university in Cleveland, Ohio, examining the impact of different kinds of information upon real estate appraisal practices. All responses are confidential; do you have a few moments to participate?                                      Y/N _____

1.    First, I would like to read some examples of factors that people might consider in making a purchase decision on a home. Using a scale of –3 to +3, where –3 represents an important negative factor, 0 is neutral or not important, and +3 represents a very important positive factor, please tell me how important each factor would be to you in making a decision about purchasing a home.

_____ 1a. Quality of public schools
_____ 1b. Property taxes
_____ 1c. Presence of environmental problems for the property
_____ 1d. Location of property in relation to shopping
_____ 1e. Structural integrity of house
_____ 1f. Natural beauty of property's land

2a.   Are there any other factors that you would rate a +3 or -3? _____
2b.   Which of these factors would be most important to you
      (including any you may have mentioned)? _____
2c.   Which would be second most important?   _____
2d.   Which would be third most important?     _____

3.    Suppose a job change required you to move to a different location. You need to find a home quickly and have been looking for some time. In looking for a home you find one that is very similar to the one you live in now. If the neighborhood is also very similar to the one you live in now, what is the most you would be willing to offer for the home?                                      $_____

*Now I am going to give you several different scenarios. These scenarios are "what if" situations. Each one is completely independent of the others. In other words, the conditions in one description do not exist in any of the other descriptions. For each scenario, imagine we are talking about the house you just described. Everything about the home and the area it is located in is the same as for your home except for the additional factors we name in the scenario. After I have read you each scenario I will ask you a few questions about it. OK?*

87

**Scenario A – Business Park** (do not read title aloud)

The first scenario:
The house is located near a business park made up of single story retail and wholesale businesses. These include a furniture store, a carpet store and a glass store that sells to both building contractors and individual residential customers. The buildings in the business park are attractive and the property is landscaped with numerous trees. The business park is located a block away from the house you are looking at buying. Except for this one factor the rest of the neighborhood is like yours, and the house is very similar to your house.

4.    Using the scale from –3 where you would be very unlikely to make an offer to +3 where you would be very likely to make an offer, how likely is it that you would make *any* offer on this home?

|        Likely        |    |    |   |    |    |       Likely        |
|     Would Not        |    |    |   |    |    |        Would         |
| -3 | -2 | -1 | 0 | +1 | +2 | +3 |

5.    What is the *most* you would be willing to pay for the home?          $_____

**Scenario W1t – LUST** (do not read title aloud)

The next scenario:
The home is located about five blocks from a closed gasoline service station. The site of the station has been registered as having had leaking underground storage tanks. The house you are considering is on municipal drinking water. The house lot is located where groundwater from below the service station could flow underneath it. Results of environmental testing showed that detectable levels of MTBE (a component of gasoline that is suspected of causing health problems) has migrated from the service station under the house lot. No active plans are currently underway to remove the MTBE from under the house. Except for this one factor the rest of the neighborhood is like yours, and the home is very similar to your home.

6.    Using the same –3 to +3 scale, how likely is it that you would make *any* offer on this home?

|        Likely        |    |    |   |    |    |       Likely        |
|     Would Not        |    |    |   |    |    |        Would         |
| -3 | -2 | -1 | 0 | +1 | +2 | +3 |

7.    What is the *most* you would be willing to pay for the home?          $_____

88

**Scenario GG1 – Petroleum Refinery** (do not read title aloud)

The next scenario:

*The home is located about half a mile from an operating petroleum refinery, which is in an industrial area. The 1,200 acre refinery processes crude oil and produces a variety of gasoline and energy products. About a year ago, the plant had an equipment malfunction that led to the release of over 500,000 pounds of PAH (Polycyclic Aromatic Hydrocarbons), toluene and benzene (hazardous substances regulated by the United States Environmental Protection Agency) and potentially other chemicals, into the air. The refinery reported over 70 releases into the air since 2009, including a dozen over the amount allowed by their permits. Because of this, the refinery faced more than 45 enforcement actions from the Texas Commission on Environmental Quality. The house you are looking at buying was tested and detectable levels of PAH were found in the air conditioning filter system. Except for this issue, the neighborhood is like yours, and the house is very similar to your house.*

8.    Using the same −3 to +3 scale, how likely is it that you would make *any* offer on this home?

|     Likely     |     |     |     |     |     |     Likely     |
| Would Not |     |     |     |     |     | Would |
| -3 | -2 | -1 | 0 | +1 | +2 | +3 |

9.    What is the *most* you would be willing to pay for the home?              $_____

**Scenario EE2 – Landfill** (do not read title aloud)

The next scenario:

The property is about 2½ miles from an operating municipal waste sanitary landfill. The 260-acre facility is fenced off. Within the last ten years, odors became noticeable near the landfill. It turns out that a fire caused by chemical reactions in aluminum waste is smoldering there, and it has not been put out. The landfill was declared a public nuisance and fined over ten million dollars by the state Environmental Protection Agency for improper management of the landfill. There have been continuing violations, and over 300 residential citizen odor complaints were reported from summer of 2008 through 2010. Typical complaints were of a burning smell, several times a month, and some complained that they could not stay outside. The landfill operator has been partially successful in containing the fire, and odor complaints in the past year are down substantially. However, no plans have been finalized to put out the fire. Except for this issue, the neighborhood is like yours, and the house is very similar to your house.

89

10. Using the same −3 to +3 scale, how likely is it that you would make **any** offer on this home?

| Likely<br>Would Not | | | | | | Likely<br>Would |
|---|---|---|---|---|---|---|
| -3 | -2 | -1 | 0 | +1 | +2 | +3 |

11. What is the **most** you would be willing to pay for the home?          $_____

12. Assuming you had to purchase one of these homes, which one would you choose first?

_____  The one near the business park
_____  The one near the gasoline service station
_____  The one near the petroleum refinery
_____  The one near the landfill

## Demographics
We have just a few more quick questions about you.

13. Which of the following best describes your current neighborhood?

_____  Entirely residential
_____  Primarily residential with a little commercial or industrial
_____  A mixture of residential and commercial or industrial
_____  Rural or other

14. What is your age?

20-29 ___        30-39 ___        40-49 ___        50-59 ___        60-69 ___        70+ ___

15. Please tell me your highest level of education:

_____  High school or less        _____  College grad
_____  High school grad           _____  Post graduate
_____  Some college               _____  Refused

16. How many people currently live in your household?     _____

17. What is your recent annual household income?     _____  Refused ___
                                                      range by $10,000
                                                      increments up to $150,000

18. Gender:                                          Male ___  Female ___

90

19.  Would you classify your ethnicity or race as:

_____  White/Caucasian          _____  Other
_____  African-American         _____  Multiple races
_____  Hispanic                 _____  Refused

20.  May I have your Zip Code?                     _____

21.  May I have the name of the county in which you live?_____

22.  May I have the value of your present house?     $_____   Refused ___

Those are all the questions I have for you.  Thank you for your time.


## Texas Case #6

Hello, my name is _____ with _____, a research firm based in Salt Lake City.  We are conducting a brief survey for a professor from a university in Cleveland, Ohio examining the impact of different kinds of information upon real estate appraisal practices.  All responses are confidential; do you have a few moments to participate?                     Y/N _____

1.   First, I would like to read some examples of factors that people might consider in making a purchase decision on a home.  Using a scale of −3 to +3, where −3 represents an important negative factor, 0 is neutral or not important, and +3 represents a very important positive factor, please tell me how important each factor would be to you in making a decision about purchasing a home.

_____  1a. Quality of public schools
_____  1b. Property taxes
_____  1c. Presence of environmental problems for the property
_____  1d. Location of property in relation to shopping
_____  1e. Structural integrity of house
_____  1f. Natural beauty of property's land

2a.  Are there any other factors that you would rate a +3 or -3? _____
2b.  Which of these factors would be most important to you
     (including any you may have mentioned)? _____
2c.  Which would be second most important?  _____
2d.  Which would be third most important?    _____

91

3.    Suppose a job change required you to move to a different location. You need to find a home quickly and have been looking for some time. In looking for a home you find one that is very similar to the one you live in now. If the neighborhood is also very similar to the one you live in now, what is the most you would be willing to offer for the home?    $_____

*Now I am going to give you several different scenarios. These scenarios are "what if" situations. Each one is completely independent of the others. In other words, the conditions in one description do not exist in any of the other descriptions. For each scenario, imagine we are talking about the house you just described. Everything about the home and the area it is located in is the same as for your home except for the additional factors we name in the scenario. After I have read you each scenario I will ask you a few questions about it. OK?*

## Scenario A – Business Park (do not read title aloud)

The first scenario:
The house is located near a business park made up of single story retail and wholesale businesses. These include a furniture store, a carpet store and a glass store that sells to both building contractors and individual residential customers. The buildings in the business park are attractive and the property is landscaped with numerous trees. The business park is located a block away from the house you are looking at buying. Except for this one factor the rest of the neighborhood is like yours, and the house is very similar to your house.

4.    Using the scale from –3 where you would be very unlikely to make an offer to +3 where you would be very likely to make an offer, how likely is it that you would make **any** offer on this home?

| Likely Would Not | | | | | | Likely Would |
|---|---|---|---|---|---|---|
| -3 | -2 | -1 | 0 | +1 | +2 | +3 |

5.    What is the **most** you would be willing to pay for the home?    $_____

## Scenario GG1 – Petroleum Refinery (do not read title aloud)

The next scenario:
*The home is located about half a mile from an operating petroleum refinery, which is in an industrial area. The 1,200 acre refinery processes crude oil and produces a variety of gasoline and energy products. About a year ago, the plant had an equipment malfunction that led to the release of over 500,000 pounds of PAH (Polycyclic Aromatic Hydrocarbons), toluene and benzene (hazardous substances regulated by the United States Environmental Protection Agency) and potentially other chemicals, into the air. The refinery*

92

*reported over 70 releases into the air since 2009, including a dozen over the amount allowed by their permits. Because of this, the refinery faced more than 45 enforcement actions from the Texas Commission on Environmental Quality. The house you are looking at buying was tested and detectable levels of PAH were found in the air conditioning filter system. Except for this issue, the neighborhood is like yours, and the house is very similar to your house*

6.   Using the same −3 to +3 scale, how likely is it that you would make *any* offer on this home?

|  Likely | | | | | Likely | |
| Would Not | | | | | Would | |
| -3 | -2 | -1 | 0 | +1 | +2 | +3 |

7.   What is the *most* you would be willing to pay for the home?    $_____

### Scenario EE2 – Landfill (do not read title aloud)

The next scenario:
The property is about 2½ miles from an operating municipal waste sanitary landfill. The 260-acre facility is fenced off. Within the last ten years, odors became noticeable near the landfill. It turns out that a fire caused by chemical reactions in aluminum waste is smoldering there, and it has not been put out. The landfill was declared a public nuisance and fined over ten million dollars by the state Environmental Protection Agency for improper management of the landfill. There have been continuing violations, and over 300 residential citizen odor complaints were reported from summer of 2008 through 2010. Typical complaints were of a burning smell, several times a month, and some complained that they could not stay outside. The landfill operator has been partially successful in containing the fire, and odor complaints in the past year are down substantially. However, no plans have been finalized to put out the fire. Except for this issue, the neighborhood is like yours, and the house is very similar to your house.

8.   Using the same −3 to +3 scale, how likely is it that you would make *any* offer on this home?

|  Likely | | | | | Likely | |
| Would Not | | | | | Would | |
| -3 | -2 | -1 | 0 | +1 | +2 | +3 |

9.   What is the *most* you would be willing to pay for the home?    $_____

93

**Scenario W1t – LUST** (do not read title aloud)

The next scenario:
The home is located about five blocks from a closed gasoline service station. The site of the station has been registered as having had leaking underground storage tanks. The house you are considering is on municipal drinking water. The house lot is located where groundwater from below the service station could flow underneath it. Results of environmental testing showed that detectable levels of MTBE (a component of gasoline that is suspected of causing health problems) has migrated from the service station under the house lot. No active plans are currently underway to remove the MTBE from under the house. Except for this one factor the rest of the neighborhood is like yours, and the home is very similar to your home.

10.  Using the same −3 to +3 scale, how likely is it that you would make **any** offer on this home?

| Likely | | | | | Likely | |
| Would Not | | | | | Would | |
| -3 | -2 | -1 | 0 | +1 | +2 | +3 |

11.  What is the **most** you would be willing to pay for the home?        $_____

12.  Assuming you had to purchase one of these homes, which one would you choose first?

_____ The one near the business park
_____ The one near the petroleum refinery
_____ The one near the landfill
_____ The one near the gasoline service station

**Demographics**
We have just a few more quick questions about you.

13.  Which of the following best describes your current neighborhood?

_____ Entirely residential
_____ Primarily residential with a little commercial or industrial
_____ A mixture of residential and commercial or industrial
_____ Rural or other

14.  What is your age?

20-29 ___        30-39 ___        40-49 ___        50-59 ___        60-69 ___        70+ ___

94

15. Please tell me your highest level of education:

    _____ High school or less    _____ College grad
    _____ High school grad    _____ Post graduate
    _____ Some college    _____ Refused

16. How many people currently live in your household?   _____

17. What is your recent annual household income?   _____ Refused ___
                                  range by $10,000
                           increments up to $150,000

18. Gender:                 Male ___   Female ___

19. Would you classify your ethnicity or race as:

    _____ White/Caucasian    _____ Other
    _____ African-American    _____ Multiple races
    _____ Hispanic    _____ Refused

20. May I have your Zip Code?            _____

21. May I have the name of the county in which you live?_____

22. May I have the value of your present house?   $_____ Refused ___

Those are all the questions I have for you. Thank you for your time.

95

**Texas Case #7**

Hello, my name is _____ with _____, a research firm based in Salt Lake City.  We are conducting a brief survey for a professor from a university in Cleveland, Ohio, examining the impact of different kinds of information upon real estate appraisal practices.  All responses are confidential; do you have a few moments to participate?                                                 Y/N _____

1.    First, I would like to read some examples of factors that people might consider in making a purchase decision on a home.  Using a scale of –3 to +3, where –3 represents an important negative factor, 0 is neutral or not important, and +3 represents a very important positive factor, please tell me how important each factor would be to you in making a decision about purchasing a home.

_____    1a.  Quality of public schools
_____    1b.  Property taxes
_____    1c.  Presence of environmental problems for the property
_____    1d.  Location of property in relation to shopping
_____    1e.  Structural integrity of house
_____    1f.  Natural beauty of property's land

2a.    Are there any other factors that you would rate a +3 or -3? _____

2b.    Which of these factors would be most important to you
(including any you may have mentioned)? _____

2c.    Which would be second most important?    _____

2d.    Which would be third most important?    _____

3.    Suppose a job change required you to move to a different location.  You need to find a home quickly and have been looking for some time.  In looking for a home you find one that is very similar to the one you live in now.  If the neighborhood is also very similar to the one you live in now, what is the most you would be willing to offer for the home?                                      $_____

*Now I am going to give you several different scenarios.  These scenarios are "what if" situations.  Each one is completely independent of the others.  In other words, the conditions in one description do not exist in any of the other descriptions.  For each scenario, imagine we are talking about the house you just described.  Everything about the home and the area it is located in is the same as for your home except for the additional factors we name in the scenario.  After I have read you each scenario I will ask you a few questions about it.  OK?*

96

**Scenario A – Business Park** (do not read title aloud)

The first scenario:
The house is located near a business park made up of single story retail and wholesale businesses. These include a furniture store, a carpet store and a glass store that sells to both building contractors and individual residential customers. The buildings in the business park are attractive and the property is landscaped with numerous trees. The business park is located a block away from the house you are looking at buying. Except for this one factor the rest of the neighborhood is like yours, and the house is very similar to your house.

4.    Using the scale from –3 where you would be very unlikely to make an offer to +3 where you would be very likely to make an offer, how likely is it that you would make **any** offer on this home?

| | | | | | | |
|---|---|---|---|---|---|---|
| Likely<br>Would Not | | | | | | Likely<br>Would |
| -3 | -2 | -1 | 0 | +1 | +2 | +3 |

5.    What is the **most** you would be willing to pay for the home?        $_____

**Scenario HH2 – Petroleum Refinery** (do not read title aloud)

The next scenario:
*The home is located about a mile and three-quarters from an operating petroleum refinery, which is in an industrial area. The 1,200 acre refinery processes crude oil and produces a variety of gasoline and energy products. About a year ago, the plant had an equipment malfunction that led to the release into the air of over 500,000 pounds of sulfur dioxide, nitrogen dioxide, sulfuric acid, toluene, benzene, and PAH (Polycyclic Aromatic Hydrocarbons), which are hazardous substances regulated by the United States Environmental Protection Agency. The refinery reported over 70 releases into the air since 2009, including a dozen over the amount allowed by their permits. Because of this, the refinery faced more than 45 enforcement actions from the Texas Commission on Environmental Quality, and recently settled the case for $50 million. A public school within five blocks of the house you are looking at was ranked as being in the worst 5 percent for air quality in the US. Except for this issue, the neighborhood is like yours, and the house is very similar to your house.*

6.    Using the same –3 to +3 scale, how likely is it that you would make **any** offer on this home?

| | | | | | | |
|---|---|---|---|---|---|---|
| Likely<br>Would Not | | | | | | Likely<br>Would |
| -3 | -2 | -1 | 0 | +1 | +2 | +3 |

97

7.    What is the *most* you would be willing to pay for the home?    $_____

**Scenario W1t – LUST** (do not read title aloud)

The next scenario:
The home is located about five blocks from a closed gasoline service station. The site of the station has been registered as having had leaking underground storage tanks. The house you are considering is on municipal drinking water. The house lot is located where groundwater from below the service station could flow underneath it.    Results of environmental testing showed that detectable levels of MTBE (a component of gasoline that is suspected of causing health problems) have migrated from the service station under the house lot.  No active plans are currently underway to remove the MTBE from under the house. Except for this one factor the rest of the neighborhood is like yours, and the home is very similar to your home.

8.    Using the same –3 to +3 scale, how likely is it that you would make *any* offer on this home?

|      Likely      |      |      |      |      |      Likely      |      |
|   Would Not   |      |      |      |      |   Would   |      |
|   -3   |   -2   |   -1   |   0   |   +1   |   +2   |   +3   |

9.    What is the *most* you would be willing to pay for the home?    $_____

**Scenario JJ – Hydraulic Fracturing** (do not read title aloud)

The next scenario:
The property is located at the edge of town.  Last year, an energy company bought the rights to inject a pressurized mix of water, sand and chemicals into a lower groundwater aquifer to try to recover natural gas trapped under the property you are looking at buying.  This is called hydraulic fracturing, or fracking.  The drilling and injection equipment for this procedure is over one-quarter mile away, and is visible from the house.  The house is on well water from a shallow aquifer, separate from the lower aquifer the natural gas is being recovered from.  This process is expected to go on for 5 years.  Except for this issue, the neighborhood is like yours, and the house is very similar to your house.

10.   Using the same –3 to +3 scale, how likely is it that you would make *any* offer on this home?

|      Likely      |      |      |      |      |      Likely      |      |
|   Would Not   |      |      |      |      |   Would   |      |
|   -3   |   -2   |   -1   |   0   |   +1   |   +2   |   +3   |

11.   What is the *most* you would be willing to pay for the home?    $_____

98

12. Assuming you had to purchase one of these homes, which one would you choose first?

_____ The one near the business park
_____ The one near the petroleum refinery
_____ The one near the gasoline service station
_____ The one near the fracking drill site

## Demographics
We have just a few more quick questions about you.

13. Which of the following best describes your current neighborhood?

_____ Entirely residential
_____ Primarily residential with a little commercial or industrial
_____ A mixture of residential and commercial or industrial
_____ Rural or other

14. What is your age?

20-29 ___    30-39 ___    40-49 ___    50-59 ___    60-69 ___    70+ ___

15. Please tell me your highest level of education:

_____ High school or less       _____ College grad
_____ High school grad          _____ Post graduate
_____ Some college              _____ Refused

16. How many people currently live in your household?    _____

17. What is your recent annual household income?    _____  Refused ___
                                                     range by $10,000
                                                   increments up to $150,000

18. Gender:                                    Male ___  Female ___

19. Would you classify your ethnicity or race as:

_____ White/Caucasian       _____ Other
_____ African-American      _____ Multiple races
_____ Hispanic              _____ Refused

20. May I have your Zip Code?                 _____

21. May I have the name of the county in which you live?_____

22. May I have the value of your present house?    $_____  Refused ___

Those are all the questions I have for you.  Thank you for your time.

**Texas Case #8**

Hello, my name is _____ with _____, a research firm based in Salt Lake City. We are conducting a brief survey for a professor from a university in Cleveland, Ohio examining the impact of different kinds of information upon real estate appraisal practices. All responses are confidential; do you have a few moments to participate?                                    Y/N _____

1.    First, I would like to read some examples of factors that people might consider in making a purchase decision on a home. Using a scale of –3 to +3, where –3 represents an important negative factor, 0 is neutral or not important, and +3 represents a very important positive factor, please tell me how important each factor would be to you in making a decision about purchasing a home.

_____    1a. Quality of public schools
_____    1b. Property taxes
_____    1c. Presence of environmental problems for the property
_____    1d. Location of property in relation to shopping
_____    1e. Structural integrity of house
_____    1f. Natural beauty of property's land

2a.    Are there any other factors that you would rate a +3 or -3? _____

2b.    Which of these factors would be most important to you
(including any you may have mentioned)? _____

2c.    Which would be second most important?  _____

2d.    Which would be third most important?    _____

3.    Suppose a job change required you to move to a different location. You need to find a home quickly and have been looking for some time. In looking for a home you find one that is very similar to the one you live in now. If the neighborhood is also very similar to the one you live in now, what is the most you would be willing to offer for the home?                          $_____

*Now I am going to give you several different scenarios. These scenarios are "what if" situations. Each one is completely independent of the others. In other words, the conditions in one description do not exist in any of the other descriptions. For each scenario, imagine we are talking about the house you just described. Everything about the home and the area it is located in is the same as for your home except for the additional factors we name in the scenario. After I have read you each scenario I will ask you a few questions about it. OK?*

100

**Scenario A – Business Park** (do not read title aloud)

The first scenario:
The house is located near a business park made up of single story retail and wholesale businesses. These include a furniture store, a carpet store and a glass store that sells to both building contractors and individual residential customers. The buildings in the business park are attractive and the property is landscaped with numerous trees. The business park is located a block away from the house you are looking at buying. Except for this one factor the rest of the neighborhood is like yours, and the house is very similar to your house.

4.   Using the scale from –3 where you would be very unlikely to make an offer to +3 where you would be very likely to make an offer, how likely is it that you would make *any* offer on this home?

|  | Likely Would Not |  |  |  |  | Likely Would |  |
|---|---|---|---|---|---|---|---|
|  | -3 | -2 | -1 | 0 | +1 | +2 | +3 |

5.   What is the *most* you would be willing to pay for the home?          $_____

**Scenario W1t – LUST** (do not read title aloud)

The next scenario:
The home is located about five blocks from a closed gasoline service station. The site of the station has been registered as having had leaking underground storage tanks. The house you are considering is on municipal drinking water. The house lot is located where groundwater from below the service station could flow underneath it. Results of environmental testing showed that detectable levels of MTBE (a component of gasoline that is suspected of causing health problems) have migrated from the service station under the house lot. No active plans are currently underway to remove the MTBE from under the house. Except for this one factor the rest of the neighborhood is like yours, and the home is very similar to your home.

6.   Using the same –3 to +3 scale, how likely is it that you would make *any* offer on this home?

|  | Likely Would Not |  |  |  |  | Likely Would |  |
|---|---|---|---|---|---|---|---|
|  | -3 | -2 | -1 | 0 | +1 | +2 | +3 |

7.   What is the *most* you would be willing to pay for the home?          $_____

101

**Scenario HH2 – Petroleum Refinery** (do not read title aloud)

The next scenario:

*The home is located about a mile and three-quarters from an operating petroleum refinery, which is in an industrial area. The 1,200 acre refinery processes crude oil and produces a variety of gasoline and energy products. About a year ago, the plant had an equipment malfunction that led to the release into the air of over 500,000 pounds of sulfur dioxide, nitrogen dioxide, sulfuric acid, toluene, benzene, and PAH (Polycyclic Aromatic Hydrocarbons), which are hazardous substances regulated by the United States Environmental Protection Agency. The refinery reported over 70 releases into the air since 2009, including a dozen over the amount allowed by their permits. Because of this, the refinery faced more than 45 enforcement actions from the Texas Commission on Environmental Quality, and recently settled the case for $50 million. A public school within five blocks of the house you are looking at was ranked as being in the worst 5 percent for air quality in the US. Except for this issue, the neighborhood is like yours, and the house is very similar to your house.*

8.   Using the same –3 to +3 scale, how likely is it that you would make *any* offer on this home?

| Likely Would Not | | | | | | Likely Would |
|---|---|---|---|---|---|---|
| -3 | -2 | -1 | 0 | +1 | +2 | +3 |

9.   What is the *most* you would be willing to pay for the home?     $_____

**Scenario JJ – Hydraulic Fracturing** (do not read title aloud)

The next scenario:
The property is located at the edge of town. Last year, an energy company bought the rights to inject a pressurized mix of water, sand and chemicals into a lower groundwater aquifer to try to recover natural gas trapped under the property you are looking at buying. This is called hydraulic fracturing, or fracking. The drilling and injection equipment for this procedure is over one-quarter mile away, and is visible from the house. The house is on well water from a shallow aquifer, separate from the lower aquifer the natural gas is being recovered from. This process is expected to go on for 5 years. Except for this issue, the neighborhood is like yours, and the house is very similar to your house.

102

10.  Using the same −3 to +3 scale, how likely is it that you would make **any** offer on this home?

|          |        |        |        |        |        |          |
|----------|--------|--------|--------|--------|--------|----------|
| Likely   |        |        |        |        |        | Likely   |
| Would Not |       |        |        |        |        | Would    |
| -3       | -2     | -1     | 0      | +1     | +2     | +3       |

11.  What is the **most** you would be willing to pay for the home?          $_____

12.  Assuming you had to purchase one of these homes, which one would you choose first?

_____ The one near the business park
_____ The one near the petroleum refinery
_____ The one near the fracking drill site
_____ The one near the gasoline service station

**Demographics**
We have just a few more quick questions about you.

13.  Which of the following best describes your current neighborhood?

_____ Entirely residential
_____ Primarily residential with a little commercial or industrial
_____ A mixture of residential and commercial or industrial
_____ Rural or other

14.  What is your age?

20-29 ___      30-39 ___      40-49 ___      50-59 ___      60-69 ___      70+ ___

15.  Please tell me your highest level of education:

_____ High school or less      _____ College grad
_____ High school grad      _____ Post graduate
_____ Some college      _____ Refused

16.  How many people currently live in your household?      _____

17.  What is your recent annual household income?      _____ Refused ___
                                                        range by $10,000
                                                        increments up to $150,000

18.  Gender:                                             Male ___ Female ___

103

19.  Would you classify your ethnicity or race as:

_____ White/Caucasian      _____ Other
_____ African-American     _____ Multiple races
_____ Hispanic             _____ Refused

20.  May I have your Zip Code?                    _____

21.  May I have the name of the county in which you live? _____

22.  May I have the value of your present house?    $_____ Refused ___

Those are all the questions I have for you.  Thank you for your time.

**EXHIBIT 8:**
**RESIDENTIAL CONTINGENT VALUATION SURVEY –**
**ANALYSIS OF PRELIMINARY RESPONSES**

| Bidding Scenario | Percent Bidding | Average Discount | Top Half Discount | Top Quarter Discount |
|---|---|---|---|---|
| Business park: | | | | |
| Wave 1 (complete) | 85% | 16% | 0% | -3% |
| Wave 2 (partial; n = 111 of 200) | 83% | 14% | -2% | -3% |
| | | | | |
| Closed gasoline service station with leaking underground storage tanks (LUST); gasoline components in groundwater on subject property; house on municipal drinking water: | | | | |
| Wave 1 (complete) | 32% | 50% | 31% | 18% |
| Wave 2 (partial; n = 111 of 200) | 20% | 50% | 32% | 24% |
| | | | | |
| Refinery Scenario 1: Half a mile from refinery; multiple chemical releases; PAH in house ducts (Wave 1, complete) | 34% | 40% | 20% | 7% |
| | | | | |
| Refinery Scenario 2: 1-3/4 miles from refinery; multiple chemical releases; $50 million settlement; air quality at nearby school among worst 5% in U.S. (Wave 2, partial; n = 111 of 200) | 28% | 32% | 11% | 0% |
| | | | | |
| Municipal waste sanitary landfill 2-1/2 miles away, with smoldering aluminum fire and odors (Wave 1, complete) | 27% | 45% | 26% | 15% |
| | | | | |
| Hydraulic fracturing injection site one-quarter mile away; house on well water (Wave 2, partial; n = 111 of 200) | 25% | 36% | 17% | 9% |

Preliminary response sample size: 200 for Scenario 1 (complete); 111 for Scenario 2 (partial). Final survey results to include 200 responses to each refinery scenario.

Note: Negative discounts for the business park scenario reflect premiums attached to the location by some survey respondents.

105

**EXHIBIT 9:**
**PLAINTIFF SURVEY INSTRUMENT USED IN THIS CASE**

**Plaintiff Real Estate Survey:**
**BP Refinery Case – Texas City, TX**

Name: _____

Mailing Address: _____

Property Address: _____

Permanent Parcel Number(s); include vacant lots: _____

_____

Telephone Number _____

1. In what year did you buy or come to own this property?        _____

2. Dollar amount paid (put $0 if gift or inheritance):        $ _____

3. Do you think emissions/contamination from the BP Refinery has caused a change in your property values?        ❏ Yes        ❏ No

4. If yes:    What kind of change? _____
   How much? _____
   Why? _____

**ATTEMPTS TO SELL PROPERTY**

5. Have you tried to sell the property since 2008?    ❏ Yes (*answer questions 6 through 11*)
   ❏ No (*skip ahead to question 12*)

6. Did you list it with a realtor?        ❏ Yes    ❏ No
   If not listed, what did you do to try to sell the house? _____

   _____

7. What was the original list price (or your asking price if not listed)?        $ _____

8. Did you get any offers?        ❏ Yes    ❏ No

9. What price did you get?        $ _____        What month/year was it? _____

10. When you tried to sell the property, did you disclose the emissions/contamination from the BP Refinery to potential buyers? (If yes, include documentation if available.)        ❏ Yes        ❏ No

11. Did any potential buyer withdraw their offer after learning of the emissions/contamination from the BP Refinery?        ❏ Yes        ❏ No

106

If yes, please describe the circumstances: _____

_____

_____

## REFINANCING

12.  Do you currently have a mortgage loan on this property?          ❑ Yes    ❑ No

If yes, with what bank? _____

13.  Have you attempted to refinance the house since 2008?          ❑ Yes    ❑ No

14.  If yes:    In what year(s)? _____

Did you disclose the emissions/contamination from the BP
refinery to the lender when you sought the loan?          ❑ Yes    ❑ No

Was the loan request granted?          ❑ Yes    ❑ No

If not granted, what reasons were given for the denial?

_____

_____

## RESIDENCE/RENTAL USE

15.  Do you currently live in this property, or do you rent it out? _____

> *If this is rental property, or if you live there and rent part of it out,
> please continue with question 16.  If this property is your residence
> (with no rental use), skip ahead to question 26.*

### *For rental property ...*

16.  How many units are in this property? _____

17.  Do you disclose the emissions/contamination from the
BP Refinery to potential renters?          ❑ Yes    ❑ No

### *Please fill out one set of answers for each unit ...*

18.  If for rent, was the property occupied in August 2011?          ❑ Yes    ❑ No

19.  If occupied, what rental rate did you get, per month, in August 2011?    $ _____

20.  Was it occupied in August 2010?          ❑ Yes    ❑ No

21.  If occupied, what rental rate did you get, per month in August 2010?    $ _____

22.  Was the property occupied in August 2009?          ❑ Yes    ❑ No

107

23. If occupied, what rental rate did you get, per month in August 2009?    $_____

24. Was it occupied in August 2008?    ❑ Yes    ❑ No

25. If occupied, what rental rate did you get, per month in August 2008?    $_____

## USE AND ENJOYMENT

26. About how many days per year are you required to stay indoors because of petroleum flaring or other emissions/contaminant releases from the BP Refinery? _____

27. Has any environmental testing been done on your property?    ❑ Yes    ❑ No
    If yes, please describe the results and provide documentation if available:

    _____

    _____

28. Have you submitted a claim for house-washing to BP (or an agent they indicated you should contact) as a result of petroleum-flaring releases from the refinery since December 2008?    ❑ Yes    ❑ No

    a. If yes, was the claim granted?    ❑ Yes    ❑ No

    b. If granted, how much did you receive?   $_____   When?_____

29. Have you noticed unusual odors in your neighborhood as a result of petroleum-flaring/emissions from the BP refinery since December 2008?    ❑ Yes    ❑ No

    If yes, about how often have you noticed those odors since December 2008? _____

30. Have the emissions/contamination from the BP Refinery changed your use and enjoyment of the property (gardening, outdoor activities in yard, additional cleaning, etc.)?    ❑ Yes    ❑ No

    If yes, how? _____

    _____

31. Have you halted (or decided not to begin) any improvement project(s) to your home or property as a result of petroleum-flaring emissions from the BP refinery since December 2008?    ❑ Yes    ❑ No

    a. If yes, briefly describe the project(s): _____

    _____

    b. How much money did you have invested in (or did you plan to invest in) the halted or delayed project(s)?    $_____

108

32. In your opinion has any property damage been caused by the emissions/contamination from the BP Refinery?  If yes, how much will it cost to repair the damage?

|  | | Yes/No | Cost to Fix Problem |
|---|---|---|---|
| a. | Rapid corrosion of outside metal (screens/gutters) or roofing | _____ | $_____ |
| b. | Found unclean material on my property | _____ | $_____ |
| c. | Unable to garden | _____ | $_____ |
| d. | Landscaping (trees/shrubs/flowers/grass) diseased or died | _____ | $_____ |
| e. | Other: _____ | _____ | $_____ |

**DISCLOSURE**

33. If you were to list the property for sale today, would you feel obligated to disclose the emissions/contamination from the BP Refinery to potential buyers?  ❑ Yes  ❑ No

34. Are there any other comments you wish to make at this time?

_____

_____

_____

_____

_____

_____

THANK YOU FOR YOUR TIME.

Please verify the above information is correct by signing below.

_____     _____
*Signature*                                                        *Date*

109